PD 365

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. JUAN JARMON, et al. Defendant. | Case No. 2:17-cr-00072-PD -1 -3 |
| | U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106 |
| | June 26, 2018, 9:57 a.m. |

PRETRIAL MOTIONS HEARING
BEFORE THE HONORABLE PAUL S. DIAMOND
UNITED STATES DISTRICT JUDGE

FILED
AUG - 6 2018
KATE BARKMAN, Clerk
By KH Dep. Clerk

APPEARANCES:

| | |
|---|---|
| For the Plaintiff United States: | YVONNE O. OSIRIM, ESQ.<br>U.S. ATTORNEY'S OFFICE<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106 |
| For Defendant Edward Stinson: | PAUL HETZNECKER, ESQ.<br>1420 Walnut Street, Suite 911<br>Philadelphia, PA 19102 |
| For Defendant Juan Jarmon: | MAUREEN C. COGGINS, ESQ.<br>MAUREEN C. COGGINS, ATTORNEY AT LAW<br>509 Swede Street<br>Norristown, PA 19404 |
| Audio Operator: | BRIAN JOHNSON |
| TRANSCRIBED BY: | KELLI RAY, CER-349, CET-349<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FL 32753<br>833-800-LCTV |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

DH

# I N D E X


| | PAGE |
|---|---|
| DEFENDANT JARMON'S REQUEST TO REPLACE MS. COGGINS | 3 |
| STARKS MOTION | 5 |
| GOVERNMENT'S WITNESS: | |
| SCOTT BABER | |
| Direct examination by Ms. Osirim | 8 |
| Cross examination by Mr. Hetznecker | 15 |
| Cross examination by Ms. Coggins | 24 |
| Redirect examination by Ms. Osirim | 31 |
| Recross examination by Ms. Coggins | 35 |
| Recross examination by Mr. Hetznecker | 37 |
| Redirect examination by Ms. Osirim | 43 |
| Recross examination by Mr. Hetznecker | 45 |
| Redirect examination by Ms. Osirim | 48 |
| Recross examination by Ms. Coggins | 49 |
| Redirect examination by Ms. Osirim | 52 |
| Recross examination by Ms. Coggins | 53 |
| Redirect examination by Ms. Osirim | 54 |
| Recross examination by Mr. Hetznecker | 57 |
| Direct examination by Ms. Osirim (Recalled) | 73 |
| COURT LIFTS SEPARATION ORDER | 62 |
| ARGUMENT | |
| By Ms. Coggins | 62 |
| By Mr. Hetznecker | 64 |
| By Ms. Osirim | 64 |
| COURT RULING | 65 |
| 404(b) MOTION | 68 |
| ARGUMENT | |
| By Mr. Hetznecker | 81 |
| CERTIFIED TRANSCRIBER'S CERTIFICATE | 86 |

| EXHIBITS | ID. | EVD. |
|---|---|---|
| (NONE OFFERED.) | | |

(Call to Order of the Court.)

JUDGE PAUL S. DIAMOND: All right. Please be seated, everybody.

MR. PAUL J. HETZNECKER: Good morning, Your Honor.

MS. MAUREEN C. COGGINS: Good morning, Your Honor.

THE COURT: Good morning to all. We are here to conduct a hearing on a number of motions that have been filed by all three parties. I thought I would begin with Mr. Jarmon's request that I replace Ms. Coggins.

I would ask everybody who -- the Government and Mr. Hetznecker to leave the room, and this portion of the transcript will be sealed.

Why don't we swear Mr. Jarmon?

(Defendant Juan Jarmon sworn.)

DEFENDANT JARMON: Yes.

THE COURT DEPUTY: Please state your full name for the record?

THE DEFENDANT: Juan Jarmon.

THE COURT: Please be seated, Mr. Jarmon. I have a letter, a handwritten letter, dated July 17th of this year, that purports to be from you asking me to replace Ms. Coggins. Did you write that letter?

DEFENDANT JARMON: Yes.

THE COURT: Do you want me to replace your lawyer?

DEFENDANT JARMON: No.

THE COURT: So you withdraw what you've said here in this letter?

DEFENDANT JARMON: Yes.

THE COURT: Okay. No need to seal the transcript.

Could we bring everybody back in, please? Very good.

THE CLERK: Counsel will be right back in, Judge.

THE COURT: Thank you. Is Mr. Hetznecker in the neighborhood?

THE COURT DEPUTY: He's out there, Your Honor.

THE COURT: Okay. Great, swell. Aw, Mr. Hetznecker. Okay. The defendant has withdrawn -- Mr. Jarmon has withdrawn his request to replace counsel, and so there's no need to seal any part of the record.

I thought that we would begin with those motions that affect both defendants, and -- and with a number of motions that only relate to Mr. Stinson who -- are we bringing him up?

THE COURT DEPUTY: Yes, Your Honor.

THE COURT: Okay.

Mr. Hetznecker, are you going to need any time to talk to your client?

MR. HETZNECKER: Just a moment. I talked to him downstairs. I think we're -- we're okay.

THE COURT: Okay.

Okay. Mr. Stinson has entered the courtroom. I thought we would first address motions that relate to both

defendants.

The Government has filed a Starks motion. Does the Defense oppose the granting of the Starks motion?

MR. HETZNECKER: May I have a moment, Your Honor?

THE COURT: Yes.

MR. HETZNECKER: No, Judge, we'll have to have a Starks hearing.

THE COURT: Ms. Coggins?

MS. COGGINS: Your Honor, as long as it's a co-defendant is asking for a hearing, then we'll have a hearing as well.

THE COURT: Mr. Hetznecker is not opposing the motion.

MR. HETZNECKER: No, I am opposing the motion.

THE COURT: Oh, you are opposing the motion. I apologize.

MR. HETZNECKER: Yeah, we have to have a hearing. No, yeah.

THE COURT: Very well, I apologize.

MR. HETZNECKER: No, I'm sorry.

THE COURT: Ms. Osirim, you're up.

MS. YVONNE OSIRIM: Thank you, Your Honor.

The defendant did file -- I'm sorry, the Government did file two motions to admit audio and video recordings in this case. The categories of recordings that we had asked to

admit at trial include Title III wire intercepts. They included controlled delivery buys, they included a video recording of a statement given by defendant Edward Stinson.

And we asked at one point for the Defense to identify if there were any particular calls, recordings, or videos about which they challenged authenticity. Because we have not received information about any particular calls or recordings, or videos in this case, I would ask that we be able to present testimony based on these categories of information, and then we can argue these motions at that point.

MR. HETZNECKER: Your Honor, two things. One is obviously the content or the --

THE COURT: Separate question --

MR. HETZNECKER: -- separate questions all together.

THE COURT: -- about whether stuff is admissible under the rules of evidence.

MR. HETZNECKER: Correct.

THE COURT: This is purely authentication.

MR. HETZNECKER: And I'll make those objections at trial. If the Court finds that the tapes are authenticated, then I'll make my proper objections based on the tapes.

THE COURT: Right now I simply want to know from the Defense whether or not the Government may proceed --

MR. HETZNECKER: They can proceed.

THE COURT: -- purely with respect to

authentication --

MR. HETZNECKER: Absolutely, yes.

THE COURT: -- in the matter its proving.

MR. HETZNECKER: Yes, I'm ready.

THE COURT: You got to let me finish the sentence, Mr. Hetznecker. I know how aggressive you are. So that you -- you have no objections to the Government's proposal?

MR. HETZNECKER: None.

THE COURT: Ms. Coggins?

MS. COGGINS: No, Your Honor.

THE COURT: Very well. Ms. Osirim?

MS. OSIRIM: Thank you.

The Government first calls as it's witness FBI Special Agent Scott Baber.

THE COURT: Very well.

MS. OSIRIM: Your Honor, would you like to move to the podium or may I remain at counsel table?

THE COURT: Where -- you don't have to stand, wherever you're most comfortable.

MS. OSIRIM: Okay. Thank you, Your Honor.

THE COURT: And that goes for all counsel, there's no need to stand.

MS. COGGINS: Thank you, Your Honor.

SCOTT BABER, GOVERNMENT'S WITNESS, SWORN

THE WITNESS: I do.

THE COURT DEPUTY: Please state your full name and spell your last name for the record?

THE WITNESS: Scott Baber, B-A-B-E-R.

DIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, can you please tell this Court what you do for a living?

A I'm a Special Agent with the FBI.

Q And how long have you been a special agent with the FBI?

A For approximately 12 years.

Q As a special agent with the FBI can you generally describe your duties and responsibilities?

A Conduct investigations of alleged violations of federal law.

Q Over the course of your work with the FBI, have you been assigned to various units within the FBI?

A Yes.

Q And what are those units?

A I've been assigned to Obama Crime Squad. I've been assigned to a narcotics squad. And currently I'm assigned to an organized crime squad.

Q Okay. As a part of your work as a special agent with the FBI, were you assigned to a case captioned United States vs. Juan Jarmon, et al?

A Yes.
Q And were you, in fact, the case agent on that case?
A Yes.
Q Are you familiar with pieces of the evidence that were gathered during the investigative period in that case?
A Yes.
Q And did some of that evidence include Title III wire intercepts of telephone calls attributable to members of targets of that investigation?
A Yes.
Q Okay. Are you aware of whether or not a federal judge issued orders authorizing the interception of wire communications to and from cellular telephone numbers for periods beginning in 2013 and 2014?
A Yes.
Q Okay. Pursuant to those orders, did telephone service providers AT&T and T-Mobile accurately identify telephone numbers to be intercepted?
A Yes.
Q Did they, in fact, send real time data from those numbers to federal agents?
A Yes.
Q How were you able to -- did you, in fact, listen to any of the real time data that was provided to federal agents in this case?

