PD

387

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Case No. 2:17-cr-00072-PD -1,3 |
| v. | U.S. Courthouse<br>601 Market Street<br>Philadelphia, PA 19106 |
| JUAN JARMON, et al, Defendants. | September 14, 2018<br>9:42 a.m. |

PRETRIAL MOTIONS HEARING
BEFORE THE HONORABLE PAUL S. DIAMOND
UNITED STATES DISTRICT JUDGE

FILED
OCT -1 2018
KATE BARKMAN, Clerk
By KK Dep. Clerk

APPEARANCES:

| | |
|---|---|
| For the Plaintiff United States: | JEROME M. MAIATICO, ESQ.<br>YVONNE O. OSIRIM, ESQ.<br>U.S. ATTORNEY'S OFFICE<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106 |
| For the Defendant Edward Stinson: | PAUL J. HETZNECKER, ESQ.<br>1420 Walnut Street, Suite 911<br>Philadelphia, PA 19102 |
| For the Defendant Juan Jarmon: | MAUREEN C. COGGINS, ESQ.<br>MAUREEN C. COGGINS, ATTORNEY AT LAW<br>509 Swede Street<br>Norristown, PA 19404 |
| Audio Operator: | NOT LISTED |
| Transcribed by: | DONNA MORRIS, Court Transcriber<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FL 32753<br>833-800-LCTV |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

DH

# I N D E X


| | PAGE |
|---|---|
| PLAINTIFF'S WITNESSES: | |
| BRAD CAKRANE | |
| Direct Examination by Ms. Osirim | 3 |
| Cross-examination by Ms. Coggins | 12 |
| Cross-examination by Mr. Hetznecker | 26 |
| Further Cross-examination by Ms. Coggins | 29 |
| Redirect Examination by Ms. Osirim | 31 |
| SCOTT BABER | |
| Direct Examination by Mr. Maiatico | 40 |
| Cross-examination by Mr. Hetznecker | 56 |
| Cross-examination by Ms. Coggins | 87 |
| Redirect Examination by Mr. Maiatico | 96 |
| DISCUSSION OF SEPARATION ISSUE | 97 |
| COURT'S RULING | 101 |

| EXHIBITS FOR THE PLAINTIFF: | ID. | EVD. |
|---|---|---|
| Ex. 1 = copy of call information | 6 | |
| Ex. 2 = video recording | 35 | |
| Ex. 3 = FD-395 Advice of Rights form | 42 | |
| Ex. 4 = court summary | 50 | |

EXHIBITS FOR THE DEFENSE:
(NONE OFFERED)

(Call to Order of the Court.)

JUDGE PAUL S. DIAMOND: All right, please be seated everybody.

MR. PAUL J. HETZNECKER: Good morning, Your Honor.

MS. YVONNE O. OSIRIM: Good morning, Your Honor.

MR. JEROME M. MAIATICO: Good morning, Your Honor.

MS. MAUREEN C. COGGINS: Good morning, Your Honor.

THE COURT: Good morning to all.

We're here to continue the pretrial motions hearing. If counsel are agreeable, why don't we begin with the Starks motion. The Government had not authenticated the state prison tapes.

MS. OSIRIM: Very well, Your Honor. The Government would call Brad Cakrane, a systems administrator for the Federal Bureau of Prison system, as a witness, if that's all right with the Court.

THE COURT: Go ahead.

THE CLERK: Please stand and raise your right hand.

BRAD CAKRANE, PLAINTIFF'S WITNESS, SWORN

MR. BRAD CAKRANE: I do.

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Brad Cakrane, C-A-K-R-A-N-E.

THE COURT: Please have a seat.

DIRECT EXAMINATION

BY MS. OSIRIM:
Q Good morning, Mr. Cakrane. How are you?
A Good morning; good.
Q Mr. Cakrane, can you please tell this Court what you do for a living?
A Yes, I'm a systems administrator at the Philadelphia Prison System.
Q And what generally are your duties and responsibilities as a systems administrator?
A I oversee the system in which the inmates make calls -- phone calls.
Q Okay. What is that system called?
A It's called the V-Track (Phonetic) System.
Q And can you explain how that system works?
A Yeah, it's an automatic system. As soon as an inmate picks up the phone, the recording starts.
Q Okay. And that recording is then transferred where?
A To the actual software that is on my computer.
Q Okay.
THE COURT: Before you get to that. In the prison, are there signs or indications that the call is going to be recorded?
THE WITNESS: Yes, Your Honor.
THE COURT: Would you describe that, please?
THE WITNESS: Yes. There's an inmate handbook which

each inmate receives upon arrival. There's also written signage --

THE COURT: What does the inmate handbook say?

THE WITNESS: It specifically says that all calls are recorded and monitored.

THE COURT: Oh, go on.

THE WITNESS: I mean, that's --

THE COURT: You --

THE WITNESS: -- that's really all it says as far as --

THE COURT: You were going to go on apparently to talk about some other place where there is such a warning.

THE WITNESS: Yes, there's also written signage on the blocks of the prisons.

THE COURT: Sir, we're here for a hearing, we need some detail. Okay? You're not getting paid by the word, you can expand.

THE WITNESS: Okay.

THE COURT: What do you mean there's written signage on blocks? What signage? What blocks? Near the phones? Right on top of the phones?

THE WITNESS: Near the phones. And the phone --

THE COURT: And what does the signage say?

THE WITNESS: The signage also says, all calls are recorded and monitored.

THE COURT: Okay.

BY MS. OSIRIM:

Q Lastly, is there a recording prompt that an inmate would hear when he picks up a phone to make an outgoing telephone call?

A Yes. As soon as you pick up any of the phones, they're also told, each call is recorded and monitored.

MS. OSIRIM: Your Honor, if I may approach the witness with something?

THE COURT: Yes.

BY MS. OSIRIM:

Q Can I show you what we will mark as Government's Exhibit Number 1? Do you recognize what I just handed you?

(Government's Exhibit 1 marked for ID = copy of call information)

A I do.

Q How do you recognize this?

A This is the actual prompt that you would hear when you pick up the phone.

Q To make an outgoing telephone call?

A Correct.

Q Okay.

MS. OSIRIM: Could --

MR. HETZNECKER: May I see a copy of that, Your Honor?

MS. OSIRIM: Yes.
(Counsel confer.)
BY MS. OSIRIM:
Q And the prompt that you see in Government's Government's Exhibit 1 explicitly states that phone calls are subject to recording and monitoring, is that correct?
A Correct.
Q Okay. We were talking a little bit about the system in which these calls are monitored. The V-Track System that you were just discussing beforehand. Is that where the calls are sent once an inmate picks up a phone to make an outgoing call?
A Yes.
Q Okay. And that software then -- does it automatically record the conversation that transpires?
A Yes. It automatically records each call right to my computer.
Q Okay. Is there any ability that you or any other official within the Philadelphia Prison System has to edit or adjust or otherwise alter what is being recorded?
A No.
Q Okay. Once those calls are recorded, where are they stored?
A They're stored in the system that is on my computer.
Q Okay. And this is a Dell Software System --
A Correct.

Q -- that you're referencing?
A Yes.
Q Okay. If a subpoena comes in, are you or other members of the Philadelphia Prison System responsible for providing copies of these recorded calls?
A Yes.
Q Can you explain the process for responding to subpoenas for recorded telephone calls?
A Yeah. I would receive the written subpoena from my supervisor and then I would use the PP number and find the date range of the calls that are in question and then send that back to my supervisor and then she would send it out.
Q Okay. You said that you would receive the subpoena from your supervisor and then would you access the Dell software, the V-Track System, by using the PP number that you just referenced?
A I would, yes, and that's when I usually put it on a disk.
Q What is the PP number, just for everyone's understanding?
A It's just an identification number that each inmate has. They're all -- each inmate has a different identification number and they use it for everything in the prison.
Q And do they use that when they're making outgoing calls?
A They do, yes.

THE DEFENDANT: No.

MR. HETZNECKER: Shh.

THE COURT: Go on.

BY MS. OSIRIM:

Q And so that is the number that you use to identify a particular inmate's calls, is that correct?

A Correct.

Q Okay. When you extract this data from the V-Track System, what do you put it on in order to respond to the subpoena?

A A disk, a WAV file disk.

Q A WAV file disk?

A Um-hum.

Q Do you have the ability to edit or alter or otherwise change the recording as it's being transferred from the V-Track System to a WAV file on this disk?

A No.

Q Okay. Once you have this disk, what happens to it? What do you do with the disk once you've burned it?

A That's when I would give it back to my supervisor and she would send it out to whoever requested it.

Q Okay. Are you aware of whether or not the V-Track System, which automatically records these telephone calls, has at any point been corrupted or malfunctioning?

A No.

Q Are you aware of whether or not the WAV files as they're being transferred onto a disk in response to a subpoena have otherwise been corrupted or malfunctioning and not playing as

recorded?
A No.
Q Okay.
MS. OSIRIM: Your Honor --
THE COURT: Does that mean they haven't been corrupted or you don't know?
THE WITNESS: They haven't been corrupted.
THE COURT: Okay.
MS. OSIRIM: Your Honor, if I may have a moment?
THE COURT: (No Verbal Response.)
MS. OSIRIM: No further questions of this witness.
THE COURT: Just remind me from the last hearing, so we don't have to have a third session, have the recordings been authenticated as Philadelphia prison recordings?
Is there a question about that, Ms. Coggins, Mr. Hetznecker?
MS. COGGINS: I'm sorry, I don't understand, Your Honor. Has it -- are we questioning whether or not they came from the Philadelphia Prison System?
THE COURT: That these are the materials just described by this witness. That these are recordings that were made in the fashion that this man just described. I don't know that anyone's -- Mr. Stinson, you want to talk quietly to your lawyer or do you want me to put a gag on you? Am I being clear?

THE DEFENDANT: A gag, what's a gag?

THE COURT: Your lawyer will define it for you.

MR. HETZNECKER: Judge, may I have a moment?

THE COURT: I'm -- I -- I'm glad you're smiling. I hope I'm amusing you.

THE DEFENDANT: No, I'm not -- I'm not smiling, Your Honor.

THE COURT: You are not amusing me, sir. Lower your voice.

Yes, Ms. Coggins?

MS. COGGINS: Your Honor, I don't have any questions that these came from the Philadelphia Prison System, other than just cross-examination as to what he just testified regarding how they're transferred to the disk. I don't have a question that they come from Philadelphia Prison System.

THE COURT: Well -- just my question is, the exhibits the Government intends to introduce, is there any dispute about whether or not those particular exhibits were obtained -- wrong word. Whether those particular exhibits went through the process that this witness just described and were then provided to the Government?

MS. COGGINS: No, Your Honor. He testified that that's where they came from. I don't have any questions about that's the process that these phones followed.

THE COURT: Mr. Hetznecker?

MR. HETZNECKER: No. And, in fact, the foundation questions are generally accurate and have been covered.

THE COURT: Thank you, Mr. Hetznecker.

Thank you, Ms. Osirim.

MS. OSIRIM: Thank you, Your Honor.

THE COURT: Which one of you would like to question first?

MR. HETZNECKER: Go ahead.

MS. COGGINS: I'll go first, Your Honor, if that's all right.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MS. COGGINS:

Q Sir, with regard to the phone calls that you've just testified to, you said that they go -- that these phone calls will go directly to your computer?

A Correct.

Q And you're the only person who runs the computer that these calls will go to, is that correct?

A That is correct.