A Yes.
Q Okay. And was that done in real time as you were sitting in a wire room?
A Yes.
Q Can you describe for the Court what a wire room is?
A Yes. A wire room is a room, excuse me, full of computers. And these computers are stand alone terminals, that is they are not connected to the internet or any other system, and are solely designed to receive data that comes in from a telephone provider pursuant to a court authorized Title III interception of wire electronic communications. And that data comes in, in real time and is monitored by individuals up to 24 hours a day, 7 days a week. And every call that comes in which is monitored is also recorded. And those sitting at the terminal have no way of editing or altering that data that comes in, but rather monitoring it, and minimizing where necessary pursuant to all.
Q During the course of your participation in this case, as you sat in these wire rooms, were you familiar with the equipment that was used to record these calls that were coming in?
A Yes.
Q Can you describe how these calls were recorded and preserved during that process?
A Yes. The calls come in via the telephone provider to a server that does not -- is not actually in the wire room. And

that server is separate and apart from the monitor stations that were used by monitors. The calls themselves were placed on a remote server and stored there and recorded and preserved, and could not be altered or accessed in any way by the monitors. The monitors who sat at a computer terminal, like myself, would simply listen to the real data that was piped over the server from the telephone provider. And that data came in as it was, it could not be changed or edited in any way.

Q Okay. During the course of your participation in this investigation, while you were sitting in that wire room, at any point in time were you alerted by either of the telephone service providers that their machinery had malfunctioned, or could not operate in any way?

A No.

Q At any point in time were you alerted to an instance where your own machinery, the computers that the FBI and the DEA were relying on, had malfunctioned or that data had been corrupted as it was being sent to that room?

A No.

Q Okay. Is there a technical ability to tamper with the information that is being provided in real time as it's coming in?

A No.

Q Okay. So essentially the recordings that you are hearing

are tamperless?
A Correct.
Q Okay. Did you listen to each of the calls as they were coming in?
A Yes.
Q And at a later point in time did you have an opportunity to review these calls, as well as prepare transcripts of the details from these calls?
A Yes.
Q Okay. When you reviewed these transcripts for each of the calls, did you believe that these transcripts were accurate representations of what you heard, in fact, on that wire?
A Yes.
Q Okay. Did the transcripts accurately reflect the individuals whose voices they were attributing?
A Yes.
Q Okay.
MR. HETZNECKER: Objection, Judge. I think there's a lack of foundation on that question and answer. I don't how he can make that --
THE COURT: I got it. Why don't you lay the foundation?
MS. OSIRIM: Certainly, Your Honor.
BY MS. OSIRIM:
Q During the course of your investigation, did you have an

opportunity to listen to, and even view video recordings of targets of the investigation as they communicated with others?

A Yes.

Q Did some of these include video recordings of controlled purchases of narcotics?

A Yes.

Q During times where you viewed controlled purchases of narcotics -- I'm sorry, during controlled purchases can you explain --

THE COURT: Why don't I -- I would like if counsel agree to do this in segments. He may well be able to testify to other categories of evidence, but when he's done with the T3s I'd like the two of you to cross-examine. And then I assume you're going to have him testify --

MS. OSIRIM: Yes.

THE COURT: -- to other categories?

MS. OSIRIM: Yes, Your Honor.

THE COURT: During the course of your investigation did you have occasion to learn what particular target's voices sounded like?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. And so when Ms. Osirim asks you whether or not the transcripts that you reviewed, and that were prepared attributed the correct words to the correct person, you were able to, you said that it did?

THE WITNESS: Yes, Your Honor.

THE COURT: And that was because of your familiarity with their voices based on other events in this investigation?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Why don't you move on?

MS. OSIRIM: Okay.

BY MS. OSIRIM:

Q You've mentioned that you were familiar with voices of individuals who were targeted during the course of this investigation; is that correct?

A Yes.

Q And were you, in fact, familiar with the voices of the defendants seated here, Juan Jarmon and Edward Stinson?

A Yes.

Q Were they individuals whose phone conversations were intercepted as a part of this investigation?

A Yes.

Q Okay. Once these phone calls were intercepted and information was transferred through the wire, how was that information preserved?

A The original information that came in placed on the server was then downloaded and recorded to a Blu-ray disc. That original disc was then taken to the court, and sealed under review of the court, and is maintained to this day with the court. Original copies of those were maintained as evidence

with both the FBI and the DEA.

MS. OSIRIM: Okay. I don't think I have any further questions, Your Honor, on this point.

THE COURT: All right. This is on the T3 -- the authenticity of the T3 intercept recordings.

Who would like to question first?

MR. HETZNECKER: I'll do it, Judge. Thanks.

THE COURT: Very well.

CROSS-EXAMINATION

BY MR. HETZNECKER:

Q Good morning, Agent.

A Good morning.

Q Let me just review a couple of things that you've said. You said that the server the telecommunications companies, based on court order, then send the information, is that a hard line to the FBI wire room?

A First, just to clarify, it was actually a DEA wire room that it was run out of.

Q I'm sorry. Okay.

A But, just yeah, just for clarification purposes. It -- it's the information is piped from the provider through a, in this case a DEA server, which then allows us to listen to those calls real time. Whether it's a hard line or done remotely, I'm not sure.

Q Okay. So the DEA server is set up particularly for this

purpose?

A Correct, yes.

Q In fact, solely for this purpose, am I correct?

A Yes.

Q To receive only the information from the telecommunications company directly to the DEA --

A Yes.

Q -- once an order -- a warrant has been issued?

A Yes, that's correct.

Q Okay. Now you said you were a monitor. There were a number of monitors I take it?

A That's correct, yes.

Q And so the monitor, just so we're clear about this, the monitor sits there, hears the conversation in real time, correct?

A Yes.

Q But then later on would also listen to conversations and create a transcript, is that correct?

A Yes.

Q Who creates the transcripts, specifically? Is it you, other monitors --

THE COURT: Is the -- does the -- does the Starks motion have to deal with the transcripts?

MR. HETZNECKER: Well, I --

THE COURT: Because, what I'm going to tell the jury,

as you know Mr. Hetznecker --

MR. HETZNECKER: I do.

THE COURT: -- assuming I grant the motion, and I haven't made a decision yet, is you're going to hear certain recordings, the transcript is being provided for your convenience, if there's any discrepancy between what you read and what you hear, what you hear controls. That is what I'm going to tell the jury, so do -- if you want to get into it, go ahead. But I'm not sure we need to.

MR. HETZNECKER: I'm not going to waste a lot of time on it, but there is a reason for me to ask this question.

THE COURT: Go ahead. Go ahead. Go ahead.

BY MR. HETZNECKER:

Q So, Agent, just with respect to the transcripts, so I can lay a foundation for my following questions, because I want to make sure I have this on the record. In the real time role that you played in listening to the conversations, did you prepare notes that would end up becoming a transcript later on or did you prepare transcript as you listened to them?

A The former, so notes would be prepared, typed in a box, a pop-up box on the voice box software system that we used to monitor. That's so that the monitor can take real time notes as the calls come through. Once the call is completed, at some point, it could be immediately thereafter, or it could be the next day, depending on how busy it was over a given shift, then

a transcript of that call, verbatim transcript could be prepared. And that's possible because then the monitor can go back, listen to the call and start and stop the call as necessary to have an accurate transcript.

Q All right. So the notes are essentially to flag those conversations, which would be pertinent, is that correct?

A That's one reason, yes.

Q And maybe write down a couple of the comments that were made during the course of that conversation?

A Yes.

Q But then the subsequent transcript would be prepared based on a review of that tape recording later on, is that correct?

A Yes.

Q Now, my question to you, as you sit here now, on the T3, on the wire tape transcripts, that were prepared by you --

A Some were by me, yes.

Q We'll get to the others.

A Sure.

Q But the ones that were prepared by you --

A Um-hum.

Q -- how many mistakes were made?

A I have no idea, Counselor.

Q Well, when you say you don't have any idea, you -- you, based on his Honor's question, specifically about how you identified voices, and you identified voices based on a number

of sources, not just the T3, correct?

A Correct.

Q So when you first sat and listened to a conversation between parties over the wire tap, without ever -- having had ever heard their voices, you relied on other information to identify them, either based on their initials or something else, is that correct?

THE COURT: Mr. Hetznecker, I understand why you would want to elicit this information, I just don't know why you want to do it now. I'm not sure what this has to do with the authenticity of the recordings. You're talking about the accuracy of the transcript and whether or not mistakes were made in a variety of ways including attribution of certain words to certain people.

MR. HETZNECKER: Um-hum.

THE COURT: What does that have to do with the Starks motion?

MR. HETZNECKER: It's tied in on one of the seven elements. One of the elements has to do with whether or not the voices as identified are -- are actually the persons that are speaking. So one of the -- one of the -- one of the --

THE COURT: All right. Go ahead.

MR. HETZNECKER: All right.

BY MR. HETZNECKER:

Q So just so we're clear about this, so as you sit here now

reflecting back on --

THE COURT: I believe that the -- the criteria of that particular factor is the speakers are identified. That's all it is. I'm not sure it's any further than that.

MR. HETZNECKER: I'll take the Court's direction, whatever you'd like. I don't -- I don't --

THE COURT: I don't want to foreclose you, this is certainly a legitimate area of cross-examination at trial. But if you want to go ahead now, go ahead.

MR. HETZNECKER: I won't spend a lot of time, Your Honor.

THE COURT: Okay.

MR. HETZNECKER: I just want to -- I just want to just identify this and I'll move on.

BY MR. HETZNECKER:

Q Just so we're clear, so in the course of your conduct -- the course of your listening to the recordings on the T3, were there mistakes made in terms of identifying the voices and attributing them to particular individuals?

A Yes.

Q Okay. And how did you rectify those mistake?

A We rectify those a couple ways, they might be rectified later on during the course of our investigation, where we identified a person's true name, who had been previously known by only a nickname.

Q Right.

A Or they might be identified later on with a cooperator, someone who's assisting our investigation who knew the voices, could listen to those calls, and identify that person as John Doe, or whoever it was on a particular recording.

Q All right. And just to follow up briefly, as you sit here now, you don't know which particular transcript and recordings were -- reflected those mistakes that were initially made by the monitors either by you or someone else?

A That's correct.

Q All right. So --

THE COURT: As far as you're aware, is the identification, or are the identifications of the speakers in these intercepts accurate now?

THE WITNESS: Yes, Your Honor, as far as I know they are accurate now.

THE COURT: All right.