Q Okay. And when they go to your computer, you're the only person then who has control over what happens with those phone recordings?

A Correct.

Q When they come into your computer, they come in -- I'm

assuming everybody's phone calls in the prison all go to your phone -- all go to your computer?
A Correct.
Q Is that right?
A Yes.
Q Do you then track them by the inmate number and then you put them in certain -- in different files?
A Yeah. I would look at the PP number if I needed to find a specific call. I would look up the PP number and also I would need a date range of the phone calls.
Q So will you have to go through -- when you put in the inmate number, it will like set up every phone call that that inmate has made on a separate screen from everyone else's phone calls, correct?
A That's correct, yes.
Q Okay. And then when you received the subpoena in this case, it gave you a date range, do you recall what the date range was for the phone calls?
A I don't remember the date range.
Q Okay.
THE COURT: That's what I was asking. You pulled the exhibits that the Government intends to introduce?
THE WITNESS: Yes, Your Honor.
THE COURT: You want to get that on the record? Ms. Osirim, you want to actually show him the exhibits and confirm

that, because I don't think that's on the record yet?

MS. OSIRIM: Your Honor, I don't have the specific disks with me for each call in order. I can confirm the date --

THE COURT: Is the Defense prepared to stipulate to that or will we have to have the exhibits brought in and have him --

MR. HETZNECKER: May I have a moment, Your Honor?

THE COURT: You may.

(Pause.)

MS. COGGINS: May I have a moment, Your Honor, to speak with co-counsel?

THE COURT: Absolutely.

(Defense counsel confer.)

MS. COGGINS: Thank you, Your Honor. We'll move on, Your Honor. I'm not going to --

THE COURT: I need more than that. We're -- if you don't want to stipulate, you don't have to. Do you stipulate that the Government exhibits that purport to be recordings of your client's phone calls in and out of the Philadelphia prisons are the ones pulled by this man in the way he described?

MS. COGGINS: Yes, Your Honor.

THE COURT: Mr. Hetznecker?

MR. HETZNECKER: Yes, Your Honor.

THE COURT: Very well. Go on, Ms. Coggins.

MS. COGGINS: Thank you, Your Honor.

BY MS. COGGINS:

Q So, sir, the phone calls that we're talking about today that are subject to the subpoena that you pulled from your computer, when you pull those from the computer, are they -- you said that you're not able to edit those phone calls, is --

A Not, no.

Q Okay. So are you able to play the phone calls?

A I am, yes.

Q And you're able to stop the phone calls prior to the end of the -- you stop listening prior to the end of the actual phone call?

A Yes.

Q Okay. So you do have some leeway as to what you can do with the actual recording, is that correct?

A I mean all I can do is stop and play.

Q Okay. And when the subpoena -- I'm sorry. When you then send these calls on and you put them on the disk, do you have the ability at that time to put on partial parts of those phone calls or do they go on in their entirety?

A No, they go on in their entirety. Phone calls to their lawyers are the only calls that are not recorded, so that would not be included.

Q Okay. But as you sit here today, you can't stop a phone

call part way through and then just send that part of the recording on to the disk?
A No.
Q You testified to the form. I believe it was marked as Government Exhibit 1. And that's basically, in a nutshell, telling the person who is making the phone call that the call will be recorded, is that correct?
A Correct.
Q Okay. Is there a -- in the prison system, does the inmate have to provide you with a list of telephone numbers that they're permitted to call?
A Yes. They're allowed to have five numbers on their list.
Q Do you know how many Mr. Stinson had on his list?
A I don't. I don't have -- I don't have it in front of me, so.
Q So if it's not on that list, then he cannot make that outgoing phone call?
A Correct.
Q Okay. So every single person that he contacts, do they have a copy of the -- of Government Exhibit 1, telling them that their phone calls will be recorded?
MS. OSIRIM: Objection, Your Honor.
THE COURT: No, she can answer. I'm sorry, he can answer.
BY MS. COGGINS:

A They hear it. They hear it also. Both parties when you pick up the phone would hear the prompt that says it's recorded and monitored.

THE COURT: Who actually makes the -- who dials the number?

THE WITNESS: The inmate.

THE COURT: I'm sorry?

THE WITNESS: The inmate.

THE COURT: When does the recording come on, when the other person picks up the phone?

THE WITNESS: When it's -- well, it's -- it comes on a couple of times.

THE COURT: Oh.

THE WITNESS: When you first pick up the phone, the inmate hears it.

THE COURT: Did the Government talk to this witness before you called him?

MS. OSIRIM: We did, Your Honor.

THE COURT: Maybe you should have talked to him some more.

How many times does it play?

THE WITNESS: It would depend on the duration of the call.

THE COURT: Okay. It plays when you pick up the phone?

THE WITNESS: Yes.

THE COURT: When the inmate picks up the phone?

THE WITNESS: Yes.

THE COURT: When, if at all, would it play again?

THE WITNESS: Five minutes into the call.

THE COURT: And when after that would it play again?

THE WITNESS: Maybe ten more minutes into the call.

THE COURT: Okay.

THE WITNESS: Like I said, it would depend on the actual call.

THE COURT: So if the call to do -- to ask the question Ms. Coggins was about to ask, if the call is less than five minutes, then the person on the other end of the line doesn't know it's being recorded, because presumably that person wasn't on the line before the call was made?

THE WITNESS: Correct.

MS. COGGINS: Thank you, Your Honor. I have no other questions.

THE COURT: Mr. Hetznecker.

MR. HETZNECKER: Thank you.

BY MR. HETZNECKER:

Q Good morning, Mr. Cakrane.

A Good morning.

Q Just want to clarify one thing that you had testified to. The inmate numbers are connected to a code that's entered into

the phone, is that correct?
A Correct.
Q So when the inmate picks up the phone, they actually enter a code that links it to the inmate number, they don't enter their inmate number on the phone?
A It's the inmate number and the code.
Q Oh, they enter both?
A Correct.
Q So when they pick up the phone, they have to do what? What do they dial?
A Well, you're putting in your inmate number and then you're also putting in your code, which is the number --
Q Oh, so you put both of them?
A It's a three -- yeah, it's the code that they have picked themselves.
Q All right. And your instruction in terms of amassing all of these phone calls is what, to keep them in your computer indefinitely?
A Correct.
Q And when you keep them in your computer indefinitely, I assume that from time to time you receive subpoenas, is that correct?
A Yes.
Q What's the purpose, as you understand it, for keeping the phone calls -- recorded phone calls indefinitely?

A Just so that, you know, they can be used in court.
Q That's the only purpose?
A Yeah.
Q Gathered for evidence by -- for government agencies?
A Yes.
Q So they're not reviewed for security purposes by the prison routinely then, is that correct?
A No.
Q So the sole purpose of gathering all this information is for investigative purposes by government agencies of inmates, correct?
A That's all I use it for, yes.
Q All right.

MR. HETZNECKER: Go ahead.

THE COURT: I'm sorry. That's not what he asked you. That's all you use it for. Do you know whether that's all they're used for?

THE WITNESS: I can't speak to that necessarily. I mean --

THE COURT: Okay.

BY MR. HETZNECKER:

Q Now, Mr. Cakrane, you said you receive subpoenas from time to time for the recorded phone calls, is that correct?
A Correct.
Q And how do the subpoenas come to you? Could you describe

that process?
A They are faxed or e-mailed to my supervisor.
Q All right.
A And then she'll -- she gives the -- she gives me the physical copy of the subpoena.
Q And would you say that -- well, what percentage of the subpoenas you have received for obtaining an inmate's conversations -- recorded conversations, what percentage of those subpoenas come from government agencies? Is it a hundred percent or close to a hundred percent?
A Are you asking how often do they use them?
Q No, no, no. What I'm asking is, from whom do you receive these subpoenas for the most part? The majority are from government agencies?
A Yes. Yes.
MS. OSIRIM: Your Honor, I object to this line of questioning.
THE COURT: Oh, because he's answered, overruled.
Go ahead.
BY MR. HETZNECKER:
Q Now with respect to the subpoenas you receive, just so we go through this process.
MR. HETZNECKER: I'll be brief about this, Your Honor.
BY MR. HETZNECKER:

Q You receive the subpoena, you then -- and the subpoena would indicate a name and then a number --
A Correct.
Q -- a police photo number --
A The PP number, yes.
Q PP number, yes.
THE COURT: Is PP police photo or Philadelphia prison? What does PP stand for or don't you know?
THE WITNESS: Police photo.
BY MR. HETZNECKER:
Q So you take the police photo number, which is attached to a particular inmate, and then through the computer you're able to access all of those phone calls as requested by the subpoena for that inmate, is that correct?
A Yes, sir. Correct.
Q And you compile them on a disk and send them out, is that correct?
A Yes.
Q And you maintain the subpoena for your records throughout an indefinite period of time or not?
A I don't save the subpoenas, no. Once I burn the disk, send it out --
THE COURT: Just to clarify. You get -- for these particular exhibit -- these particular recordings, you got a subpoena for certain dates?

THE WITNESS: Correct. Yes.

THE COURT: And you pulled all, with the exception of the attorney/client -- so attorney/client calls are also recorded, is that right?

THE WITNESS: They're not recorded.

THE COURT: They're not recorded. How --

THE WITNESS: Those are the only calls not recorded.

THE COURT: How do we -- how does the computer know not to record them? Are they made on a separate bank of phones?

THE WITNESS: No. There's just a different setting in the prompt where -- there's a legal database also, so any lawyer's numbers will not be recorded.

THE COURT: And is there any other way that lawyer's numbers are not recorded? Is there something the prisoner, if he's got or she's got a new lawyer that isn't in the database, can alert the prison not to record those calls?

THE WITNESS: No.

THE COURT: It's got to be in the database?

THE WITNESS: Yes.

THE COURT: So that the prisoner has to tell the prison, I'm going to be calling my lawyer and this is my lawyer's number? When he or she gives the list of calls he's allowed to make --

THE WITNESS: Yes.

THE COURT: -- he can say in addition, there's my lawyer's number?

THE WITNESS: Yes.

THE COURT: So that when you're asked for -- in this case, do you happen to remember what the dates are? Do you have a copy of the subpoena, Ms. Osirim?

MS. OSIRIM: I do not, Your Honor.

THE COURT: We have a Starks hearing on recordings that were subpoenaed, you didn't bring the recordings, and you didn't bring the subpoena?

MS. OSIRIM: I apologize, Your Honor. We did not have a specific objection from the Defense as to certain of the calls or certain of the range and so we didn't provide.

THE COURT: Yes, this is the nature of litigation. This is the nature of litigation. Perhaps you'll grow more used to it. Do you happen to remember the dates?

THE WITNESS: I don't.

THE COURT: You were asked or the subpoena asked you to produce recordings from one date to another?

THE WITNESS: Yes.

THE COURT: And you pulled all those recordings?

THE WITNESS: Yes.

THE COURT: You didn't segregate out some as opposed to others?

THE WITNESS: No.

THE COURT: You just pulled them all?

THE WITNESS: Yes.

THE COURT: Okay.

MR. HETZNECKER: You've done most of it, Your Honor, and I appreciate it, with respect to the attorney/client calls. I just have a follow up question on that, since you --

THE COURT: You can ask whatever you want, Mr. Hetznecker.

MR. HETZNECKER: I appreciate that.

BY MR. HETZNECKER:

Q The program has in it the attorney's names and numbers, do they not?

A It does, yes.

Q Okay. So if an inmate is represented by a particular lawyer, that number itself when called will automatically exclude the recording?