BY MR. HETZNECKER:

Q So when you say as far as you know, because I think that's an operative question -- and I'm going to follow up on his Honor's question. As far as you know, what you're saying is you don't have as you sit here now, based on not just your review of the T3 intercepts, but based on other information that you mentioned, including the cooperators identifying voices. As you sit here now, you don't know if, in fact,

there's been a mistake, do you?
A I don't know, correct.
Q Fair enough. So just again on the T3, so we can just -- I'll finish up my line of cross-examination on this. Do you have a number, an exact number, of those phone calls in which you monitored individually, yes or no?
A No, I don't, as I sit here, no.
Q Okay. Is there a record in which you keep that's a part of a catalog for those monitors who monitor particular phone calls, and then prepare transcripts?
A There would be a -- I want to make sure I understand you question.
Q A log, I guess a log.
A Yes there would be a log, because in order to log in to the computer voice box system, one must have a unique login and password. And the voice box system tracks who is the live monitor so if there's a question about what happened during a particular interception, then that monitor can be asked about that. So there would be a log that would indicate when I was monitoring, what shifts I monitored, how long I monitored during the course of the wire.
Q All right. And so the transcripts that are prepared initially are then edited later on?
A Yes, that's fair to say.
Q And frequently more than once?

A Yes.

Q And those edits, are they dated in the log or not?

A No, they would not be dated in the log.

Q All right. So if I stand before you with a transcript now on a particular phone conversation, you probably couldn't tell me whether it was edited, how many times it was edited, and when it was edited, fair?

MS. OSIRIM: Objection, I'm sorry this does not relate to the authenticity of the --

MR. HETZNECKER: I'm almost done, I'm only --

THE COURT: Don't be shocked, Ms. Osirim, I think he's trying to get a little discovery. I'll allow you to continue briefly, Mr. Hetznecker.

BY MR. HETZNECKER:

A Counselor. I'm sorry, Counselor. So you're saying if I had a physical transcript in front of me would I know how many times if it was edited -- if it was edited and by whom; is that -- I want to make --

Q And when. And when.

A And when? No, I would not, I would not be able to determine that.

MR. HETZNECKER: Thank you. I have no further questions.

THE COURT: Thank you, Mr. Hetznecker.

Ms. Coggins?

MS. COGGINS: Thank you, Your Honor. Just a few questions.

THE COURT: Very good.

CROSS-EXAMINATION

BY MS. COGGINS:

Q Sir, when you had testified before that you had listened to each call as they came in, you weren't listening to every single phone call as it came in real time, correct?

A Well -- to clarify, that's correct, Counselor. The ones I would have been listening to were the ones I listened to during the times that I was sitting on a shift or monitoring. But every live call that came in during the course of the wire, no, I would not have listened to every live call as it came in during the wire.

Q Because you would have had to be up 24 hours a day for several weeks, correct?

A Yes, Counselor.

Q How many other agents were there that were assigned to listening, just like you did, sitting in a room listening to the phone calls?

A I couldn't give you an exact number, but there were approximately 20 or 25 different agents or task force officers, or contract monitors who were utilized to act as real time monitors.

Q And they were monitoring a certain telephone call, so when

a telephone number would come in on real time, they would then note whose name was associated with that telephone number; is that correct?

A Yes.

Q So it wasn't necessarily that they had recognized the person's voice, they would just recognize that, that name was associated with that telephone number, is that correct?

A That could be, but they could also recognize the voice. They might immediately hear a voice and recognize the voice as someone that they knew to be John Doe based on our previous investigation.

THE COURT: If I can interrupt? As far as you know, how long into this T3 wire tap did it take the investigators to identify the voices of these two defendants?

THE WITNESS: I couldn't give you a date, Your Honor. I could say that very quickly we were able to identify, particularly as it pertains to, my recollection, for Juan Jarmon, because there had been controlled purchases of drugs from him, where audio and video was captured of him. So I specifically, and other monitors were able to attribute that voice to him.

THE COURT: You recognized the voices of these two gentlemen, you collectively, recognized the voices of these two gentlemen early on?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

MS. COGGINS: May I followup on your question, Your Honor?

THE COURT: Absolutely.

MS. COGGINS: Thank you.

BY MS. COGGINS:

Q So that was one of my line of questions. At what point during these phone calls do you -- do you have an exact date, did it go several days before you recognized my client's voice? Did you -- you obviously you said didn't recognize it right away, is that correct?

A I think we would have recognized your client's voice right away, Counselor, because it was your client's phone number that was the -- that was the target or the focus of the Title III wire intercept. So based on our investigation and the affidavit that was written, we had to attribute that phone number to a particular individual. And the phone number that we attributed it -- excuse me, the person to whom we attributed was your client. So therefore, when the first calls began to come through, I believe in approximately August of 2013, it would become readily apparent and known that it would have your client using that telephone, because it was for his number that we wrote the affidavit.

Q Correct. Because in the affidavit of probable cause you stated that you had gotten that phone number from a

confidential informant who had made several buys, allegedly made several buys from my client, is that correct?
A Yes.
Q And those clients, I believe you alleged occurred, started occurring back at the end of May, is that correct?
A I believe it was early May, the first week in May 2013, were the first controlled purchases of narcotics from your client.
Q You would agree with me that the conversations that you claimed to recognize my client's voice with a confidential informant, there really wasn't a whole lengthy conversation, is that correct? In any of those phone calls?
A Are you saying in the phone calls or in the controlled purchases?
Q I'm sorry, in the video recordings the -- the oral part of the video recordings of the undercover buys?
A I suppose it depends on one's definition of lengthy, but they were not particularly long, in my assessment, long conversations between your client and the -- and the confidential informant that we utilized.
Q And most of the, what you attribute to my client, in those video recording, the oral, the audio portion, most of that, those phone calls didn't last more than 20 seconds, 25 seconds, is that fair to say?
A Again, are you saying -- I want to make sure I'm answering

your question properly. Are you asking about the phone calls, the intercepted phone calls, or the -- the discussion that your client would have had that was recorded with?

Q On the video.

A On the video.

Q Yes.

A Those would have been relatively short conversations, yes.

Q In some instances maybe even just a sentence, is that fair to say?

A Some were very short, yes.

Q And in the light of those video recordings of the undercover buys, you don't ever see my client's face, is that correct?

A I can't say a lot, I believe that there's at least one controlled purchase of narcotics where your client's face may not have been captured. I know that there were some where his face certainly was captured though.

Q So basically -- okay. So in those situations, in order to establish that the voice on those videos was my client, and in addition, the audio portions -- let me take it one at a time. On the video portions where you're attributing a conversation to my client, was that partially you're determining that was my client came from the confidential informant's information?

A In part, yes.

Q Okay. In addition to that, I think in the affidavit of

probable cause you had also used audio, prior to the wire tap, confidential informant would call a number attributed to my client, or vice versa. In those instances, you're claiming that you used that also as background to establish that this is my client's voice on the calls that are in question today, is that correct?

A Yes.

Q Okay. That again is information that you would have to take on the word of the confidential informant, correct?

A What we would take for the word of the confidential informant is when the confidential informant would come back from say a controlled purchase of narcotics. He or she would tell investigators this is the phone number that I received from your client. Now that would be verified by a review by myself or other agents involved in the investigation, of the audio/video that was captured where your client was providing a phone number saying this is my phone number to the confidential informant. So that was both provided verbally by the confidential informant, but then verified by us or -- through our review of the audio/video recording.

Q Because the phone that the confidential informant was telling you was given to him by Juan Jarmon actually was registered to someone else?

THE COURT: Ms. Coggins, I think that we're going well beyond what is proper for Starks hearing. If the voices

on the audio tapes, if the Defense at trial intends to dispute that the voices on the audio tapes are those of the defendants, we're going to have to figure out a way, I think, to take voice exemplars from your clients to be introduced, because it's the jury's decision in the end, regardless of what the transcripts say. The jury has to decide whether or not the people the Government identifies as Jarmon and Stinson are in fact Jarmon and Stinson. But I don't think, I'm prepared to be corrected by counsel, I don't think you need to go a whole lot further on whether or not -- the voices have been identified according to this man's testimony, in accordance with Starks. Whether or not every single conversation is accurately -- every speaker is accurately identified, I don't think we have to go into that at a Starks hearing, but I'm always prepared to be educated by counsel.

MS. COGGINS: Just two more questions, Your Honor?

THE COURT: Okay.

MS. COGGINS: Thank you.

BY MS. COGGINS:

Q Sir, in this case you've listened to thousands of phone calls, is that correct?

A Yes.

Q And we're talking about maybe a hundred participants on those phone calls, is that fair to say?

A It's a fair assessment, yes.

Q And would you say 95 percent are male?
A Yes.
Q Thank you.

MS. COGGINS: I have no other questions, Your Honor.

THE COURT: Okay. Does the Government intend to introduce any additional evidence with respect to the T3?

MS. OSIRIM: No, Your Honor.

THE COURT: Okay. Do counsel wish to be heard -- you know what I think, I think why don't we go through everything, and then you can make argument at the end, does that make sense?

MR. HETZNECKER: That's fine.

MS. COGGINS: Yes, Your Honor.

THE COURT: Okay. You're going to a different area now?

MS. OSIRIM: Yes. As Ms. Coggins had already begun this line of questioning, we might as well talk about the recordings made of controlled purchases.

THE COURT: The -- oh, controlled -- you're talking about consensual recordings?

MS. OSIRIM: Yes.

THE COURT: Okay. Go ahead.

REDIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, during the course of this

investigation, did you conduct through the use of confidential sources, controlled purchases of crack cocaine from targets of this investigation?

A Yes.

Q During the course of that investigation, was one of the targets from whom controlled purchases of crack cocaine were made Juan Jarmon?

A Yes.

Q Can you explain to the Court how, if at all, those controlled purchases were surveilled and recorded?

A Yes. Prior to conducting any controlled purchase of narcotics, investigators would meet with a confidential informant who would be searched for any contraband, that can include money, drugs, or any other recording device that he or she might want to bring. Once the person has been searched, the person, that confidential informant was then provided with money that the government would provide in order to purchase the drugs, as well as a surreptitious recording device.

In addition to the surreptitious recording device, the confidential informant would be provided a transmitter, that would transmit in real time the audio only of what was going on. That was for the safety of the informant in case something happened where we needed to come in and try to rescue the informant. The recording device would be activated by law enforcement, a preamble would be given, that is stating who was

present, the date, and time. And then the informant would be dropped off at a safe location, in this particular situation walk to the area of the Bomberg Apartments with the audio/video recording devices recording what was going on, both audio and video.