A Correct.

Q All right. And that's built into the program?

A Correct.

Q So you put the data in, you put the names of the attorneys and their numbers, and that data then excludes the conversations from being recorded by the program?

A Yes.

Q Okay. Now the particular admonition or warning that's given to the inmates, you said it was in the handbook, is that

correct?
A Correct.
Q And the handbook is provided to the inmate when -- upon their entry, is that correct?
A Yes.
Q And then it's also on the wall and it's then recorded on the --
A Yes.
Q -- on each phone call?
A Yes.
Q All right. Do you know whether or not my client, Mr. Stinson, was a pretrial detainee at the time these phone calls were recorded?
A I don't know.
Q So the phone calls are recorded both of pretrial detainees who could not make bail as well as those who are convicted and serving a sentence in the county prison system, is that correct?
A Yes.

MR. HETZNECKER: I have no further questions. Thank you.

MS. COGGINS: Your Honor, I'm sorry, may I just follow up with one question?

THE COURT: Sure.

FURTHER CROSS-EXAMINATION

BY MS. COGGINS:

Q Sir, so are you saying that Edward Stinson was only permitted to call five different people, is that correct?

A That's correct, yes.

Q So any number that falls outside of those five telephone numbers that you have recorded were not permissible phone calls -- they were impossible to make, correct?

A They're only allowed to have five numbers -- five numbers they're allowed to call.

THE COURT: And the lawyer's number in addition or is that one of the five?

THE WITNESS: No, in addition.

THE COURT: And what if an inmate needs to call a sixth person, can he or she alert the prison and say, look, I need to -- I understand something happens -- something's happened to my cousin, I didn't know, could --

THE WITNESS: Yes, there's a form that they would have to fill out and then it would have to go through the proper channels and then it would be added to the list.

THE COURT: Do you know whether either of these defendants asked for additional numbers to -- asked for permission to call additional numbers?

THE WITNESS: Not to my knowledge.

THE COURT: Okay.

BY MS. COGGINS:

Q And do you have a list right now of those five phone numbers?
A I don't have anything in front of me.
THE COURT: And you didn't bring them with you?
THE WITNESS: No.
THE COURT: Because nobody asked you to?
THE WITNESS: No.
THE COURT: You could have, if you'd been asked?
THE WITNESS: Yes.
THE COURT: Yes, Ms. Osirim?
MS. OSIRIM: Your Honor, may I just ask one redirect question?
THE COURT: Yes, of course.

REDIRECT EXAMINATION

BY MS. OSIRIM:
Q Could you take a look at Government's Exhibit 1 and read that aloud for us?
A Yes. You have a Global Tel Link prepaid call from inmate's name, an inmate at the Philadelphia Prison System. The use of three-way calling -- the use of three-way or call waiting will disconnect the call. This call will be recorded and monitored. Your advanced -- your advanced pay account balance is, dollar sign, numbers, cents. To hear the cost of this call, press eight now. To accept this call, press five now.

Q Now when that --

THE COURT: So this is -- this is -- this is -- this -- it's odd, because this would seem to -- who is this message directed at? On the one hand, it would seem that it's directed at the person who is receiving the call, on the other hand, it seems to be directed at the person who's making the call. I don't understand. For instance, it says you have a call from and it says the inmate's name. That would suggest it's being played for the person who's receiving the call. On the other hand, it talks about your advanced pay account, which I assume is the inmate's advanced pay account, is that right?

THE WITNESS: Correct. When the called party answers, that's when they're told --

THE COURT: That's when this plays?

THE WITNESS: That's -- yes, that's the second time. For the -- it's the first time for the called party, it's the second time for the inmate.

THE COURT: So this -- so that it's played when the person -- the inmate picks up the phone?

THE WITNESS: Correct.

THE COURT: And then after the person who is called, receives the call, this plays again?

THE WITNESS: Correct.

BY MS. OSIRIM:

Q And is that person then asked to press five in order to

accept the call from that inmate?

A Yes.

Q Okay. So does that indicate to you that both the receiver of the call and the --

THE COURT: You don't need to --

MS. OSIRIM: Okay.

THE COURT: -- it's perfectly clear if I credit his testimony that both sides know it's being recorded.

MS. OSIRIM: No further questions, Your Honor.

THE COURT: If I credit this witness's -- I'm leaving him here in case there are additional questions. If I credit this witness's testimony, do I necessarily have to deny your Starks motion, Mr. Hetznecker, Ms. Coggins?

MR. HETZNECKER: Let me have a moment with counsel.

(Counsel confer.)

MR. HETZNECKER: Your Honor, I think you're ready to decide this motion. That's the way I would put that.

THE COURT: Ah-ha. Well, I credit his testimony. Does the either of you suggest that I shouldn't?

MR. HETZNECKER: No, I do not suggest you shouldn't.

THE COURT: Ms. Coggins?

MS. COGGINS: No, Your Honor.

THE COURT: Very well then. Then all that's left -- because I believe that this witness has provided more than ample basis to authenticate these recordings, all that's left

is your Carpenter motion, correct?

MR. HETZNECKER: Yes. Yes.

THE COURT: Which this witness --

MR. HETZNECKER: No, this witness has -- right, correct.

THE COURT: Well, he had something to do with it, because an expectation of privacy is something that the Supreme Court addressed in Carpenter. Is there anything more either one of you wants to ask this witness in connection with the Carpenter motion?

MR. HETZNECKER: I just have one follow up with respect to that.

THE COURT: Okay.

MR. HETZNECKER: Just one question.

RECROSS-EXAMINATION

BY MR. HETZNECKER:

Q There are no signed waivers for the recordings to be taken -- or for the prison calls to be recorded by the inmates, there's no signed waivers are there?

A No.

Q All right.

MR. HETZNECKER: I have no further questions.

THE COURT: Okay. Is this witness free to go, counsel?

MS. COGGINS: Yes, Your Honor.

MR. HETZNECKER: Yes, Your Honor.

MS. OSIRIM: Yes, Your Honor.

THE COURT: Thank you very much, sir.

All right, I will deny the Starks motion. I will take the Carpenter, part of the motion, under advisement.

Why don't we go to the -- I think your witness just disappeared. Why don't we go to the -- all that's left, I believe, which is the statement taken by the agent.

Do you happen to have the video of the -- I would like to begin with that.

MR. MAIATICO: Your Honor, we do have the video. Are you asking for it to be played again?

THE COURT: I'm asking for it to be played again.

MR. MAIATICO: Okay. We can do that, Your Honor. I have spoken to counsel and the Government's file day -- a supplemental response, which provides some additional case law --

THE COURT: I'm well aware of it.

MR. MAIATICO: -- because the focus of the challenge.

THE COURT: I'm well aware of it.

MR. MAIATICO: Defense counsel has asked for an opportunity to respond to that, which obviously wouldn't object to in writing.

THE COURT: I am going to ask both sides for proposed findings and conclusions with respect to the motion to

suppress.

Had the Government -- does the Defense wish to question the agent further?

MR. HETZNECKER: I'll leave that up to the Court, because -- because I -- because I'll -- just -- we could go back to the posture of what occurred at the last hearing. The real issue is very narrow. That issue is very narrow and --

THE COURT: Well, wait, before you get to that, why don't we play the video.

MR. HETZNECKER: Fine.

THE COURT: And then counsel can decide how they want to proceed --

MR. HETZNECKER: That's fine.

THE COURT: -- because my understanding is, until two years ago, the FBI didn't video these statements and this case may be an illustration for why that was a wise policy as far as the FBI is concerned. Could we please play the video?

MR. MAIATICO: Yes, Your Honor. If I may, I think it may be helpful, because the video starts with the reading of the Miranda rights that we had the agent testify with regards to the totality of the circumstances surrounding --

THE COURT: It's perfectly fine.

MR. MAIATICO: -- and --

THE COURT: But I still want to see the video.

MR. MAIATICO: And for the Court's -- we -- perhaps I

could talk to Defense counsel. The waiver, as the Court knows, we heard it last time, is approximately a minute and a half long. The interview and the video itself is approximately 40 minutes long.

THE COURT: The waiver is what we're here discussing and whether or not there was a waiver. I understand that there was a bunch of stuff, including the reading of the so-called Miranda warnings at the very beginning. I don't want to hear 40 minutes, I just want to hear a minute or two.

MR. MAIATICO: Yes, Your Honor.

THE COURT: That's all I want to hear. If counsel want to hear more, they're free to ask. Okay? Could we please play it?

MR. MAIATICO: Yes. Would you like to be given the testimony, Your Honor? I'm happy to play it. Let's start with that.

THE COURT: Thank you.

MR. HETZNECKER: Can we mark that as an exhibit so it's part of the record?

THE COURT: I -- I --

MR. HETZNECKER: I don't know whether they did the last time.

THE COURT: I would very much like this to be part of the record. In the event an appellate court is asked to review this matter, I would very much hope the appellate court would

view the video --

MR. HETZNECKER: Thank you, Judge.

THE COURT: -- before it made its decision, much as I want to view it again.

MR. HETZNECKER: Thank you, Your Honor. I appreciate that.

MR. MAIATICO: Your Honor, for the record we will mark this Government Exhibit 1 for today's purposes.

THE COURT: Well, actually, you have a Government Exhibit 1, so this is going to have to be 2.

MR. MAIATICO: Government Exhibit 2.

THE COURT: Okay.

MR. MAIATICO: Thank you, Your Honor.

(Government's Exhibit 2 marked for ID = video recording)

(Video played.)

THE COURT: Stop. Stop.

MR. MAIATICO: I will restart that, Your Honor, so that the video is up.

THE COURT: What a good idea.

MR. MAIATICO: Thank you.

THE COURT: Very -- to the very, very, very, very beginning.

(Video played.)

MR. MAIATICO: Your Honor, we --

THE COURT: A little more. A little more.

MR. MAIATICO: Yes, Your Honor.

(Video played.)

THE COURT: Put it on hold for a second. Put it on hold for a second. We'll listen to this if we have to -- or watch it. I am assuming the agent continued to review evidence with this defendant for some period before the defendant actually answered a question. Do we know how long?

MR. MAIATICO: Your Honor, it's a few minutes. I don't have the specific time.

THE COURT: We're going to have to do better than that, because if you're -- if you are -- if you're arguing an implied waiver --

MR. MAIATICO: Yes.

THE COURT: -- you're going to have to do a lot better than that because the quantity of evidence that your agent practically threw in his face is something I have to consider in whether or not there was an implied waiver or whether or not they simply ran over him. So let's keep listening.

MR. MAIATICO: Yes, Your Honor.

(Video played.)

THE COURT: Hold on. Hold on. I'm sorry, I can't really hear what Mr. Stinson just said. Can anybody tell me what he just said?

MR. MAIATICO: Your Honor, we can rewind that

briefly.

THE COURT: If somebody can hear -- if somebody can actually interpret for me, I'd be grateful. I simply want to know when it is that Mr. Stinson did something that the Government believes constitutes an implied waiver. I don't know if that was it. If I can't hear it, I don't see how I can say it was.

MR. MAIATICO: If I could have one moment, Your Honor?

(Pause)

MR. MAIATICO: I would suggest to the Court, Your Honor, if there's a question on that particular interaction, that we rewind it and play it one more time.

THE COURT: Very good. They're at 12:13:24. That's --

(Video played.)

THE COURT: All right. I have no idea what he said.