Once the confidential informant had completed meeting with the target, in this case defendant Jarmon, and purchasing the controlled -- completing the controlled purchase of narcotics, the informant would come back and the recording device would be shut off by law enforcement. The informant would be searched for any contraband, the narcotics, if any, would be removed from the person. Any cash that might be left over would be taken and it would documented.

Then the device on which the recording was made would be taken back and maintained at all times by law enforcement. It would be downloaded onto a disk and treated as evidence, and the original would be placed in evidence of the FBI or DEA, and it would remain there with a copy available to law enforcement for review.

Q At any point in time during the controlled purchases that were initiated during the course of this investigation, did you learn that the recording devices, the surreptitious recording device for audio, as well as the small camera that was used to obtain video had malfunctioned during the course of a controlled purchase?

A No.
Q Did you learn at any point in time that either had malfunctioned, or corrupted the data they contained after, immediately following the controlled purchase when the items were returned to the FBI?
A No.
Q You mentioned that these items were maintained and stored as evidence. Does that mean that the only individuals who had access to these items after the completion of the controlled purchase were other law enforcement officers?
A Yes.
Q And these items have been maintained at the FBI's evidence locker, is that correct?
A Some would be at FBI original, some would be at DEA evidence.
Q At any point in time following the return of these items to FBI and DEA, were they -- were the recordings themselves altered, modified, or tampered with?
A No.
Q Did you have an opportunity to review the video recordings, as well as the audio recordings after the completion of these controlled purchases?
A Yes.
Q And in your review of these materials, after the completion, did they -- were they consistent with what you were

hearing in real time as you listened to the audio during the controlled purchase?

A Yes.

Q Okay. And based on seeing video of individuals involved in a controlled purchase, did that assist in your ability to identify voices and faces of those involved in this investigation?

A Yes.

Q Okay.

MS. OSIRIM: No further questions.

THE COURT: Go ahead --

MS. COGGINS: Okay.

THE COURT: -- Ms. Coggins.

MS. COGGINS: Thank you, Your Honor.

RECROSS EXAMINATION

BY MS. COGGINS:

Q Sir, with regard to the tapes that you just testified to, are there additional tapes other than the -- where you start with the person in the van and then the person goes out and then the person comes back to the van and it's shut off? Are there additional tapes of say that single control buy?

A Like audio/video recordings that --

Q No.

A -- we would capture?

Q For example, is there a video of the search prior to the

confidential informant going -- your starting the tape?
A No.
Q Is there a reason for that?
A I don't know that there's a particular reason for that. It's not necessary by policy. It's -- an informant is searched by an agent with another witness to ensure that there's no contraband on that informant. But that search in and of itself is not videotaped, no.
Q How about this -- is there a videotape of the search of the CI when they come back to the van?
A No.
Q Is there a video of the money or the drugs that were allegedly taken or given to the confidential informant?
A It depends on the situation. Sometimes it -- there will be audio/video or video captured of the narcotics and -- that are recovered from an individual, and sometimes they're not.
Q So I'm not talking about during the transaction, I'm talking about after the person comes back to the van. Is the -- the drugs are laid out and videotaped?
MS. OSIRIM: Objection, Your Honor. I don't think this --
THE COURT: Overruled, overruled.
BY MS. COGGINS:
A Sometimes there are -- sometimes that is done and sometimes it is not done.

Q Was that done on any of the purchases that allegedly occur with my client?

A I don't recall.

MS. COGGINS: Thank you, Your Honor. That's all I have.

THE COURT: Mr. Hetznecker?

MR. HETZNECKER: Just briefly, just briefly.

THE COURT: Okay.

RECROSS EXAMINATION

BY MR. HETZNECKER:

Q There are no controlled buys of my client in this investigation, are there?

A Correct.

Q All right. So just -- I just want to be clear about timing in terms of your ability to identify Mr. Stinson's voice. The timing -- you mentioned a number of factors based on his Honor's questioning earlier on, which was you gave us a review of this instances in which you would have heard a voice that you would attribute to Mr. Stinson, correct?

THE COURT: Actually, I cut him off when --

MR. HETZNECKER: Well, you did -- you did, but he provided --

THE COURT: -- because I didn't think it was necessary, but go ahead.

BY MR. HETZNECKER:

Q All right. So -- all right. So just so we're clear about it, can you identify my client's voice as you sit here now?

A Yes.

Q Okay. And you can do so not based on the review of any T3s, correct? For this case when you sat there and listened to the tapes of this case it wasn't based on any of your review of those conversations, correct?

A When I listened to what case, counselor?

THE COURT: I don't think -- I don't think I understand the question.

MR. HETZNECKER: Well, I rephrase it.

THE COURT: Okay.

BY MR. HETZNECKER:

Q So you -- you mentioned earlier that you would listen as a monitor to the voices that came in on realtime, correct?

A During the Title III interception, yes. Yes.

Q Yes, and for the --

THE COURT: I'm sorry, you're going back to T3?

MR. HETZNECKER: Yeah, I'm going back to his ability to identify it all and I want to segment this out.

THE COURT: I'm sorry. I'm sorry. I'm sorry, Mr. Hetznecker, you're getting far afield here. Do you have anything more?

MR. HETZNECKER: Yeah, I do. I do.

THE COURT: Okay.

BY MR. HETZNECKER:

Q So you can't identify my client's voice based on the confidential informant buys because he wasn't involved, correct?

A That's correct, yes.

Q All right. So you're not identifying his voice based on the T3s, correct?

A (No Verbal Response)

Q Solely based on the T3s?

MS. COGGINS: Objection.

THE COURT: I don't think you said what you meant to say. You said two different things just then.

MR. HETZNECKER: Let me rephrase it then.

BY MR. HETZNECKER:

Q You can't -- as you sit here now and saying that now how you can identify my client's voice, you cannot do it solely based on your review of the Title III wiretaps, am I correct?

A I can't say that's correct or not. During the course of the wire interception, there might have been some additional evidence obtained during the interception of your client that would have allowed us to identify him. For example, self-identification or use of a nickname, for example. Which might have been very well one way that we identified your client.

Q Right, but we're not talking about we. I'm talking about you right now. Just you, individually. So when you say --

THE COURT: I'm sorry, Mr. Hetznecker, move on to another subject.

BY MR. HETZNECKER:

Q So based on -- as you sit here now, based on your testimony that you can identify his voice, my client's voice --

THE COURT: You don't have to answer that.

Move to another -- please move to another subject. I'm sorry, we're getting far afield. We are talking about the -- the controlled purchases, the audio and videos of the controlled purchases. He's already said your client wasn't on them. Everything else you're saying is argument.

MR. HETZNECKER: So -- no. What I'll do then, I'll wait until he talks about the prison tapes and then I'll talk -- then I'll cross-examine him about that and then I can argue it.

THE COURT: But you can certainly argue it.

MR. HETZNECKER: No, but --

THE COURT: But you're kind of doing it now.

MR. HETZNECKER: No, I'm cross-examining. Your Honor, here's what -- the way you've laid this out, as I understand it, is you asked the Government -- well, we -- the Government has the burden of establishing authenticity of the voices. And the way in which Your Honor has laid this out is you've segmented it from T3s to confidential source buys and then I assume the prison tapes, am I correct?

THE COURT: Whatever Ms. -- it's the Government's burden.

MR. HETZNECKER: Right, so --

THE COURT: I assume that's the next thing.

MR. HETZNECKER: Okay.

THE COURT: Yes.

MR. HETZNECKER: Okay. I'm simply shortcutting that and I'd be glad to follow Your Honor's procedure.

THE COURT: I'm not sure how you're shortcutting at all, but go ahead.

MR. HETZNECKER: All right. So I will wait until they put testimony on regarding the prison tapes.

THE COURT: All right.

MR. HETZNECKER: So I'll go back to my initial question which is his ability to identify my client's voice. That -- I'll do that. I'll wait until the prison tapes come in.

THE COURT: I believe we've had more than enough for Starks purposes, but what -- if you're done, why don't you have a seat.

MR. HETZNECKER: All right. And I will reserve the right to cross the agent on the prison tapes and his ability to identify based on that.

THE COURT: Understood.

MR. HETZNECKER: Thank you.

THE COURT: Anything further, Ms. Osirim?

MS. OSIRIM: On the controlled purchases --

THE COURT: On this subject.

MS. OSIRIM: -- no, Your Honor.

THE COURT: All right. Is Mr. Hetznecker an accurate prophet? Are you now moving on to the prison tapes?

MS. OSIRIM: I was going to move on to recording but I will move on to the prison tapes next to abet the ease with which Mr. Hetznecker can make his point.

THE COURT: All right. Fine. I hate to refuse Mr. Hetznecker anything, no offense.

MS. OSIRIM: Okay. So there are two remaining categories, just for clarity sake. Recordings that the Government wishes to admit at trial. One of those is prison recordings, calls made by the defendant and Stinson. The final is an audio and visual video recording on an interview of Edward Stinson.

THE COURT: Okay. The -- we're going to a prison then?

MS. OSIRIM: Yes.

THE COURT: The -- and we're just dealing with authenticity now --

MS. OSIRIM: Yes.

THE COURT: -- not the arguments that you've raised on the -- whether or not there's an expectation of privacy in

the --

MR. HETZNECKER: Yeah, right.

THE COURT: Okay.

MR. HETZNECKER: Correct, correct.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. OSIRIM:

Q During the course of your investigation, Special Agent Baber, did you obtain -- did you and federal agents obtain telephone calls from Philadelphia Department of Prisons for Edward Stinson for various periods between 2012 and 2014?

A Yes.

Q And did these calls and records that accompanied them, include logs showing the outgoing telephone calls, dates, times, duration of calls, as well as audio recordings of those calls?

A Yes.

Q The telephone calls that were placed by Edward Stinson and recorded, do you know whether they were done so as a matter of course pursuant to the Philadelphia Department of Prisons typical procedures with respect to inmates?

A Yes, they were.

Q Okay. The equipment that was used to save the data and recordings made, did it make it impossible for anyone to subsequently alter or tamper with or modify those recordings in

any way?

A Yes, it did.

Q Did you have an opportunity to speak with representatives of the Philadelphia Department of Prisons?

A Yes.