MR. MAIATICO: Your Honor, I believe at that point that was a question to the officers, are these --

THE COURT: I know. I --

MR. MAIATICO: Are these the people that are coming in?

THE COURT: I'm sorry, what?

MR. MAIATICO: Are these the other people that are coming in, with a reference to the recordings and perhaps to

the --

THE COURT: Why don't -- why don't you have your agent take the stand?

SCOTT BABER, PLAINTIFF'S WITNESS, SWORN

THE WITNESS: I do.

THE CLERK: Please state your full name for the record.

THE WITNESS: Scott Baber.

THE COURT: And you've already described your employment and so forth at the last hearing.

Agent Baber, when did Mr. Stinson waive his Miranda rights?

THE WITNESS: After I read him his Miranda rights and asked him if he understood, Your Honor. He answered, yeah, and gave a subtle nodding of his head.

THE COURT: And that was when the waiver took place?

MR. MAIATICO: Your Honor, if --

THE COURT: Wait.

That was when the waiver took place?

THE WITNESS: Your Honor, that's when I understood him to understand what I read to him.

THE COURT: Sir, you're trained to administer Miranda warnings and if the defendant invokes his Miranda rights, what are you supposed to do?

THE WITNESS: Immediately cease questioning, Your

Honor.

THE COURT: And did he invoke his Miranda rights or did he waive them in your view?

THE WITNESS: He waived them.

THE COURT: And when did he do that?

THE WITNESS: He waived them both when he acknowledged he understood the rights and then agreed to listen to what we had to say and then later answer questions as the recording went, Your Honor.

THE COURT: When did he do all that? When did he -- when did he agree to listen to what you had to say? Did he respond to that when you said something to him?

THE WITNESS: Respond to which part, Your Honor? I'm --

THE COURT: You're under oath, sir. You know that.

THE WITNESS: Yes, sir, I do.

THE COURT: Yes, at the beginning you said to him, we got to play something before we can talk to you. Did he respond to that or did he just sit there?

THE WITNESS: I don't recall, Your Honor.

THE COURT: You don't recall. And when you said to him -- let's go back to the end of the Miranda warnings.

MR. MAIATICO: Your Honor, may I comment for a moment --

THE COURT: No.

MR. MAIATICO: -- on the testimony?

THE COURT: No. I don't need the witness coached. No.

(Video played.)

THE COURT: Now the waiver took place when?

THE WITNESS: He -- when he acknowledged that he understood his right to --

THE COURT: And how did he acknowledge it?

THE WITNESS: By --

THE COURT: What did you hear him say?

THE WITNESS: Yeah. I heard him say, yeah.

THE COURT: And you said, okay. That was when the waiver took place?

THE WITNESS: Yes, Your Honor.

THE COURT: Yes, Mr. Maiatico.

MR. MAIATICO: Your Honor, if I may, the -- these are legal questions that you're asking --

THE COURT: Mr. Maiatico --

MR. MAIATICO: -- to the agent. I would --

THE COURT: Mr. Maiatico, you don't have to educate me on the law. Do you have questions of this witness?

MR. MAIATICO: I do, Your Honor, if I may.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. MAIATICO:

Q Agent Baber, were you one of the agents that was involved in the investigation of Edward Stinson?
A Yes.
Q Okay. And are you aware that he was arrested on the day that the interview that we just watched that took place?
A Yes.
Q Can you describe at what point during that day you had your first interaction with the defendant, Edward Stinson?
A Just moments prior to this.
Q And can you describe his demeanor when you had those initial interactions?
A He was alert, responsive to the questions, he did not --
Q Well, let me stop you there one second. When you first interacted with him, so prior to any questioning, can you describe his demeanor?
A He seemed alert, awake. He -- he did not seem -- he did not question where he was. His demeanor seemed calm at the time.
Q As he was directed to the interview room, did he respond appropriately?
A Yes.
Q Did he -- was he stumbling?
A No.
Q Did he appear intoxicated?
A No.

Q And did he -- was he slurring his words?

A No.

Q Did he understand the English language?

A Yes.

Q Okay. Now during the course of the interview -- or actually I'll say once he sat down, we watched the video, but can you describe how you present the Miranda rights to him?

MR. HETZNECKER: Objection.

THE COURT: Sustained.

BY MR. MAIATICO:

Q Did you read from a card?

MR. HETZNECKER: Objection, Judge, it's on the video.

THE COURT: Well, I can -- he can answer that. He was reading from something, it appeared to me.

THE WITNESS: I read from our FBI Advice of Rights form, an FD-395.

MR. MAIATICO: Okay. Your Honor, I'm showing counsel a -- what I propose to mark Government Exhibit 3.

THE COURT: It's not a bad idea, because he read them so quickly it might be said that some people couldn't understand everything he said. So, yes, it's a good idea for you to present the written warnings, Mr. Maiatico.

MR. MAIATICO: Yes, that would be so, Your Honor.

(Government's Exhibit 3 marked for ID = FD-395 Advice of Rights form)

MR. MAIATICO: Your Honor, if I may approach the witness?

THE COURT: You may.

BY MR. MAIATICO:

Q Agent Baber, I'm showing you what's been marked Government Exhibit 3. Now you said you had read from a form when you advised the defendant of his rights. What are you looking at there, Government Exhibit 3?

A The FD-395, FBI Advice of Rights form.

Q And is that a copy of the type of form that you read from when you advised defendant Stinson of his rights?

A Yes.

Q Okay. And --

THE COURT: Is it fair to say, agent, you read that form rather quickly?

THE WITNESS: Yes, Your Honor, I did.

THE COURT: Would it be fair to say you read it quickly because you wanted to get it over with and get to the questioning as soon as you could?

THE WITNESS: Your Honor, I don't recall what I was thinking at the time. I -- I --

THE COURT: Try.

THE WITNESS: That may have been a reason, Your Honor.

THE COURT: Okay.

BY MR. MAIATICO:

Q And when you read those rights, do you believe that the defendant understood those rights?

MR. HETZNECKER: Objection as to his belief.

THE COURT: No, he can -- he can answer that.

THE WITNESS: Yes.

BY MR. MAIATICO:

Q In fact, did you ask defendant Stinson whether he understood those rights?

A Yes.

Q And how did he respond?

A Yeah.

THE COURT: Did he ask him if he understood those rights? Do we need to play it again? Why don't we play it again.

(Video played.)

THE COURT: Now did he ask -- did you ask him whether or not he understood his rights or did you -- whether or not he understood that this was the stuff they had -- you had to go over with him before they could -- you could question him?

THE WITNESS: I asked him if he understood that.

THE COURT: Which of the two -- did you ask him if he understood his rights or whether or not he understood that you had to read this stuff to him before you could question him? It was the second, wasn't it?

THE WITNESS: Your Honor, what I -- what I was --

THE COURT: Let's play it again.

(Video played.)

THE COURT: All right, we're going to take a short break so Mr. Maiatico could look deep into his soul and decide if he wants to continue with this.

THE CLERK: All rise.

(Recess from 10:32 a.m. to 10:40 a.m.)

THE COURT: And how tall are you?

THE WITNESS: Six-four, Your Honor.

THE COURT: Thank you. Please sit.

Yes?

MR. MAIATICO: Your Honor, the Government is prepared to proceed --

THE COURT: All right.

MR. MAIATICO: -- with a response to the motion to suppress and the testimony of Agent Baber, if I may?

THE COURT: I'm sorry?

MR. MAIATICO: If I may?

THE COURT: You may.

BY MR. MAIATICO:

Q Agent Baber, have you reviewed the audio/video recording?

THE COURT: How tall is Mr. Stinson?

MR. HETZNECKER: Six-one, Your Honor.

THE COURT: Okay. Go ahead.

BY MR. MAIATICO:

Q Agent Baber, have you reviewed the audio/video recording from February 16th, 2017 of the interview of defendant Stinson?

A Yes.

Q And were you there during the interview of defendant Stinson?

A Yes.

Q And does the video that you viewed, does it fairly and accurately depict the interactions that you and the other agents had with defendant Stinson?

A Yes.

MR. MAIATICO: Briefly, Your Honor --

BY MR. MAIATICO:

Q Before this interview and before the video starts, did you offer defendant Stinson food and drink?

A Yes.

Q Did he accept?

A Yes.

Q And do you --

THE COURT: Actually, I'm -- I believe the food and drink were served by the other agent. I believe after the parade of evidence started, but go ahead.

BY MR. MAIATICO:

Q Did the FBI offer defendant Stinson food and drink during the course of this interview?

A Yes.
Q Was he offered the opportunity to go to the bathroom before or during the interview?
A Yes.
Q Agent Baber, you were involved in the investigation of defendant Stinson prior to this interview, correct?
A Yes.
Q And was this the first time that defendant Stinson was arrested?
A No.
Q As part of your investigation, did you run criminal background checks, criminal history checks --
THE COURT: I'm sorry, what does that mean, the first time he -- was that the first time he was arrested or was that the first time he was arrested by you?
THE WITNESS: In general, Your Honor, that was -- that was not -- this was not the first time he --
THE COURT: Because he has a criminal record?
THE WITNESS: Yes, Your Honor.
THE COURT: Oh, okay. But it was the first time he was arrested by you?
THE WITNESS: Yes, Your Honor.
THE COURT: Okay.
BY MR. MAIATICO:
Q But this was not the first time he was arrested in his

life, correct?
A Correct.
Q Had defendant Stinson been arrested before this interview?
A Yes.
Q One time or multiple times?
A Multiple times.
Q And did you --
THE COURT: Did you know that at the time of the interview?
THE WITNESS: Yes, Your Honor.
THE COURT: And did that affect how you treated him?
THE WITNESS: No, Your Honor.
THE COURT: Then why are you asking?
MR. MAIATICO: Your Honor, if I may, the --
THE COURT: You think Miranda --
MR. MAIATICO: -- the --
THE COURT: You think Miranda rights vary with the record of the person being warned?
MR. MAIATICO: No, I do not, Your Honor.
THE COURT: He said he didn't affect how he acted.
MR. MAIATICO: Yes, Your Honor.
THE COURT: So that you're telling me that because Mr. Stinson has a record, what, that I should -- I should view, because he already -- he must have heard these warnings a million times, I should view what he did a different way?

MR. MAIATICO: Your Honor, well the Third Circuit says that a factor in determining whether a defendant has understood his Miranda rights is his experience in the criminal justice system.

THE COURT: Wouldn't it have been a lot easier if he had just said, do you understand what I have just read to you?

MR. MAIATICO: Perhaps, Your Honor, although the legal standard here -- what we're looking at is whether or not this defendant understood his rights. That seems to be the issue that we're focused on. So the significance of whether he --

THE COURT: Well, whether he understood them and whether or not he waived them, yes, there -- there are -- I hate to have to instruct you as well, but there are two things.

MR. MAIATICO: Understood, Your Honor, and the first is whether or not he understood his rights and the second, as we described in our supplemental brief, is whether there was an implicit waiver here, which we argue that there was when he responded to those questions posed by the agents.

THE COURT: Yes, go on.

BY MR. MAIATICO:

Q Agent Baber, I'd like to show you what I'm -- will be marking Government Exhibit 4.

MR. MAIATICO: And I'll show that to counsel, Your Honor.

(Government's Exhibit 4 marked for ID = court summary)

MR. MAIATICO: Would the Court like to review this before I show it to the witness, Your Honor?

THE COURT: You don't have a separate copy?

MR. MAIATICO: I do, Your Honor.

MR. HETZNECKER: Do you have one for counsel as well? Thank you. Thanks. Okay.