Q Okay. And did they explain to you that calls are monitored and recorded in real time as they're being placed from the prison?

A Yes.

Q Okay. Did they in any way in response to any subpoenas for these calls suggest to you that their recording and monitoring equipment had malfunctioned in any way?

A No.

Q Did they report to you that there was any fault or any problem with the operation of the technology that they use in order to make these recordings?

A No.

Q Okay. Once these recordings as well as their attending documents were provided to the FBI and to law enforcement, how were they preserved?

A They were preserved in a case file in what we call a 1A envelope, which is an envelope that -- is maintained in a case file -- in our case file system to be retrieved by agents on the investigation if -- if they need to be reviewed again in the future.

Q And what was then done with those files after they were placed in the case file and reviewed or not reviewed at subsequent times?

A They would go back in the case file where they remain today.

MS. OSIRIM: Okay.

No further questions, Your Honor.

MR. HETZNECKER: May I, Judge?

THE COURT: You may.

MR. HETZNECKER: Thank you.

RECROSS EXAMINATION

BY MR. HETZNECKER:

Q So --

THE COURT: And by the way, if anybody needs a break, let me know, we will take -- we've been sitting for almost an hour and a half.

Go ahead.

MR. HETZNECKER: I'll be brief, Judge.

BY MR. HETZNECKER:

Q So I'm clear but --

THE COURT: You said -- you keep saying that.

MR. HETZNECKER: Do you think I've been lengthy?

THE COURT: Sometimes.

MR. HETZNECKER: Well, I'll keep that in mind.

THE COURT: All right.

BY MR. HETZNECKER:

Q Special Agent, when you received the phone calls from the prison in the tape recorded form, I assume they were on disks?

A Yes.

Q All right. And you received the log as well from the prison?

A Yes, the log would correspond with that disk to indicate a call went on January 1st, 2014 at 5:45 p.m., for example. Yes.

Q And the way the log registers the identity of the caller from the prison is a number, is that correct? A number attributed -- a prison number attributed to the person who has been identified as connected to that number?

A Yes.

Q Am I correct?

A Yes.

Q So the log -- so the prison calls themselves are logged by prison number not by name initially, is that correct?

A That's correct. They're logged by the person's Philadelphia prison number, PPN.

Q All right. And your review of those particular phone calls for Mr. Stinson, I take it was not just you, it was other agents as well?

A Yes.

Q And your review of those phone calls from the prison that were logged in and then turned over to you by the Philadelphia

Prison System, were the -- were there transcripts created by you for those phone calls?

A For some of them, yes.

Q Okay. And, again, just briefly, you can't, as you sit here now, identify which ones you identified -- or which ones you prepared, correct?

A Correct.

Q Now, when did you receive those tape recorded phone calls from the prison during the course of your investigation, do you recall that?

A I don't recall exactly when, counselor. I know that we have reviewed prison calls for your client as going back to 2012, predating the Title III.

Q So is it fair to say that -- when you say we, I'm talking about you right now. Is it fair to say that your ability to identify my client's voice was based upon -- solely based upon prison calls that you reviewed prior to the Indictment in this case?

A I can't say that's a fair representation, counselor. It may very well have been. I don't recall at the time when the -- when we have a Title III wire monitor going. Once your client was identified, how precisely at that time he was identified or that voice was attributed to your client. It may very well have been from a review of the prison tapes.

Q And so just so -- and my final question on that is, in

response to your answer, is then to the best of your recollection, there is no point in time in which you can say you identified certain calls as my client? That you said kind of, uh-huh, this is Edward Stinson's voice, is that fair to say?

A That's fair to say, yes.

MR. HETZNECKER: All right. I have no further questions. Thank you.

MS. OSIRIM: Brief redirect, Your Honor?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, during your review of prison calls obtained from Edward Stinson's calls, are there times where the defendant self-identified himself during these calls?

A On every call, yes.

Q Thank you.

THE COURT: Okay.

MS. COGGINS: May I, Your Honor? I have one --

THE COURT: I'm not sure how this implicates your client, but you're free to proceed.

MS. COGGINS: I do have one phone call, Your Honor, that went from -- that is a prison phone call from allegedly Mr. Stinson to my client. So I'm just going to ask about that.

THE COURT: Okay. Go ahead, yes.

RECROSS EXAMINATION

BY MS. COGGINS:

Q Okay. Agent -- this really involves basically one telephone call to my client on October 3rd of 2012 for Mr. Stinson from the prison. How were you able to identify my client's voice on October 3rd of 2012?

A He likely would have been identified -- long after this call. That is once he was identified during the investigation, sometime after May of 2013.

Q So when you pulled this phone call, did you pull this phone call on October 3rd; is this also a real time phone call?

A No, that's a -- that was a call that we would have obtained pursuant to a subpoena.

Q And these phone calls stretch from August 27th of 2012 to September 2nd of 2014, is that correct?

A I don't have them in front of me, counselor, but that sounds correct, yes.

Q Okay. So do you know approximately how many phone calls you had to go through in that period of time?

A No, I don't.

Q And so on October 3rd of 2012, you did not mark that phone call as significant because there was no way to identify the person's name or the person's voice on that telephone call, correct?

A I want to make sure I'm answering this properly. On

October 3rd, 2012 we did not -- we, the FBI, or I, specifically, did not review that particular call. That was a call that was intercepted in the Philadelphia Jail System on October 3rd, 2012. When the FBI obtained it and when I reviewed it, I can't exactly -- I don't recall when I reviewed that particular phone call.

Q When you testified to the storage of these -- or the -- not the accuracy, but the storage of these phone calls, so the October 3rd phone call from 2012 may have just sat within the prison system for at least two years, is that correct?

A That's possible, yes.

Q Okay. And during that time, do you have any idea how that phone call was kept?

A No, I don't.

Q So you really don't have any kind of a change of custody and you just -- at some point in time, prior to the Indictment, happened upon a phone call that you believe was to my client?

A Well, what -- the way we would have obtained the calls, is send an administrative subpoena to a custodian of records at the Philadelphia Prison System who maintains jail calls for all of the Philadelphia jails on State Road in Philadelphia, requesting jail calls from a particular time period for a particular inmate. How it's obtained by the Philadelphia Prison System, whether it's based on a server, whether it's based on a series of computers, I can't speak to that, counsel,

I'm not sure. I simply know that we requested via subpoena the records come in, the logs and the actual CD containing the audio from the jail, pursuant to the subpoena.

Q In this -- just with this particular phone call, do you know what date the subpoena was served on the prison system for that phone call?

A I do not, no.

Q Do you know who served the subpoena on the prison for that particular phone call?

A An analyst with the FBI would have served that subpoena electronically to the Philadelphia Prison System.

Q And this was one subpoena for all -- the whole entire two years of phone calls or would you do a subpoena for a particular period of time?

A Most likely the latter, most likely -- probably what I -- I'm not exactly sure. The short answer is I don't know. But, typically, we would send an administrative subpoena for records for a period of time, receive those records, review them, and then as time passed, send a followup subpoena for additional record as time goes on.

Q So as you sit here today, you cannot testify to the accuracy of the date of this phone call, is that correct?

A What I could testify to is a review of the phone call and the information that contains on the disk, that is the preamble that's on there, the recording that's stated in the record from

the Philadelphia Prison System. As to how it was obtained within the Philadelphia Prison System before providing it to the FBI, I cannot testify to that.

Q Or how it was kept?

A Or how it was kept, that's correct.

Q Or how it was documented as to time and date?

A That's correct.

MS. COGGINS: Thank you.

I have no other questions, Your Honor.

MS. OSIRIM: Brief redirect, Your Honor?

THE COURT: Yeah.

MS. OSIRIM: Okay.

REDIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, how many investigations have you conducted over the course of your career in which you've subpoenaed prison recordings, ballpark?

A Fifteen, probably.

Q Okay. And is it your understanding in conversations with administrators at the Philadelphia Prison System as well as in federal prisons, that recordings of inmate telephone calls are kept during the regular course of business and monitored on a regular basis for prison security?

A Yes.

Q Okay. At any point in time, did you receive calls in

connection with this case from Edward Stinson's prison calls, in which you were advised that the -- there was some sort of uncertainty as to the dates of the calls in response to your subpoenas?

A No.

Q Did you receive any information from the prison system that suggested that the calls had been tampered or otherwise deleted or altered in any way during the time -- between the time that they were recorded and the time that they were provided to you pursuant to subpoena?

A No.

MS. OSIRIM: Okay.

No further questions.

MS. COGGINS: May I, Your Honor, just follow up?

THE COURT: Okay.

RECROSS EXAMINATION

BY MS. COGGINS:

Q So you're saying that all of these things are -- should be kept in the normal course of business, is that correct?

A I can't speak for what records are exactly kept in the normal course of business. My experience on both this investigation and numerous other investigations, counselor, is that when an individual was incarcerated at one of the Philadelphia Prison Systems, that in the normal course of practice, telephone calls made by that inmate are recorded and

maintained and are available pursuant to the appropriate legal process.

Q And you just hope that's the way that they followed through on this call, correct?

A Correct.

MS. COGGINS: No other questions.

THE COURT: Okay. We are done with the prison calls, is that right? And we are going to move on to the last category of recordings, which was the recording of Mr. Stinson's police statement?

MS. OSIRIM: Yes.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, on the date when Edward Stinson was arrested in February 2017, did you bring him to FBI headquarters, pursuant to his arrest?

A Yes.

Q And at that time did you and other agents meet with Edward Stinson in the context of an interview --

A Yes.

Q -- the post-arrest interview?

A Yes.

Q Prior to that interview were recording devices installed in an interview room at the FBI?

A Yes.

Q Are you familiar with those recording devices and how they work and function?

A Yes.

Q And are you familiar with how they functioned on the day of this particular recording?

A Yes.

Q Okay. Can you please describe for the Court what these recording devices are, where they're located within this room, and how they function?

A The FBI Philadelphia Office has a couple of interview rooms, each one is wired with a camera in the corner to capture video and at least one microphone that's also in there. And these are on standby mode and are ready to be activated at any point. And so prior to interviewing Edward Stinson, I activated the device which is in a -- on a computer in a separate room and that began to record all audio and all video that was captured in that room. And once the recording was completed then I shut off the recording. The recording is maintained on a hard drive on a computer that I cannot access or alter. It was then downloaded to a disk and that disk was placed into evidence where it's maintained to this day.