THE COURT: I'm sorry, do we have the least idea of whether or not the defendant received Miranda warnings after any of these arrests?

MR. MAIATICO: Your Honor, the testimony that I anticipate here would be with regards to his prior arrests, whether they were guilty pleas or trials with regards to these.

MR. HETZNECKER: Objection, Judge. I don't think that's relevant. The question was whether or not as a factor he had a criminal history. That was all, not the specifics of the arrests and his background. That's an attempt to undermine my client's rights and eviscerate the rights and the waiver by somehow diminishing those rights because he has a record. We're not diminishing the rights of the waiver. The waiver speaks or non-waiver speaks for itself based on the video.

THE COURT: Well, I'll --

MR. HETZNECKER: So the fact that he has a criminal history, I didn't object. But now we're getting to the details, that's irrelevant with respect to whether or not there

was a waiver.

THE COURT: Why don't you go on, Mr. Maiatico.

BY MR. MAIATICO:

Q Agent Baber, I'm showing you what's been marked Government Exhibit 4. Do you recognize what I'm showing you?

A Yes.

Q What is that?

A This is a court summary of -- Philadelphia of defendant Edward Stinson.

Q And is that publicly available information?

A Yes, it is.

Q Is that information that you had prior to the interview with defendant Stinson?

A Yes.

Q And is the information that's on there -- well, let's go through some of the information that's on there.

Does it list --

THE COURT: What is the Government's position, that your view -- reading of the law is that the defendant's record shows what, whether or not --

MR. MAIATICO: He has experience in the criminal justice system. Your Honor, a defendant who --

THE COURT: And what does that go to in your view under the law?

MR. MAIATICO: Well, Your Honor, a defendant who has

had experience in the criminal justice system, who has stood in front of a court and pled guilty, who has gone to trial on prior criminal charges, would be hard-pressed to say that he does not understand the significance of the Fifth Amendment and his right to remain silent.

THE COURT: I'm sorry. I'm sorry. Do the cases explicitly say that?

MR. MAIATICO: The cases, as we cite in our motion, Your Honor -- or our supplemental response, talk about the experience in the criminal justice system of a --

THE COURT: You're not answering my question. The cases don't explicitly say that it reflects whether or not a defendant has knowledge of the Fifth Amendment, does it -- do they?

MR. MAIATICO: An understanding of their rights and the significance of those rights.

THE COURT: Do we know from this piece of paper whether this defendant received Miranda warnings in connection with any of these charges? Do we?

MR. MAIATICO: We could -- we could -- no, we do not, not based on that piece of paper.

THE COURT: And do we know whether or not the Philadelphia police have always had a policy that with the exception of homicide cases, they generally don't administer Miranda warnings, they don't bother to take a statement from

the defendant, because they don't really feel they need it because they have other witnesses? Were you aware of that?

MR. MAIATICO: Your Honor --

THE COURT: Were you aware of that?

MR. MAIATICO: I can tell you what the significance of the -- this --

THE COURT: You want to answer my question?

MR. MAIATICO: Am --

THE COURT: You weren't aware of it.

MR. MAIATICO: Am I personally aware of that?

THE COURT: Yes.

MR. MAIATICO: I'm not aware of the contours of -- in other cases of --

THE COURT: You just don't want to answer my questions.

MR. MAIATICO: I'm not --

THE COURT: So that we don't know whether or not in any of these cases, even if he stood there and heard the jury foreman say guilty, it was preceded at any time by Miranda warnings, do we?

MR. MAIATICO: Miranda -- so the Miranda warnings include --

THE COURT: Do we? No, we don't know, do we?

MR. MAIATICO: Your Honor, a defendant would be hard-pressed to say they don't understand the significance of their

constitutional rights --

THE COURT: Perhaps as you grow older in the law, you will learn that on occasion you have to answer a judge's questions, even if the answer isn't particularly favorable to your side. We don't know what preceded these particular dispositions, whether the charges were withdrawn, whether he pled guilty, whether he was convicted. We don't know if police at any time before he was represented by counsel administered Miranda warnings, do we?

MR. MAIATICO: We do not, Your Honor, but the Court can make reasonable inferences based on this criminal history and based on the broad experience of the defendant that he understood the significance of his rights because he's been through the system before. And not just with arrests, Your Honor, but through the court system, in front of judges who have accepted his guilty pleas and in front of a judge and jury who have convicted him.

THE COURT: Okay.

MR. MAIATICO: We can make some -- I believe, Your Honor, respectfully, that we can make reasonable inferences based on the criminal history about whether or not this defendant would understand the significance of those rights that were read to him.

THE COURT: Okay.

MR. MAIATICO: Your Honor, the -- if I may have one

moment?

THE COURT: Yes.

(Pause)

BY MR. MAIATICO:

Q Agent Baber, I'm going to ask you just a couple of questions before we conclude here about Government Exhibit 4. Based on your review of the criminal record and your understanding of the defendant's criminal record prior to this interview, had he been arrested before?

A Yes.

Q Multiple times?

A Yes.

Q Had he pled guilty in a State court to crimes?

A Yes.

Q Had he gone to trial based on charges in a State court?

A Yes.

Q And how do you know all that?

A Both a review of his criminal history and I also attended part of a trial where defendant Stinson was a defendant.

MR. MAIATICO: Your Honor, I have no further questions from this witness.

MR. HETZNECKER: May I, Judge?

THE COURT: You may.

MR. MAIATICO: And, Your Honor --

CROSS-EXAMINATION

BY MR. HETZNECKER:
Q Good morning, agent.
MR. MAIATICO: I'm sorry. If we may also move -- so I have a copy for the Court. It's Government -- marked Government Exhibit 2 --
THE COURT: Yes.
MR. MAIATICO: -- it is the video recording. As marked Government Exhibit 2, I'll make that available to the Court.
THE COURT: Thank you.
MR. MAIATICO: Thank you.
MR. HETZNECKER: Could we put the video back to the very beginning?
BY MR. HETZNECKER:
Q Good morning, Agent Baber.
A Good morning, counselor.
Q Let's talk about your experience. You had how many years experience as a law enforcement officer before you took this statement from my client?
A Approximately fourteen.
Q Fourteen years. In your fourteen years, how many statements did you take from individual defendants and/or suspects?
A I don't recall an exact number, counselor, but probably forty perhaps.

Q Forty statements taken where you administered Miranda warnings and a waiver was issued and then you took the statement, is that your testimony?
A That's approximately correct, yes.
Q And you were trained by the FBI as to how to conduct an interrogation, correct?
A Yes.
Q And part of that training included, obviously, legal training, correct?
A Yes.
Q Which required you to administer the Miranda warnings as set forth in this FBI form that you have in front of you, which is FD-395, is that correct?
A Yes.
Q Would you say you know the warnings in this particular form by heart?
A No, that's why I read it verbatim.
Q That's why you read them and you read them from this form?
A Yes.
Q Let's go over the form. It says, FBI Bureau of Investigation Advice of Rights, is that what it says?
A Yes.
Q And then the first question, before we ask you any questions, you must understand your rights, correct?
A Yes.

Q You have the right to remain silent, correct?
A Yes.
Q You have -- anything you say can be used against you in court, correct?
A Yes.
Q You have the right to talk to a lawyer for advice before we ask you any questions, correct?
A Yes.
Q You have the right to have a lawyer with you during questioning, correct?
A Yes.
Q If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, correct?
A Yes.
Q If you decide to answer any questions now without your lawyer present, you have the right to stop answering at any time, correct?
A Yes.
Q Tell His Honor what's underneath those Miranda warnings that we just -- I just read in the record and you have affirmed? What's underneath them?
A There's a -- in dark, bolder font there's the word consent.
Q Consent. And what does it say underneath it? Read into the record.

A I have read the statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present.

Q You didn't present that to my client in the video, did you?

A No.

Q The particular question, correct?

A Correct.

Q In fact, you never presented the form to my client for signature, which is required by the form, correct?

A It's not required by the form.

Q It says signed underneath it, doesn't -- is there not a place for a signature?

A There is a place for a signature, but it's not a requirement.

Q It's not a requirement. Why is there a place for the signature on the FBI form?

A In the event that the individual wishes to sign, he or she may sign.

Q In the event that they're given their Miranda warnings in a coherent manner, provided waiver on every single question, and then asked at the end whether or not I have read this statement of my rights and I understand what my rights are and at this time I am willing to answer questions without a lawyer present. Then they sign, is that correct?

A They may sign if they so choose, yes.

Q But you never asked this question or you never gave this opportunity to my client, did you?

A No.

Q So the statement which would indicate the consent, underneath the consent, I have read the statement of my rights and I understand what my rights are, that was never asked of my client, nor was this form shown to my client, was it?

A Correct.

Q At this time I am willing to answer questions without a lawyer present. That was never asked of my client, was never shown to my client, and he never signed this form, correct?

A Are you -- counselor, I just want to make sure I understand your question. Are you asking specifically under the consent portion of this form specifically?

Q I'm talking about the form, that's correct.

A Right. That -- the portion under consent, he was not read and nor did -- nor was he shown the form or asked to sign it.

THE COURT: Agent, in the forty statements you've taken, have you ever paused after reading each of the warnings and said to the person you're questioning, do you understand that?

THE WITNESS: I don't believe I have, Your Honor, but I can't recall.

THE COURT: You can't recall, so you might have?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you know that perhaps that other police officers and agents do that? Are you aware of that?

THE WITNESS: I'm not aware of the individual practices of other law enforcement officers, Your Honor.

THE COURT: You're not. You're not aware that some agents or officers have the person they're questioning initial the form after each question?

THE WITNESS: I believe I have seen that from other law enforcement officers, yes, Your Honor.

THE COURT: Okay. Go on.

BY MR. HETZNECKER:

Q So just following up on His Honor's questions, you've never been present when another agent took a statement from a suspect in which they, in fact, administered the questions, paused, and got an affirmation after every question that the client understood -- or the suspect understood the question and gave an affirmative answer?

A I don't --

Q You've never been present with -- where another agent has done that?

A I don't recall, counselor.

Q Well, when you say you don't recall, you took forty statements. How many statements have you been present that have been taken by other agents?

A I don't -- I don't remember, counselor. Probably about as many. Approximately about as many, thirty or forty.
Q So we're talking about eighty statements overall in which you've been a witness to, in which Miranda warnings were administered, is that correct?
A Yes.
Q And of those eighty statements, as His Honor questioned you about the initials, you've indicated you have seen documents, Miranda forms, in which initials are provided after every question. You've seen those?
A Yes.
Q By the FBI?
A I can't say by the FBI, I can see those. I've seen Advice of Rights forms from other agencies as well, so I can't recall whether or not it was from an FBI Advice of Rights form or another law enforcement agencies.
Q But in this particular case, you made a decision to have a conversation, to question my client before you ever gave his Miranda warnings. You asked him a question, did you not?
A I'm not following, counselor. Can you please re-ask that?
Q The purpose of sitting down with Mr. Stinson was to get a statement from him, correct?
A The purpose was to interview him, correct.
Q Right, get a statement from him, correct?
A Correct.