Q Okay. At any point in time were you alerted to any problem with the recording equipment, whether operational or functional or otherwise?

A No.
Q Did you have an opportunity to review the video recording of that interview after the interview had been completed?
A Yes.
Q Did you notice that there was anything awry with the video itself? Was the data corrupted? Were you unable to hear or see what the recording was supposed to capture?
A No.
Q Okay. And you -- it is your testimony that that video is maintained on a hard drive at the FBI, correct?
A Yes.
Q And that a downloaded version, which is saved to a DVD has been stored in Evidence.
A Yes.
Q Okay. Does that mean that only law enforcement personnel, if anyone, would have had access to the DVD contained in that video?
A Yes.
Q And are you able to access the hard drive version on the monitor and make edits or changes to the video in any way?
A No.

MS. OSIRIM: Okay.

No further questions.

MR. HETZNECKER: May I, Judge?

RECROSS EXAMINATION

BY MR. HETZNECKER:

Q So, Special Agent, when you say you -- the tape itself is not edited or changed at all, so the start time --

THE COURT: I don't think it's a -- I don't think it's a tape.

MS. OSIRIM: Objection.

MR. HETZNECKER: The video, the videotape.

THE COURT: I don't think it's a tape. I think you're dating yourself. I don't know what it is. It's some kind of an electronic medium but I don't think it's a tape.

MR. HETZNECKER: So the digital recording.

THE COURT: Excellent.

BY MR. HETZNECKER:

Q The digital recording of this particular interview of my client or interrogation, however we want to phrase it, that was done -- initiated by you before it began, is that correct?

A Correct.

Q All right. So when you say it's not edited, so the tape went all the way through from the time you began it until the time you turned it off, is that correct?

A Correct.

Q And you were the one that initiated the end of that -- that particular recording, is that correct?

A Yes.

Q All right. And that initiation and the ending of that

recording was outside of the room, not inside the room, correct?
A Correct.
Q And was my client informed that you were videotaping -- or digitally recording this particular interview? Was he informed of that?
A I do not -- he was not verbally advised of that. There is a posting on a sign inside the space that indicates that the room is -- does have audio/video recording equipment and the person is subject to being -- to be recorded.
Q But there was no acknowledgment on the recording that he, in fact, knew that it was being recorded?
A No.
Q All right.
A No.
Q Now, at the point at which you sat down with him, you had already listened to the prison tapes, correct, of my client --
A That's correct.
Q -- am I correct? So as you sit here now, your recognition of my client's voice, was it based on the recording that was done of that interview, that is your identification of Edward Stinson's voice as his voice? Was that based on the recording of that particular interview or that face-to-face conversation with him, or based on other factors?
A Other factors.

Q So the other factors would be the prison phone calls, is that correct?

A That would based on prison phone calls, it would be based on review of the wiretaps, it would be based on talking to the law enforcement officials who had contact with your client, who when listening to the prison calls or the Title III intercepts, would identify that particular voice as being associated with your client.

Q So you had never had a face-to-face conversation with him until that day, correct?

A I had not; that's correct.

Q All right. So as part of your information about his voice identification or attribution to his particular voice was from other sources, meaning, not recorded sources but other individuals; is that correct?

A Yes.

MR. HETZNECKER: All right.

I have no further questions. Thank you.

THE COURT: Ms. Osirim?

MS. OSIRIM: Nothing further.

THE COURT: Oh, I'm sorry. I assumed you had nothing, Ms. Coggins.

MS. COGGINS: I don't have a dog in this fight, Your Honor.

THE COURT: Okay. I didn't think so.

All right. Is there anything more for this witness?

MS. OSIRIM: As it pertains to other motions; Yes, Your Honor.

THE COURT: No, no. As it pertains to Starks.

MS. OSIRIM: No, Your Honor.

THE COURT: Thank you, Agent.

THE WITNESS: You're welcome, Your Honor.

THE COURT: Does the Government have anything else it wishes to present in connection with the Starks motion?

MS. OSIRIM: No further witnesses, Your Honor.

THE COURT: Any evidence you want to submit otherwise in connection with the Starks motion?

MS. OSIRIM: No, Your Honor. All of the recordings in this case have been provided to the Defense. Copies of a list of recordings that the Government intends to perhaps admit at trial have been provided to the Defense as of July 20th. And we have also provided in connection with those transcripts of the recordings based on that work being done in the course of the investigation.

THE COURT: Okay. Does the Defense have any evidence it wishes to present or witnesses it wishes to call in connection with the Starks motion?

MS. COGGINS: No, Your Honor.

MR. HETZNECKER: No, Your Honor.

THE COURT: Okay.

I have heard the testimony of the agent and assuming I credit his testimony, could counsel for the Defense, please explain to me why I should not grant this motion?

MS. COGGINS: May I, Your Honor?

THE COURT: Yes.

MS. COGGINS: Your Honor, even taking the agent's testimony as true in this case --

THE COURT: Is there -- is there anything that he said that you think was untrue? That you wish to argue was untrue?

MS. COGGINS: Your Honor --

THE COURT: You're free to do it. He won't take it personally and I won't. Is there anything he said that you think I shouldn't believe?

MS. COGGINS: At this point, Your Honor, my only argument would be either I'm going to -- may I have a moment to think, Your Honor?

THE COURT: Sure.

MS. COGGINS: Thank you.

THE COURT: Why don't we -- why don't we take a short break and when we resume, I'd like to hear argument and then we will move on, I guess to the 404(b). I think that's the next thing, is it not?

MR. HETZNECKER: It is, yes.

THE COURT: And that affects both defendants?

MS. COGGINS: Yes, Your Honor.

MR. HETZNECKER: Yes, Your Honor.

THE COURT: Okay.

(Recess from 11:04 a.m. until 11:28 a.m.)

THE COURT: Who would like to go first?

MR. HETZNECKER: Your Honor, Ms. Coggins is going to argue. I just wanted to remind the Court that I needed to raise an issue regarding separation so that they could talk to each other. So I would like the Court to order the lifting of the separation order with respect to Juan Jarmon and Edward Stinson. If we could do that immediately, orally, and then have it on the record so that we can execute it.

THE COURT: Ms. Osirim?

MS. OSIRIM: The Government has no objection.

THE COURT: It's lifted.

MR. HETZNECKER: Thank you.

THE COURT: Do I need to take another break?

MR. HETZNECKER: No, no, no.

MS. COGGINS: No, Your Honor.

THE COURT: Okay.

Ms. Coggins?

MS. COGGINS: Thank you, Your Honor. Your Honor, at this point I'm not going to argue regarding the testimony of the agent, I'll save that for another day if that's okay. But the only issue, Your Honor, that I do want to argue before the

Court is specific to the prison calls between my client and Mr. Stinson. And I'm going to reference, Your Honor, the factors out of the Donahue case and the factors, Your Honor, with regard to this hearing are: number one, the creation; two, the accuracy; three, the storage; four, legibility of the phone calls; five, identity of the participants of the phone calls; and eight [sic] is the accuracy of the transcripts. And then if those prongs are satisfied then that will satisfy the admissibility with regard to the Starks hearing.

I have an argument, Your Honor, with regard to the first three. We have absolutely no testimony here as to how these calls were kept within the Philadelphia Prison System because we don't have a representative here from the prison system to tell us how these records are kept. I do appreciate that the agent in this case said that his familiarity or lack thereof, but basically what he said was that records are usually kept in this manner.

There was no testimony that he was intimately familiar with how the prison system in Philadelphia keeps their records. There's no testimony that the date on these phone calls was in any way accurate. We have a date of October 3rd of two thousand -- 2012. I don't have any information as to when that actual phone call was taken from the Philadelphia Prison System. There's absolutely no testimony as to how it was kept, how it was generated. There's zero testimony, Your

Honor, with regard to how the --

THE COURT: I think you're saying the same thing a number of times. I understand your argument.

MS. COGGINS: Thank you, Your Honor.

THE COURT: And I will take it under advisement.

Mr. Hetznecker?

MR. HETZNECKER: Yeah, I just join in that. Judge, generally speaking in the Starks hearings that I've had, a representative from the -- or a custodian of records from the prison is called as a witness in order to establish those prongs. They haven't done so and based on that they haven't met their burden.

THE COURT: Ms. Osirim?

MS. OSIRIM: Your Honor, as I stated at the beginning of this hearing, we had not been apprised by Defense counsel what calls and what recordings were being challenged by the Defense based on authenticity, not admissibility. Without that we did not want to call witnesses from AT&T, from T-Mobile, from the prison system, et cetera, to be present in court, because we didn't know what was being challenged. If the Court feels that it needs that testimony, we're happy to provide it. But I think what the agent --

THE COURT: All right. We'll continue this based on the defendant's continuing objection and, perhaps, the Government can offer the defendants a written offer of proof as

to particular witnesses and what they would testify to. The defendant is under no obligation -- the Defense is under no obligation to accept those. But it may obviate the need for a further hearing. If those are your only objections, then what I'm hearing is you no longer have objections to -- on authenticity -- on authenticity to the T3s, to the consensual searches and to the police statement; is that correct?

MR. HETZNECKER: That's correct, Your Honor. I think based on the testimony of the agent, I think I have no argument on that section, that portion of the Starks that's required to be established by the Government, so that is correct.

MS. COGGINS: Yes, Your Honor.

THE COURT: Very well then, I will grant that -- those portions, which I guess is about three-quarters of the Stark's motion as uncontested. And I will allow the Government to present additional evidence with respect to the Philadelphia Prison intercepts. I believe it's two phone calls involving your client, not one. My clerk pointed that out to me over the break, Ms. Coggins. The same day. They're both on the same day.

MS. COGGINS: Yes, Your Honor.

THE COURT: Yes, Mr. Hetznecker?

MR. HETZNECKER: Your Honor, actually so -- just so we're clear about this, my intention was not to cross-examine this agent who has no information about that. My argument was

going to be they never presented that at all. Ms. Coggins, obviously, she questioned the agent that was her choice.

THE COURT: I'm sorry. I'm sorry. You're -- I'm not sure what you're talking about.