Q In an effort to get that statement, you had an initial question that you posed to him before you ever Mirandized him. Do you remember that?
A No, I don't.
Q Let's play the tape, please.
(Video played.)
MR. HETZNECKER: Stop right there. Stop right there.
BY MR. HETZNECKER:
Q You probably want to hear us out. Okay? That's a question, is it not?
A That's a statement, counselor.
Q It's not a question to him?
A It was a statement. You probably want to hear us out is a statement.
Q Why would you assume that he probably --
THE COURT: Well, wait, didn't you say afterwards, okay?
THE WITNESS: I don't remember, Your Honor. To me --
THE COURT: Let's play it again.
MR. MAIATICO: Your Honor, the video speaks for itself. We could --
THE COURT: Please sit down, Mr. Maiatico.
MR. MAIATICO: Thank you, Your Honor.
(Video played.)
THE COURT: Now was that okay?

Please turn it off.

That okay was a question, wasn't it? You were asking him if he agreed.

THE WITNESS: I would suppose, yes, Your Honor.

THE COURT: Okay.

BY MR. HETZNECKER:

Q So you had a question before you gave him Miranda warnings, is that correct?

A Yes.

Q You posed a question to him, correct?

A Yes, to ensure that he understood what I was saying before I asked him --

Q To ask him a question about what you were saying, which meant you probably want to hear us out, right?

A Correct.

Q All right.

MR. HETZNECKER: Go ahead, let's play the tape.

(Video played.)

MR. HETZNECKER: Let's stop there. Let's stop there. If we can go back just a minute. I'm sorry, Ms. Osirim.

MS. OSIRIM: You want to go back to the beginning?

MR. HETZNECKER: No, no. Just -- I'm sorry, Ms. Osirim. Just before -- after he says okay, if we could just play the next part.

(Video played.)

MR. HETZNECKER: I'm sorry.

MS. OSIRIM: It's all right.

MR. HETZNECKER: I apologize.

MS. OSIRIM: It's hard to --

MR. HETZNECKER: No, no, no. It is. It is.

(Video played.)

BY MR. HETZNECKER:

Q Okay. What were you asking him, you probably heard? What are you asking him about?

A Regarding the Indictments that were then unsealed that day and resulting in his arrest.

Q He was just walked into an interrogation room, correct?

A Correct.

Q He was escorted by FBI agents, correct?

A Correct.

Q He was told he was indicted and that was -- he was brought -- why he was being brought to the FBI office, was he not?

A I can't say that, counselor, because I was not part of the arrest team on Mr. --

Q No, no, no. You were in the room. You're here in the room. You're walking in. That's not the first time you ever saw him, is it, that day?

A Yes, that -- right before that, when he came into the room, that was the first time I had seen him. I did not participate in the arrest of --

Q I'm not saying you participated in the arrest. When he was in that room, had you seen him outside the room before?
A I don't remember whether I -- he -- I saw him outside the room or not.
Q Well, you had some change in your hands. There was some purchase made for him, correct?
A Correct.
Q For some items -- food items, correct?
A Correct.
Q So he was asked what food items he wanted and those items were purchased, correct?
A I don't remember, counselor, whether or not I -- who asked him that or whether or not he was -- he took a -- we took an order of food from him or --
Q Well, agent, my question is, did you have any contact with my client before you walked into that room -- any contact, before you walked into that room and the videotape began?
A I don't remember, counselor, whether or not we had any contact before. That's what --
Q Not me, you specifically.
A Whether I had any contact with him?
Q Yes.
A I don't recall.
Q All right. It's true that you have change in your hands, correct?

A Yes.
Q And you hand it to your fellow agent, is that correct?
A Yes.
Q What was the change for?
A To purchase food and drink for your client.
Q All right. Did you take the order from my client on the videotape?
A I don't remember. I don't think I took the order from him, no.
Q But the agent comes in with the items after the interrogation begins, correct?
A Yes.
Q So someone took an order for the food from my client, is that correct?
A Yes.
Q And you were aware of that, because you gave her the money to go purchase it, correct?
A Yes.
Q That was your money, correct?
A Yes.
Q So presumably you understood what he wanted?
A No.
Q No?
A No. I simply would have handed the money to an agent to go purchase whatever your client may have wanted. I may not

have --

Q Well, he -- it's not -- he doesn't -- he's not asked on the tape what he wants, is he?

A No.

Q So that question and that answer from my client happened before the videotape begins, correct?

A Presumably, yes.

Q All right, let's play the tape.

MR. HETZNECKER: Thank you, Ms. Osirim.

MS. OSIRIM: You're welcome.

(Video played.)

MR. HETZNECKER: Let me stop. Let me stop. Stop. Stop.

BY MR. HETZNECKER:

Q I'm going to read what I got to read you and then I'm going to play something, correct?

A Yes.

Q So you say, I'm going to read what I'm going to read to you and then you say --

THE COURT: What I got to -- what I got to read.

BY MR. HETZNECKER:

Q -- what I got to read to you and then I'm going to play something. What you got to read to him were these Miranda warnings on the form, which obviously has a signature area for consent, correct?

A Correct.
Q Which you don't provide, correct?
A Correct.
Q And then I'm going to play something for you, correct?
A Correct.
Q You're trying to sloth through as quickly as possible these warnings so that you can get to the real issue, which was playing the tape that you wanted me to hear, correct?
A No.
Q No?
THE COURT: Well, wait --
BY MR. HETZNECKER:
Q Isn't that what you did?
THE COURT: -- wait, wait, wait. You said you're going to read what you got to read and then you're going to play a tape, correct?
THE WITNESS: Yes, Your Honor.
THE COURT: You're going to play something, correct?
THE WITNESS: Yes, Your Honor.
THE COURT: So you're presuming he's going to waive his rights, correct? Because if he doesn't waive his rights, then you're not going to play the tape for -- you're not going to play anything for him, correct?
THE WITNESS: That's correct, Your Honor.
THE COURT: So you were presuming. You say, we're

going to -- I'm going to read what I got to read to you and then I'm going to play something for you, right? That's what you said?

THE WITNESS: Yes, Your Honor. I was hoping certainly that he was going to waive. If he --

THE COURT: You're telling him what you're going to do, correct? That's what this is, you're telling him what you're going to do.

THE WITNESS: Yes, Your Honor.

THE COURT: And so you're telling him that you're going to play something for him, which you could do only if he waived his rights, correct?

THE WITNESS: Yes.

THE COURT: Okay.

MR. HETZNECKER: We can play the tape.

(Video played.)

MR. HETZNECKER: Let me stop. Let me stop. Stop right there.

BY MR. HETZNECKER:

Q Why did you not read the line under the consent form and provide him the consent form to sign?

A Because it's not a requirement.

Q So that's the only reason? But was it you were trying to get through the Miranda warnings as quick as possible to play the tape and get him to talk?

A No.

Q No? You sat him down here for the sole purpose of getting a statement from him, did you not?

A Only if he was going to consent to give one.

Q You were trying to avoid the consent by going through it very quickly and never providing him the form, isn't that correct, agent?

A No.

Q Well, then why didn't you provide him the form as the form indicates for his signature? Why? Why did you choose in this case not to provide the form after eighty statements that you've been present for, forty of which you've taken, why did you choose in this case not to provide the form to my client so he could sign the consent? Tell the Court why you decided in this case not to do that.

A It is both not a requirement and it is audio and video recorded to confirm that I, in fact, read him his statement.

Q Ah, so you were relying on the videotape to confirm whatever you thought was going to be the waiver, is that correct?

A Not entirely, but I knew that there would be an audio/video recording of this incident, yes.

Q That's not my question. My question is, because the videotape was running, you felt that you could run through these questions very quickly and then not have him sign the

form and the videotape would essentially establish the waiver as long as he agreed to talk --
A Yeah.
Q -- is that right?
A Yes.
Q But the agreement wasn't to talk and the agreement wasn't to waive his rights, because that's not the question you asked him.
MR. HETZNECKER: If we could back it up for a second and play the question.
(Video played.)
MR. HETZNECKER: Period. Stop.
BY MR. HETZNECKER:
Q That's the stuff we have to go over before we start talking to you about what this is about. The stuff we have to go over, what -- he didn't go over anything. The stuff we -- what did he go over? You never showed him the form, correct?
A Correct.
Q So he never went over any of those things you just read to him, did he?
A He didn't read the form, no.
Q He did not go over any of the questions that you provided to him quickly in running through this form. He did not do that. That's not the stuff that you -- we did, you did it. He never did it, did he?

A He never did what, counselor?

Q He never went through the form, he never went through the questions. He never affirmatively answered on any one of those questions that he understood his rights, did he?

A He never -- we never went over each individual question with him.

Q That's my question.

A Right.

Q He -- you never went over each individual question and the way you characterize is, that's the stuff we have to go over. That's what you say, correct?

A That's -- that is what I say, correct.

Q But he never went over it.

THE COURT: Wait. Wait. Wait. You're repeating yourself.

Could -- Ms. Osirim, could you play the last few seconds again?

(Video played.)

THE COURT: All right. That's the stuff we got to go over because we can talk to you -- before we can talk to you about what this is about, you understand that? Those were your words, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: If, in fact, Mr. Stinson -- Mr. Stinson's yeah, assuming there is a yeah on that tape, was, he was saying

yes, I understand you have to go over that with me before you can talk to me, if that's what he was saying yes to, then he was not indicating that he understood the warnings, isn't that correct? If he said he understood that that was the stuff you had to review with him before you could talk to him about what this was about, if that's what he understood, that you had to read those things to him before you could talk to him, then he was not indicating that he understood the rights themselves, isn't that correct?

THE WITNESS: I don't know, Your Honor. All I know is that when I asked him if he --

THE COURT: Listen to my question closely, because you pose these questions -- this is the script you wrote, sir, and nobody else. You said to him, you understand that this is the stuff we have to go over with you before we can talk to you about what this is about. And he says, yes. If he said -- if that yes was, if he did say yes, yes, I understand that's what you have to go over with me, then he was not indicating -- if that was the question that he heard and that he answered, then he was not indicating that he understood the rights you just imparted to him, isn't that correct?

THE WITNESS: Yes.

THE COURT: Why don't we take a break?

BY MR. HETZNECKER:

Q And then you --

MR. HETZNECKER: One more question.

THE COURT: Why don't we take a break?

THE CLERK: All rise.

(Recess from 11:09 a.m. to 11:20 a.m.)

THE COURT: Okay, please be seated everyone.

Yes, Mr. Maiatico?

MR. MAIATICO: Your Honor, the --

THE COURT: I'm sorry, Mr. --

MR. MAIATICO: Mr. Hetznecker is -- yes.

THE COURT: I'm sorry, Mr. Hetznecker. I apologize.

MR. HETZNECKER: That's okay. If we could continue the tape.

(Video played.)

MR. HETZNECKER: By the way, if we could just -- just one -- I'm sorry, Ms. Osirim.

BY MR. HETZNECKER:

Q You then take the form indicating the Miranda warnings and you put it down on the table, correct?

A Yes.

Q So my client never sees it --

A Correct.

Q -- is that correct?

A Correct, yeah.

Q Okay.

MR. HETZNECKER: So play it.

(Video played.)

MR. HETZNECKER: Now if I could stop right there.

BY MR. HETZNECKER:

Q The other agent that's in the room, can you identify her?

A Yes.

Q What's her name?

A Sara Cardone (Phonetic).

Q Okay. She shows her identification to my client at that point, presumably had never met or seen my client because she shows her ID, correct?

A Presumably. I'm not sure though.

Q When she walked in the room, she walked in at some point with the items -- the food items that my client had requested, does she not?

A I don't remember who -- I wasn't paying attention --

Q Fine.

A -- to that part, counselor --

Q That's fine.

A -- so I don't remember who walked in with it.