MR. HETZNECKER: What I'm talking about is I challenge all of the recordings that they seek to introduce based on the lack of foundation for those recordings. So the fact that they did not put on the prison custodian, which is required to establish the foundation for Starks, my challenge is --

THE COURT: Wait, wait, wait, wait, wait, wait. Can we go back to the three areas that you're not opposing? You're not taking that back now, are you?

MR. HETZNECKER: No, no, no, no.

THE COURT: Okay. So we're talking about just the prison?

MR. HETZNECKER: The foundation.

THE COURT: Just the -- just the Philadelphia Prison?

MR. HETZNECKER: Correct.

THE COURT: All right. We have half the story, we have the agent saying that he served an administrative subpoena on the Philadelphia Prison asking for certain things.

MR. HETZNECKER: Right.

THE COURT: And this is what he got back --

MR. HETZNECKER: Correct.

THE COURT: -- but we don't know what happened at the other end of that line, and that's what the Government has to present?

MR. HETZNECKER: Correct, because there's a --

THE COURT: I --

MR. HETZNECKER: Yeah, that's it.

THE COURT: You're kicking an open door.

MR. HETZNECKER: That's it.

THE COURT: I agree with you that's what the Government has to present and I understand why the Government. I read the motions and they weren't -- they could have been more -- so I'm not faulting anybody, they could have been more specific and so the Government is going to be obligated to present evidence to establish the authenticity on the -- for want of a better expression, the City's end of the -- of the transactions.

And, again, if a written representation from the Government, an offer of proof so you can review it with your clients, if that would suffice, that's fine, and if it doesn't suffice, that's fine too.

Can we move on now to the 404(b) motions? Mr. Stinson seeks to exclude evidence from the other matter, criminal matter 17-71, which purports to cover the drug trafficking activities from 2010 to September 2015. And, Mr. Jarmon seeks to exclude evidence of his own criminal history of

other unindicted bad acts and joins in Mr. Stinson's motion.

Would counsel like to put a little bit more meat on those bones? Yes?

MR. HETZNECKER: I would. Yes, may I approach?

THE COURT: Yes, yes.

MR. HETZNECKER: So, Your Honor, with respect to Mr. Stinson's motion going forth would be -- it actually covers all prior acts, all bad acts that would include -- what I included was identified in the other Indictment but it includes what now the Government is seeking to introduce, which is prior bad acts evidence, prior to 2012. Their interest -- and actually prior to the Indictment, I should say.

So what we were provided about a week or 10 days ago was an affidavit of probable cause for an investigation that was conducted on an individual, not my client. Incorporated in that 73-page document were references to my client's alleged criminal conduct in a period of time from 2008 going forward. I had a conversation with the Government about what in that document they sought to introduce and I was told that they were going to seek none of it except for as was represented today by the Government, the one conversation which is really a lap over. So the way the Indictment reads is, from late 2012 to late 2014, the charged crimes within the Indictment are alleged. What they're alleging is in October 2012, arguably whether that's late or not, I argue it's not late, it's not

included late would be December but the Court will have to make a determination as to whether or not that's covered -- that this conversation that was referenced earlier in the Starks hearing is the conversation that they seek to introduce.

In addition, as was represented by the Government this morning, they want to introduce testimony from --

THE COURT: I'm sorry. Mr. Hetznecker, I'm lost.

MR. HETZNECKER: Yes.

THE COURT: I -- Ms. Osirim, all three counsel have done a wonderful job but you don't need to nod your head when you agree and shake your head when you disagree. Particularly if there's a jury here, the Defense will object to it.

MR. HETZNECKER: Thank you.

THE COURT: Could we go back to --

MR. HETZNECKER: Sure.

THE COURT: I'm not sure what it is the Government wants to introduce that you want excluded.

MR. HETZNECKER: Well, I want everything excluded. What was represented to me.

THE COURT: What do you mean everything?

MR. HETZNECKER: Well, everything that's --

THE COURT: The history of the universe, everything.

MR. HETZNECKER: Yes, everything in the 73-page document that they foisted upon us 10 days ago, which included alleged crimes that occurred in 2008 going forward involving my

client. Since that time they've made representations --

THE COURT: That is an affidavit of probable cause for whom with --

MR. HETZNECKER: An investigation into a gentleman by the name of, I think, Jason Butler, I believe.

THE COURT: Jason Butler, okay.

MR. HETZNECKER: Is it Jason Butler? Yeah, Jason Butler.

THE COURT: Okay. Hold on, hold on, hold on, hold on.

Ms. Osirim, what is it that -- in that affidavit that you wish to introduce in this trial?

MS. OSIRIM: Your Honor, I -- I'm sorry for signaling. I was only trying to ask the defendant for what --

THE COURT: No, you weren't signaling. You weren't signaling. You were being enthusiastic. It's been a long time since I was a young lawyer. When I was young, I had the energy to shake my head too. I no longer do. That's okay. Believe me, I didn't -- I didn't need a signal from you to know which way the Government wants me to rule. I just -- but I would like to know what is it in that 73-page affidavit that you want to introduce here?

MS. OSIRIM: If I may pose one question to the Defense, Your Honor?

THE COURT: Sure.

MS. OSIRIM: Mr. Hetznecker, I'm trying to understand what item you're talking about, and I'm assuming it is the evidence from the ATF search of --

MR. HETZNECKER: No, let me -- let me clarify.

THE COURT: Can we do this?

MR. HETZNECKER: Let me clarify.

THE COURT: Wait, wait, wait. Here's what we're going to do. Here's what we're going to do. We're going to take a break and counsel are going to discuss among themselves exactly what it is that the Defense thinks it wants excluded and the Government may not be seeking to be introduce it. And then we're going to come up with a very clear list of the things that the two Defense counsel would like excluded and the Government's reasons why they may be or should be admitted. Is that fair?

MR. HETZNECKER: That's fair.

THE COURT: All right. Thank you very much.

THE COURT DEPUTY: All rise.

(Recess from 11:40 a.m. to 11:52 a.m.)

MR. HETZNECKER: ...very quickly. And I'll make the representations and then I think the Government can correct me if I'm wrong. So there in the response by Mr. Maiatico which is -- which generally and kind of paints in broad strokes those -- that information regarding relationships prior to the Indictment that he would like to introduce. They're going to

give us that in specifics. They have not provided that. So I think at this point we would table the argument on the 404(b) until a later date so we can make specific objections to those -- those particular representations.

THE COURT: Is that right, Ms. Coggins?

MS. COGGINS: It is, Your Honor.

THE COURT: Okay. Then I think that this concludes that portion of the hearing involving both defendants, unless I'm mistaken, is that right, Ms. --

MR. HETZNECKER: That's --

THE COURT: Mr. --

MS. COGGINS: That is correct.

THE COURT: Somebody has to -- okay. Then why don't we break for lunch. Mr. Jarmon and his lawyer need not return. And after lunch we will deal with the -- we've dealt with separation. We will deal with the motion to suppress and the bail motion and all relating to Mr. Stinson, and I think that covers all the motions presently before us. Is that right?

MS. COGGINS: Yes, Your Honor.

MR. HETZNECKER: That's correct.

MS. OSIRIM: That is correct, Your Honor.

THE COURT: All right. Then my thanks to all three counsel who really did an excellent job and to our marshals, of course.

MS. OSIRIM: Thank you, Your Honor.

(Recess from 11:54 a.m. to 1:40 p.m.)

THE COURT: I think we should return now to the motion to suppress the defendant's statement to the Government.

Ms. Osirim?

MS. OSIRIM: Thank you, Your Honor.

If the Government may, it calls FBI Special Agent Scott Baber to the stand.

SCOTT BABER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

THE COURT: Agent Baber, you're still under oath. Do you understand that?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

MS. OSIRIM: If I may, Your Honor. I'll incorporate by reference what Agent Baber has testified to earlier about his role at the FBI and his --

THE COURT: Do you have a problem with that Mr. Hetznecker?

MR. HETZNECKER: I do not.

THE COURT: Okay.

MS. OSIRIM: Okay.

DIRECT EXAMINATION

BY MS. OSIRIM:

Q Special Agent Baber, on February 16th of 2017, did you arrest the defendant Edward Stinson?

A Yes.

Q And on the day of his arrest where, if anywhere, did you transport Mr. Stinson?
A He was transported back to the FBI field office here in Philadelphia, I think Green Federal Building.
Q Okay. At that time was he placed in an interview room at the FBI?
A Yes.
Q At that time did you provide him with any food or anything to drink?
A Yes.
Q Do you recall what those things were?
A I do not recall exactly what those items were.
Q Okay. Was he given an opportunity to use the bathroom either prior to entering that room or at any point in time that he may have requested to do so?
A Yes, he was.
Q Okay. Did you explain to him the nature of the charges against him, did he have a sense that he had been charged with a federal Indictment?
A Yes.
Q Okay. And did you review with him his Miranda rights as detailed on the FBI's Advice of Rights form FD-395?
A Yes.
Q Okay.
MS. OSIRIM: May I approach, Your Honor?

THE COURT: Well, you got him to the room. He's in -- I just want to know what the first thing you said to him was. Do you remember?

THE WITNESS: I don't recall, Your Honor. We audio/video recorded it so we could look at it.

THE COURT: From the moment he got to the room, you audio/video recorded it?

THE WITNESS: Yes, Your Honor. As soon as he had a seat.

THE COURT: Did you say anything to him before you got into the room?

THE WITNESS: No, Your Honor.

THE COURT: Okay.

BY MS. OSIRIM:

Q After you provided him with this Advice of Rights form, did the defendant acknowledge that he understood the rights that were conveyed?

A Yes.

Q Did he say so?

A Yes.

Q Okay. During the course of the interview that you conducted with him, was he alert?

A Yes.

Q Was he responsive?

A Yes.

Q At any point in time did he complain that he was sick?
A No.
Q Did he complain that he was tired?
A No.
Q Did he express to you that he was suffering from any other physical ailment or mental ailment at that time?
A No, he did not.
Q Did he suggest that his faculties were somehow impaired?
A No.
Q Okay. Was this interview, in fact, recorded?
A Yes.

MS. OSIRIM: Your Honor, if I may, I'm -- can I show the --

THE COURT: Yes, everybody has a monitor -- do you need a monitor, Mr. --

MR. HETZNECKER: No, Your Honor, but I can see it from here. I think my client can see it as well.