Q But you don't remember being in her presence and my client's presence before she came in the room? This is her first opportunity to identify herself, correct?

A Correct.

Q So my client was not in her presence prior to going into the room, but my client was in your presence prior to going

into the room, is that correct?

A I don't recall the conversations that I had or didn't have with your client before I began to speak with him within the interview room.

Q But you had conversations with him?

A I don't remember, counselor.

Q You were in his presence, were you not?

A I don't remember, counselor. That -- this was -- this was quite a while ago. I don't remember whether or not I had -- I was in his presence prior to this time.

MR. HETZNECKER: So we can play the tape.

(Video played.)

MR. HETZNECKER: Stop right there. Let's stop right there.

BY MR. HETZNECKER:

Q Debra is whom?

A A co-defendant Debra Baylor.

Q It's his girlfriend, is it not?

A I can't -- I can't speak to the romantic relationship with the --

Q You didn't know that -- you didn't know that there was a relationship between Debra Baylor and Edward Stinson before your fellow agent asks -- or told my client that Deb was locked up?

A I was aware that at one -- at one point there had been a

romantic relationship. Whether they were at this time, I wasn't sure.

Q Well, the point of telling my client at that juncture that Deb was locked up was to try to get him to cooperate to help her situation out. So Deb's locked up, you can help her situation out. That's the point of giving that information. That's a strategic attempt on your part to give some information that might get him to talk, is it not?

A I can't speak to that, counselor, because I didn't say that, so I'm not sure what -- what's --

THE COURT: Agent, did you and Agent Cardone talk about how you were going to conduct the interview before you conducted the interview?

THE WITNESS: Your Honor, I don't remember. We arrested many people that day, so I don't remember.

THE COURT: Agent, you're under oath. You don't remember if you spoke to Agent Cardone about an interview strategy for the head of this drug trafficking ring? You don't remember?

THE WITNESS: No. No, Your Honor. We arrested about twelve people that day and it was a very busy day, so I don't remember whether we had a discussion specific to defendant Stinson or not.

THE COURT: Okay.

MR. HETZNECKER: Can we -- Ms. Osirim, back it up

just for a moment and then play it. Yeah, so go ahead.

(Video played.)

MR. HETZNECKER: Let me stop you right there.

BY MR. HETZNECKER:

Q So as you slap down the Indictments in front of him, the purpose of throwing the Indictments in front of him in the way you did was to intimidate him?

A No.

Q Well, what was the purpose of doing it instead of handing it to him? Why did you slap it down in front of him the way that you did?

A I wouldn't say I slapped, I dropped them in front of him and I did that just so that --

Q Emphatically, right?

A I'm not -- I wouldn't characterize it as emphatically or anything, I put them -- I placed them in front of him so that he was aware of what the charges were against him, so he could see the Indictment.

Q These are multiple page Indictments, correct? They're thick.

A Correct.

Q One is over a hundred pages, is it not?

A Correct.

Q So you're throwing those in front of him, his name is on the front of the Indictments, correct? You're telling -- the

two of you are telling him his girlfriend is locked up. Presumably his girlfriend's been locked up. And then you've locked all these other people up, correct?

A Yes.

Q And all in an effort to get him to talk about the case, correct?

A I don't know whether that was an effort to get him to talk about the case or simply to tell him the facts. And the facts were he had been indicted, along with numerous other co-defendants.

Q What was the purpose of telling him the facts and throwing the Indictments in front of him in the way in which you did if it wasn't to get him to talk about the case?

A It was to show him that we, in fact, had -- brought charges against --

Q You could have whispered that in his ear on the way in. That wasn't the purpose in throwing the Indictments in front of him. The purpose of throwing the Indictments in front of him and starting to play the phone calls was to get him to talk, was it not?

A Mr. Hetznecker, as I said, I wasn't part of the arrest team that morning, so I don't know what was advised to him at the time that he was arrested, so I was informing him of the charges against him.

Q And then you continue by playing recordings, correct? So

you could have advised him of the charges and said we're going to leave the room, right?
A Yes.
Q You didn't do that --
A No.
Q -- because the purpose was to get a statement from him, correct?
A The desire was to get a statement from him, yes.
Q All right. So the purpose of everything that you were doing was toward furtherance of that desire. So everything that you did from here on out in this particular videotape was to try to get him to implicate himself and the others in this conspiracy, correct?
A I can't say that everything was, counselor. I would say that our --
Q What wasn't? What wasn't? What wasn't? Exclude a technique that you used in this particular videotape that wasn't designed to try to get him to talk.
A Well, for example, providing him with food and beverage is simply the right thing to do and to be --
Q Well, he asked for it, right, based on request by someone, do you want something to eat? And someone went and got it and provided it to him, correct?
A That I don't know.
Q And that's an incentive, that's a technique that's used to

ingratiate yourself with a particular suspect so they're comfortable and they will eat, is that correct?

A I don't know, counselor. What I know is that we provided him with --

Q You've never been trained that that's a --

MR. MAIATICO: Objection, Your Honor, if he'd let the witness answer the question.

THE COURT: Let the witness finish his answer, Mr. Hetznecker.

MR. HETZNECKER: Fine. Go ahead, yes.

THE WITNESS: What I can tell you is that food and drink were provided to your client that morning because it's the right thing to do. He had been arrested that morning and we provide them with food and drink and provide them with the opportunity to use the bathroom.

BY MR. HETZNECKER:

Q You were concerned about him, his nourishment?

A We're concerned about the well-being of everyone we bring in. The last thing we want is someone to be injured or ill when -- while they're in our custody.

MR. HETZNECKER: If we could play the tape.

(Video played.)

MR. HETZNECKER: Let me stop right there.

BY MR. HETZNECKER:

Q The two phone conversations you were playing, were they

tape recorded from the prison or were they wiretapped?

A I don't remember, counselor, which calls we played. It's hard for me to hear what calls in that audio are being played, so I don't remember whether they were prison phone calls or whether they were Title III interceptions.

Q But you knew which phone calls you were going to play when you sat down with Mr. Stinson, correct?

A Yes.

Q You chose those specific phone calls, correct?

A Yes.

Q In an effort to get him to talk, is that correct?

A That's part of the reason, yes.

Q Yeah, right. So as you sit here now, those phone calls, which were an effort to get him to speak, didn't include his voice on either one of those?

A Yes.

Q So presumably it's either a prison call, correct, or a wiretap, correct?

A Correct.

Q Did you hear in front of either one of those calls the admonition from the prison that, in fact, this call was recorded?

THE COURT: You really don't need to go into that now.

MR. HETZNECKER: All right, I won't do that, sir.

Thanks.

Can we continue to play this?

BY MR. HETZNECKER:

Q By the way, he's indicating -- he's asking a question about whose on -- whose names are on the Indictment, is that correct?

A I believe so, yes.

Q All right.

MR. HETZNECKER: If we can play it.

(Video played.)

THE COURT: Could we -- could we hold for just a -- could we stop for just a second? There's a third person in the room?

THE WITNESS: Your Honor, this individual just entered the room. He's a Philadelphia police officer. He was a task force officer assigned to our office and in this investigation.

THE COURT: Was he armed?

THE WITNESS: At the time, Your Honor, I don't recall. Our policy is not to be back there. Our policy is to lock up firearms for agent and officer safety.

THE COURT: Okay.

BY MR. HETZNECKER:

Q My client is handcuffed and is he also chained to the floor or not?

A No. We don't have a -- there is no chain to the floor. The only option is on the table.
Q Does he have shackles on his legs?
A I don't recall. I'm not sure.
Q Now the conversation that you played, the recording that you played, and my client asked you about this conversation. During that exchange right there, were you implicating him in the drug conspiracy by playing that phone call?
A Yes.
Q So in implicating him and playing that particular phone call, it was an effort to elicit information from him or an affirmation that, in fact, he was a part of that conspiracy, correct?
A Yes.
MR. HETZNECKER: Play it.
(Video played.)
MR. HETZNECKER: Let me stop it right there. Let me stop. Stop right there. Stop right there.
BY MR. HETZNECKER:
Q So now you've tried the technique, you played the phone calls, correct?
A Yes.
Q He had a question about whether or not it was him on the phone. He said, that ain't me, correct?
A Correct.

Q You're not satisfied with that, so you further the interrogation by then referring to others that you've already spoken to, correct?
A Correct.
Q Implicating to him or implying to him that, in fact, other people have made statements against him about the conspiracy, correct?
A Correct.
Q In an effort to get him to cooperate by giving you a statement?
A Correct.
Q All right. And this went on for 45 minutes, correct?
A Approximately, yes, counselor.
Q All right. Throughout this interrogation -- by the way, the actual form that you used, did you preserve that form or was it just a random form, unsigned form?
A It was an unsigned form. It's one of -- it's a copy. They're all the same.
Q They're all the same, meaning you did not preserve that form for this hearing or any other hearing, is that correct?
A Are you referring to the specific form that I had --
Q Yes.
A -- in this video?
Q Yes.
A No, I did not preserve it. No.

Q And with respect to my client, you had seen him on numerous occasions before, correct?
A Yes.
Q In fact, you said you -- you testified you saw him in a courtroom, correct?
A Correct.
Q At a trial, correct?
A Correct.
Q In which he was convicted, correct?
A I believe he was, yes. Yes.
Q He didn't plead guilty, did he?
A In that particular case, no.

MR. HETZNECKER: I have no further questions.

THE COURT: Ms. Coggins.

MS. COGGINS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. COGGINS:

Q I'm sorry, I'm a little confused. I thought you said before you walked into that room you had not seen the defendant before?
A I hadn't seen him that day.

MR. MAIATICO: Your Honor, if I may, I'm not sure that this defendant has standing to -- on this issue.

THE COURT: Overruled. Go ahead.

MS. COGGINS: Thank you, Your Honor.

BY MS. COGGINS:

Q So when you testified earlier that you had not -- you were not familiar with the defendant, you had not seen him before, you were just speaking about that day, correct?

A Correct, because I --

Q You were very familiar with Mr. Stinson, because as Mr. Hetznecker said, you sat through a trial, correct?

A Yes.

Q Okay. So another thing I was interested in, you said that not every interview that you do is to get the suspect to talk. Did you testify to that?

A I don't believe I said that. If I did, I was -- I made a mistake. And can you elaborate further, counselor, what you mean?

Q Sure. You would agree with me then that as soon as you step into the room with a suspect, your main intent from the get-go is to get that suspect to talk?

A Correct.

Q And to get them to say something that you can later use against them, is that correct?

A That's one of the reasons, yes, counselor.

Q That was the purpose on this date, correct?

A One of the reasons, yes.

Q Okay. What was another reason?

A Well, in general just to get cooperation from the

individual so that we could possibly use that interviewee, whoever it is, as a potential witness against others in a multi-defendant case like this.
Q In order to do that, you need to get the goods on that person, correct?
A We would need that person to cooperate, yes.
Q So your main goal walking in there -- your only goal was to get this person to cooperate?
A That was my goal, yes.
Q You understand the difference of course between advising someone of their rights and having someone waive their rights, correct?
A Yes.
Q It's a two-step process, advise and waive, correct?
A Yes.
Q And you would agree with me that your main purpose that you testified to was to advise him of his rights, correct?
A Advise and waive -- and receive the waiver.
Q Okay. But you didn't do anything in furtherance of a waiver, is that correct?
A No, that's not correct.
Q Okay. What did you do in order to get him to waive his rights?
A I asked him if he understood his rights --
Q Um-hum.