THE COURT: They stole my monitor. Okay. I'll watch it from here.

BY MS. OSIRIM:

Q Special Agent Baber, I'm showing you what's been pre-marked for purposes of identification as Government's Exhibit 1. Do you recognize this disk?
A Yes.
Q How do you recognize it?

A It is a disk that contains a copy of the audio/video recording done of Edward Stinson.

MS. OSIRIM: Okay. Your Honor, if I may play the video recording? Just a small portion of it?

Any objection?

MR. HETZNECKER: Yes, no objection.

THE COURT: No objection. Very well.

(The video played from 1:44 p.m. to 1:45 p.m.)

MS. OSIRIM: Does the Court wish for me to play any further?

MR. HETZNECKER: Absolutely, I do.

THE COURT: Oh, yeah.

(The video played from 1:46 p.m. to 1:47 p.m.)

THE COURT: Is this long? If I -- if you could put it on hold.

MS. OSIRIM: Certainly.

THE COURT: How much longer is -- how much longer does this go on?

MS. OSIRIM: The entirety of this video is 40 minutes and 53 seconds, Your Honor.

THE COURT: Oh.

MS. OSIRIM: I did not intend to play the entire --

THE COURT: Well, I heard the agent read the Miranda warnings to the defendant. I may have missed it but I didn't hear the defendant waive his Miranda rights. Did I miss

something?

MS. OSIRIM: Would you like me to rewind the tape?

THE COURT: I would. It's not a tape.

(The video played from 1:48 p.m. to 1:49 p.m.)

THE COURT: I'm sorry. I don't think that's a waiver of his Miranda rights. I heard the agent say, we have to read this to you before we can ask you any questions. I didn't hear the defendant say, I understand, I'm waiving my Miranda rights. Maybe I'm -- maybe I'm being dense.

MS. OSIRIM: May I ask the agent a few questions?

THE COURT: Sure. But I -- the -- he's kind of a prisoner of his own video, isn't he? I don't know what it is he's going to explain that isn't on that video, but go ahead.

BY MS. OSIRIM:

Q Special Agent Baber, what, if anything, did you hear the defendant say after you completed reading the FD form 395?

MR. HETZNECKER: Objection, to the form of the question. It doesn't --

THE COURT: No, no. I'll let him answer but it doesn't kind of matter what he hears, it's what we all hear.

MR. HETZNECKER: Right.

THE COURT: It's what's on the tape.

Go ahead.

THE WITNESS: After I asked him if he understood -- it's difficult to hear but what I could hear him at the time

utter and when I reviewed it, he utters the word, yeah, when I asked him, do you understand this.

THE COURT: Well, no, I heard him say that but I don't view that as a waiver of his Miranda rights.

MS. OSIRIM: Your Honor, if you were to, in fact, review this entire video, you would see that the agents then engage in an interview with the defendant in which he is --

THE COURT: I don't --

MS. OSIRIM: -- voluntary --

THE COURT: The defendant can talk a blue streak after that. I dare say in the last 40 something years I've done an awful lot of suppression motions one way or another, and a waiver of Miranda rights is a waiver of Miranda rights. I didn't hear it.

Mr. Hetznecker, I don't throw these pitches to you all that often.

MR. HETZNECKER: You're absolutely correct, Judge. The evidence is incontrovertible. As the Court knows, a waiver of Miranda is essential to the admission of a statement of a confession under the Fifth Amendment of the United States Constitution and under Miranda. We don't have -- we don't -- the answer, yes.

THE COURT: Him saying -- him saying, do you --

MR. HETZNECKER: Yes.

THE COURT: -- understand.

MR. HETZNECKER: Do you understand?

THE COURT: And I heard the defendant say, yeah. I didn't -- I don't construe that -- I'm going to continue this hearing right now and the Government may wish to reconsider whether it intends to use the statement, which I haven't heard. But I assume it's helpful to the Government's case in some way. And if it does, we will resume the hearing, okay?

MS. OSIRIM: Certainly.

THE COURT: Why don't we go on to the bail hearing. Right now, if I had to rule I'd say that there was no knowing, voluntary, and intelligent waiver. Every one of these I've had whether -- in the last 14 years, not to mention whatever criminal work I did before I got here, there's usually a written waiver, there's usually a written waiver where they ask each question and the defendant signs his answer to each question. I don't know that a written waiver is essential, but a waiver is essential. I'm not hearing it, Ms. Osirim.

Let's go on to the bail hearing. You can stand down, Agent Baber.

THE WITNESS: Yes, Your Honor.

THE COURT: Mr. Hetznecker?

MR. HETZNECKER: Your Honor --

THE COURT: What has changed? You say there are changed circumstances that warrant granting bail in this case. You are unable to rebut the presumption before, I guess it was

Judge Rice. What's changed?

MR. HETZNECKER: We actually stipulated at the time. What's changed is, obviously aside from the time period between that date and today, my client's father has become ill. Now I have not confirmed by medical records what he's suffering from, but I've been told by the family it's a serious and terminal illness. So my client obviously wants to spend some time with his father. I think that you can fashion a series of conditions that would allow him to be released on those conditions that would assure the Government's concerns about any flight risk. And certainly I think it can rebut the presumption at this point after he's been in jail for now over 15 months that there's no danger to the community that we know of that would change. It's still the same argument, the rebut of the presumption at the time of his original hearing. So the only condition that's changed really, the only circumstance that's changed rather, and I think it's significant, I'd ask the Court weigh it in determining what you think is appropriate is that his father is ill. So --

THE COURT: Does your client have a criminal record?

MR. HETZNECKER: He does.

THE COURT: And what is that record?

MR. HETZNECKER: It's not significant. He has I believe a prior conviction for simple assault, I believe. And I don't have the pretrial services report in front of me, which

I did at the time. But I certainly know that the Government had it in their detention memo. He had I think it's two prior convictions, I believe. One is for intimidation of a witness, I believe that's one of the convictions. He served state time on that conviction. And the other is I believe a simple assault. Am I correct?

THE COURT: Your client is charged with two counts conspiracy to distribute 280 grams or more of crack and use of a -- unlawful use of communication facility. I believe the first count carries a mandatory ten year minimum.

MR. HETZNECKER: It does.

THE COURT: And up to life. Mandatory, is it six years, of supervision?

MR. HETZNECKER: Correct.

THE COURT: Up to lifetime supervision. I forget what the second carries. It's something like 40 years or -- I --

MR. HETZNECKER: I think it's 20 years, but I may be wrong about that. Yeah.

THE COURT: All right. All right. Well, I mean --

MR. HETZNECKER: It's irrelevant.

THE COURT: It's not longer than life.

MR. HETZNECKER: No, it's irrelevant in terms of Your Honor's consideration. I understand that.

THE COURT: I -- if you present -- I have no

evidence. If you present evidence to me that your client's father is gravely ill, I am not prepared to allow your client to remain at liberty. Whether or not I can talk to the Marshal and arrange for your client to visit with his father somewhere, I would try to do that.

MR. HETZNECKER: All right. I'll look into that, Judge. I'll get the details to Your Honor and then we can -- you can --

THE COURT: But I don't think that your statement as it is now rebuts the presumption.

MR. HETZNECKER: That's fair enough.

THE COURT: Is there anything further?

MR. HETZNECKER: There is one other issue, which is the motion to suppress the recordings, which I filed --

THE COURT: Hold on. I think my clerk is about to tell you what I forgot to do.

MR. HETZNECKER: Yes. No, that's fine.

THE CLERK: You want to discuss the challenge to the --

THE COURT: Oh, yes. Oh, goodness gracious. How could I forget that? Yes. How could I have forgotten the prison recordings?

Mr. Hetznecker, the Supreme Court decision that you have cited, which I regret to say I can't remember.

MR. HETZNECKER: *Carpenter*, Your Honor.

THE COURT: *Carpenter*. Thank you. Suggested that a prisoner's -- I -- we have -- I don't have a record in front of me. We can have a second suppression hearing and we can have the circumstances of the prison recordings described. We can't do that today because these are state prison recordings.

If the prison recording were made in circumstances where there were warnings on the phone and around the phone, as I've learned over many suppression hearings involving the Philadelphia prisons, and there was even an audio, a warning on the phone that this -- that these calls could be monitored, are you prepared to stipulate that the Government could prove that in this case?

MR. HETZNECKER: Yeah. I'm not arguing that there aren't warnings on the phone. There are clearly --

THE COURT: Well, I just want to know what you're -- what you're willing to concede? The --

MR. HETZNECKER: As a matter of evidence, you mean?

THE COURT: The *Carpenter* -- yeah, the *Carpenter* case, as I understand it, said that the movements, the physical movements, of a prisoner tracked by a GPS, he had an interest in the privacy, privacy interest, in his physical movements. Where a party is repeatedly warned, admonished if you will, that these calls can be intercepted and recorded, and as I understand it, the only calls where that is not the case are calls to counsel, which are made on a separate phone. Then I

don't see how he could have any privacy interest at all.

We don't have the witnesses to conduct the hearing here today. Those are my, off the cuff, if you will, remarks. If you want to continue, as is your perfect right, with the suppression motion, and say that *Carpenter* necessarily implies a certain kind of privacy interest that a prisoner has involving the use of his or her phone, then we're going to have to have a full hearing.

MR. HETZNECKER: That's fine.

THE COURT: And the Government's going to have to present prison witnesses to testify as to the circumstances in which these intercepts were made. Okay?

MR. HETZNECKER: I would prefer that. Yes, I would request that. Because I think it's part and parcel of the argument I want to make regarding the evolution of this issue of the expectation of privacy.

THE COURT: And you may well be looking to change the law, which is also your perfect right to try.

And so is -- now is there anything else we need to --

MR. HETZNECKER: No --

THE COURT: -- address?

MR. HETZNECKER: -- there's not. No.

THE COURT: From the Government?

MS. OSIRIM: No, Your Honor.

THE COURT: All right. My thanks to counsel and to

our Marshals.

MR. HETZNECKER: Thank you.

(The proceeding concludes at 1:59 p.m.)

* * * * *

C E R T I F I C A T I O N

I, Kelli Ray, CET-349, court approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

Kelli Ray

DATE: July 30, 2018