A -- he said yeah, and he agreed -- he then answered questions as the interview progressed, which was an implied waiver to me that he understood those and was going to agree to answer questions.

MR. HETZNECKER: Objection, Judge, objection to that -- to his conclusion.

THE COURT: Overruled. No, no, I -- I --

MS. HORTON: At any --

THE COURT: -- I -- that's a legal conclusion and, by the way, it's inconsistent with what he testified to before --

MR. HETZNECKER: It is.

THE COURT: -- and I'm going to have to make credibility findings --

MR. HETZNECKER: Right.

THE COURT: -- about this agent, Mr. Maiatico.

Go ahead.

MS. COGGINS: Thank you, Your Honor.

BY MS. COGGINS:

Q You also said earlier that you don't have the Miranda rights memorized?

A Correct.

Q You've been doing this 14 years, correct?

A Yes.

Q And there's five lines?

A Yes.

Q You're honestly saying here under oath that you don't have the Miranda rights memorized?
A No, and I choose not to try to memorize them because I don't want to miss something or be erroneous, so I always read from them. That's what I do, so that I don't miss something there, skip a line, miss a word, and that's why --
Q There's only five lines --
A I understand.
Q -- right?
A Yes.
Q The right to remain silent, right?
A Yes.
Q Okay. I -- I'm sorry. Now you also said -- you testified under oath to the judge that you went and got food and drink for Mr. Stinson because it was the right thing to do, is that correct?
A That's one of the reasons, yes, counselor.
Q And you were just being a good guy, concerned about the people that were now in your control on this day, is that correct?
A That is one of the reasons, yes.
Q My client was sitting in a cell in that building from 10:00 in the morning until 8:00 at night, is that correct?
A I don't know. I don't -- I don't know. I didn't talk to your client that day, so I'm not sure where he was at that

time.
Q Are you aware that nobody asked him if he wanted anything to eat or drink?
A I'm not aware of that, no.
Q But you're concerned about the welfare of these people under your control, correct?
A Yes.
Q That's ten hours, correct?
A Again, counselor, I don't know. I'm not aware of what your client's situation was at the time.
Q And you're honestly trying to say to the Court under oath that it isn't a tactic that's used by investigators to try to ingratiate themselves with the person who is seated in front of them, is that correct?
A No, that -- that is a technique. There are -- but there's -- there are other reasons to do it as well.
Q From the goodness of your heart?
A Correct. Yeah, it's the right thing to do. Yes.
Q Now you said after the first phone call that you played on the computer for Mr. Stinson -- right after that played, you said Juan, is that correct?
A Yes.
Q Were you trying to say that that was a phone call between Mr. Stinson and Mr. Juan Jarmon?
A I believe so, but I don't recall what recording we played

in front of him at this time.

MS. COGGINS: Would you mind playing that first -- the first recording?

MS. OSIRIM: Now?

MS. COGGINS: Um-hum.

(Video played.)

MS. OSIRIM: You want me to stop, Ms. Coggins?

BY MS. COGGINS:

Q Did you say right there Juan?

A I think I did, yes.

Q Okay. And it's your testimony there that that's Juan Jarmon on that phone call, is that correct?

A I believe it is. Again, it's hard for me to hear, as I sit here, what's being played in there, but I believe the call we were playing was between your client and Mr. Stinson.

Q Okay. And you're sure about that because you listened to hours -- as you testified, hours of phone calls --

A Yes.

Q -- correct?

A Yes.

Q You also said that Mrs. -- that Debra Baylor is in jail and you testified that you didn't know at the time that they were -- Mr. Stinson and Ms. Baylor were in a relationship?

A I wasn't sure at that moment whether they were still in a relationship. We had evidence that they had been in a

relationship, but weren't sure at that time, at the day of the arrest --

Q You mean that second --

A Well --

Q -- that second that he answered that question?

A On February 16th, 2017, I wasn't sure if they were still together or not.

Q You knew that they were together all the way up until he walked into the room, correct?

A No. I knew that there had been a time where they were together and wasn't sure up to that date whether they were still together on that day.

Q Are you saying then that the point of the very first person that you list is -- the fact that you're giving that much significance to the name Debra Baylor wasn't because you knew that that was his girlfriend at the time?

A No, it was, because we knew that at least at some point there had been a boyfriend/girlfriend relationship. Yes, that -- and that was the reason that we gave that name versus other names, yes.

Q Because that was the most important person to him at the time, correct?

A I don't know whether it was or not. We thought it might be, so that's why we used that name.

Q You absolutely --

THE COURT: Wait. Wait. Wait.

BY MS. COGGINS:

Q -- thought it was.

MS. COGGINS: I'm sorry. I'm sorry, Judge.

THE COURT: You thought it might be, you said?

THE WITNESS: Yes, Your Honor. I can't -- I know I can't definitively say who --

THE COURT: No, no, but you -- you -- I'm sorry, you weren't permitted to finish your answer. Go ahead.

MS. COGGINS: I'm sorry, Judge. It's just out of frustration. The reason -- and you're --

THE COURT: I believe this -- the agent said that's why he began by -- that's why they began -- it was the other agent who mentioned her, but that's why they began by mentioning her because she was the most significant person, correct?

THE WITNESS: We believe that she was the most significant. Yes, that's why we mention her name as opposed to other names.

BY MS. COGGINS:

Q Now just to follow up, you do agree now -- I know that on direct examination you said that you placed the Indictments in front of him. Do you now agree that you've seen it another time that you threw them down in front of him in an intimidating manner?

A No, I wouldn't say I threw it in an intimidating manner. I -- I can -- I would certainly concede that I dropped them in front of him. My intent was not to intimidate Mr. Stinson.

Q But you don't seem like a volatile person up there on the stand. It does seem like this was done for an intended purpose. Are you denying it was done in that fashion to intimidate the defendant?

A That's correct, I was not trying to intimidate the defendant. I try not to intimidate anyone.

MS. COGGINS: I don't have any other questions, Your Honor.

THE COURT: Mr. Maiatico?

MR. MAIATICO: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. MAIATICO:

Q Agent Baber, at any point during the interview did defendant Stinson say that he wished the interview to be stopped?

A No.

Q At any point did he say that he wished to remain silent?

A No.

Q If he would have done that, what would you have done?

A Immediately terminated the interview.

Q At any point during the course of the interview did he say he wanted to speak to an attorney?

A No.
Q If he would have done that, what would you have done?
A Immediately terminated the interview.
Q Okay.
MR. MAIATICO: I have no further questions.
MR. HETZNECKER: I have nothing.
THE COURT: Thank you, agent.
Does the Government have any other evidence it wishes to present?
MR. MAIATICO: Your Honor, none of this matter.
THE COURT: Well, that's what we're here on, this matter. On this motion to suppress the statement, nothing more?
MR. MAIATICO: Nothing more.
THE COURT: Does the Defense have anything it wishes to present?
MR. HETZNECKER: No, Your Honor.
MS. COGGINS: No, Your Honor.
THE COURT: Okay. Is there anything else we need to address this morning before I give you a schedule?
MR. HETZNECKER: No, Your Honor.
MS. COGGINS: Would Your Honor --
MR. HETZNECKER: Well, actually separation issue --
MS. COGGINS: Yeah.
MR. HETZNECKER: -- we do need to address.

THE COURT: All right. Well, let me give you a schedule then. How much time -- I will order a -- an expedited transcript. And you're both CJA appointed. I assume that means you can get them with the CDJ paying for them. How long will counsel need, you think, to prepare proposed findings and conclusions?

MR. HETZNECKER: You want to go? Go ahead.

I would -- Judge, I would need probably -- after I obtain the record, probably about ten days to two weeks, just given my schedule.

THE COURT: Ms. --

MS. COGGINS: The same, Your Honor.

THE COURT: Mr. Maiatico?

MR. MAIATICO: Two weeks sounds appropriate.

THE COURT: All right. Well, then -- I'm not sure how long it's going to -- it's always a problem figuring out how long it'll take for the transcripts and I know we've moved the trial date in this matter quite a bit.

What is the trial date presently, does anybody know?

MR. HETZNECKER: I believe it's in March.

MS. COGGINS: March 13?

MR. MAIATICO: March 2nd.

THE COURT: All right.

MS. COGGINS: Oh, March 5th, yes.

THE COURT: So that there's no rush, I would -- I

will order -- it may take as long as, even with expedited, two weeks to get these transcripts. So I will ask you 30 days from today -- is that a weekday? Today is the 14th, so it would be October 14th.

THE CLERK: It's a Sunday, Your Honor.

THE COURT: All right. By Monday, October 15th, is that okay with counsel for proposed findings and conclusions?

MS. COGGINS: Yes, Your Honor.

MR. HETZNECKER: Yes, Your Honor.

MR. MAIATICO: Yes, Your Honor.

THE COURT: All right.

MR. HETZNECKER: As long as we get that transcript, which --

THE COURT: If you need more time, just ask.

MR. HETZNECKER: Fine.

THE COURT: And I would ask that replies to the -- I don't think I need replies to the proposed findings of fact, but replies -- or responses, I should say, to the proposed conclusions of law two weeks after that.

MR. HETZNECKER: That's fine.

THE COURT: So it would be the 29th. Is that okay?

MR. HETZNECKER: Yes, Your Honor.

MR. MAIATICO: That's fine, Your Honor.

MS. COGGINS: Yes, Your Honor.

THE COURT: Okay, then I'll issue an order to that

effect. What else do we need to discuss?

MR. HETZNECKER: Your Honor, we -- there's an issue of the separations. So Your Honor had ordered that my client, Mr. Jarmon, that separation be dissolved. Apparently that's not gotten to the prison. The Marshal -- Marshals recognize it, but my understanding is that's not been received by the prisons.

THE COURT: All right. Here's what I would ask, that you get on a joint conference call with Ms. Coggins and Mr. Maiatico and you call Ms. Nash at the FDC and you say you're doing it on my order and say that I've ordered that the separation order be resolved and I'm ordering her to see to it. And if she doesn't --

MR. HETZNECKER: I'm sure she will.

THE COURT: I -- I'm not, but if she doesn't -- I've had a lot of trouble getting the FDC to comply with my orders --

MR. HETZNECKER: Is that right?

THE COURT: -- over the years. Yes, on and off.

MR. HETZNECKER: There's a second issue with respect to separations, which began back in May. I had requested, when my client was here at a hearing before Your Honor, requested that the separations between the remaining co-defendants in the Stinson matter, which starts in January, be dissolved. Your Honor requested every counsel -- and I contacted every counsel

that was still going to trial, intending to go to trial, to contact Your Honor's chambers, they did so, and then back in July, Your Honor requested from the Government and you -- in fact, you issued an order, which I have here, that they respond to the request for the separations by August 1st. And I believe Mr. Maiatico responded. And they haven't --

THE COURT: And I haven't issued an order yet?

MR. HETZNECKER: No and that's what I'm requesting as --

THE COURT: I apologize.

MR. HETZNECKER: That's okay.

THE COURT: I am granting the motion and I apologize. I will issue -- I will issue a written order to that effect.

MR. HETZNECKER: Thank you very much. I appreciate it.

THE COURT: Anything else?

MR. HETZNECKER: No, Your Honor, that's all.

THE COURT: All right. My thanks to counsel and to our Marshals.

THE CLERK: All rise.

(The proceeding concluded at 11:50 a.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Donna Morris, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

Donna Morris

______________________________

DONNA MORRIS DATE: September 24, 2018