RD

493

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 17-CR-00072-PD-1 |
| Plaintiff, | : | |
| | : | |
| vs. | : | Philadelphia, Pennsylvania |
| | : | March 6, 2019 |
| JUAN JARMON, | : | 10:11 a.m. |
| | : | |
| Defendant. | : | |
| | : | |
| . . . . . . . . . . . . . . . . . . | : | |

FILED
MAR 27 2019
KATE BARKMAN, C
By EMS Dep.

TRANSCRIPT OF JURY TRIAL - DAY 2
BEFORE THE HONORABLE PAUL S. DIAMOND
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | Jerome M. Maiatico, Esq.<br>Yvonne O. Osirim, Esq.<br>U.S. Attorney's Office<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106 |
| For Defendant: | Maureen C. Coggins, Esq.<br>509 Swede Street<br>Norristown, PA 19404 |
| Court Recorder: | Jim Cruze<br>Clerk's Office<br>U.S. District Court |
| Transcription Service: | Jessica B. Cahill, CER/CET-708<br>Maukele Transcribers, LLC<br>467 Maukele Place<br>Wailuku, Maui, HI 96793<br>Telephone: (808)298-8633 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DL

INDEX


| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR PLAINTIFF: | | | | |
| Sarah Cardone (By Mr. Maiatico) | 33 | | | |
| WITNESSES FOR DEFENDANT: | | | | |
| None | | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Government 101 to 109 | 39 | 39 |
| Government 1 to 11 | 60 | 60 |
| Government 12 | 60 | 60 |
| Government 505 | 67 | |
| Government 501 to 504 | | 68 |
| Government 201 to 245A | 73 | 74 |
| Government 306G to 312A | 73 | 74 |

MARCH 6, 2019 10:11 A.M.

THE CLERK: All rise. Court is in session. The Honorable Paul S. Diamond presiding.

THE COURT: Please be seated, everybody. Good morning.

GROUP RESPONSE: Good morning.

THE COURT: I asked my clerk to give you a copy of my order in the Stinson regarding what Agent Cardone who was also the first witness in Stinson may and may not testify to regarding lay opinion of otherwise understandable language.

This was made a lot easier by the fact that counsel had agreed before she took the stand as to the definitions of certain terms.

The only two of which that stick in my mind are that PD is crack cocaine and grinding is selling crack cocaine.

Now there may have been others, in fact, I think there were others. I just as I sit here, I can't remember what they are. But those were the two biggies.

Is there any such agreement between counsel in this trial?

MS. COGGINS: We haven't discussed that, Your Honor.

THE COURT: Other than PD and grind, you may want to speak with Agent Cardone, and perhaps the three lawyers and the agent could talk. And if an agreement is not possible, that's fine. The agent can testify to what is otherwise unclear based on her personal knowledge and as long as she lays a foundation.

And she did that with regard to some other terms in the Stinson trial.

And I say, there really aren't very many and by the end of the trial simply from the context of the words, it became I think clear to the jury, certainly to me, what certain words meant except for the word, John, which as far as I can tell means absolutely everything and nothing all at the same time.

So why don't I take a recess? Why don't we take a recess? I'm sorry. And the parties can report to me whether they can come to any agreement.

THE BAILIFF: All rise.

(Recess at 10:14 a.m., recommencing at 10:24 a.m.)

THE CLERK: Court's in session.

THE COURT: Please be seated. My clerk has reviewed his notes and the parties in the Stinson trial agreed to the following terms and definitions so that Agent Cardone was simply allowed to say what they meant. PD is crack, Grinds is to sell crack, a bean is a hundred dollars, to trap is to sell, a yak, Y-A-K, is a bundle of crack and a stack is a thousand dollars. Those are the ones that -- I believe those are the terms that were agreed to.

Mr. Maiatico?

MR. MAIATICO: Yes, Your Honor. In this case, the Government spoke to the Defendant, Defense counsel, and those are the same terms that we will agree with regards to Agent Cardone's

testimony, there's an agreement by the parties that she be able to testify to each of those terms based on her lay opinion.

THE COURT: I see Mr. Davison just walked in. If we if I misremembered, I'm sure he'll correct -- All right. So, we're agreed, are we not, Ms. Coggins that Agent Davison can simply say when the parties use the term PD, I know from my investigation that meant crack?

MS. COGGINS: Yes, Your Honor.

THE COURT: And so forth with respect to these other terms?

MS. COGGINS: That's correct.

THE COURT: Okay. Thank you. Is there anything else we need to address before the jury comes out?

MR. MAIATICO: Very briefly, Your Honor, with regards to these terms. This is with regard to Agent Cardone's testimony. I reminded both Defense counsel, I'd remind the Court, if there are other terms that we expect to have either witnesses from inside the conspiracy talk about, witnesses who were participants in conversations themselves and also a drug expert --

THE COURT: Well we're not up to -- I assume it's Agent Updegraff again?

MR. MAIATICO: Correct.

THE COURT: And I assume he's going to testify at the end as he did in the last trial?

MR. MAIATICO: That's correct, Your Honor.

THE COURT: All right. So, we're a few days from him. The order I gave you, which for the record is Document Number 508 in the 17-71 matter, it's my order of January 23rd, 2019, set out the parameters which I think I already described to you.

Anybody who pled guilty to a conspiracy and then cooperates and is testifying, can testify to the meaning of terms used in furtherance of the conspiracy he or she pled guilty to whether or not he or she is a participant in the actual call.

As for the expert testimony, we'll deal with that later.

MR. MAIATICO: Yes, Your Honor.

THE COURT: Are we free to bring the jury in now?

MS. COGGINS: Your Honor, just one follow-up question with that. So, the witness must have pled guilty to this indictment, this conspiracy; is that correct?

THE COURT: Yes.

MR. MAIATICO: Your Honor, if I can clarify that to this conspiracy. We do expect a witness who pleaded guilty to this conspiracy as part of the information and not this indictment.

THE COURT: As long as it's the conspiracy. If the Defendant waived his or her right to indictment, but pled guilty to participating in the same conspiracy, then he or she may interpret terms used in furtherance of the conspiracy to which he

or she pled guilty.

MS. COGGINS: Very well, Your Honor.

THE COURT: Okay. I believe that's clearly addressed by the Second Circuit in 2008, the Leonadi (phonetic) case which I've cited in my order. Anything else?

MR. MAIATICO: Your Honor, very briefly. There are several other stipulations or agreements.

THE COURT: You keep saying very briefly.

MR. MAIATICO: Well, I don't want to take up too much time here.

THE COURT: Yes.

MR. MAIATICO: I want to make sure we address them. We had a discussion with Defense counsel about an individual that goes by the nickname E-Black or Edward Stinson.

THE COURT: Yes.

MR. MAIATICO: His name will come up in this trial and during periods of time of this conspiracy he was in prison. We do not plan to address the fact that Edward Stinson was in prison, but similar to the last trial, we will, with agreement of the parties, address with both the first witness and with other witnesses that Stinson was away from the Blumberg Housing Projects in late 2012 and for extended periods of time throughout 2013 and 2014.

THE COURT: Was unavailable was what was used in the previous trial and although given that Mr. Stinson is not on

trial here, I'm not sure that these euphemisms are necessary, but if the Government wishes to act in an abundance of caution, that's okay with me. So, the parties agree to that; is that right? And stipulate to it and I will before any stipulation is read to the jury, I will tell the jury what the stipulation is, is that right, Ms. Coggins?

MS. COGGINS: May I have just a moment, Your Honor?

THE COURT: Yes.

(Counsel confer)

MS. COGGINS: Thank you, Your Honor.

MR. MAIATICO: Your Honor, in addition there's an agreement amongst the parties to redact social media posts, Government Exhibits 502 and 504, to remove the text, "Fuck me, you know I got it." There is also stipulation to the admissibility of these social media records.

It's also a stipulation to admissibility of evidence relating to the drug distribution within 1000 feet of public housing, those charges. There's a specific stipulation that we've signed.

And lastly, Your Honor, there were materials that were made available within the last few days and this morning. We made available to the Defense, mental health records with regards to a co-defendant and witness in this case. We also provided duplicate audio recordings of controlled drug buys for which the Defendant already audio and video recordings. Those were made

available this morning.

And Your Honor, with regards to Agent Cardone's testimony, I spoke to Defense counsel, and we agreed that we're going to reserve the right to recall her and present testimony of controlled drug buys that she would testify about later in the week and not as part of the first testimony.

THE COURT: Okay. Before the first stipulation is announced to the jury and lawyers seem to do it differently, some read the stipulation to the jury. The United States by and through William McSwain and assistant, you know, so on and so forth. And Ms. Coggins, I like to read to the jury what a definition of a stipulation which I think I've given to you on page 27 of the preliminary instructions, stipulated facts.

Just so the jury knows what a stipulation is. It may be very familiar to lawyers, but not so much so to lay people. And before you play any transcripts, the next page has a cautionary instruction about transcripts.

MR. MAIATICO: Yes, Your Honor. Understood. And I'll let the Court know that we would plan to read in the one stipulation before Agent Cardone testifies. So, it's the first thing --

THE COURT: So that's the first thing you're going to do after the opening statements to the jury?

MR. MAIATICO: Yes, Your Honor.

THE COURT: Okay. And I will then say to you, Ms.

Coggins, so stipulated and presumably you will say, yes.

MS. COGGINS: Yes, Your Honor.

THE COURT: Okay. There was something else I wanted to raise with you, and it's gone clear out of my mind, so hopefully it'll come back before we need to address it.

Are you going to play audio recordings? I assume you're going to play them for Agent Cardone.

MR. MAIATICO: Yes, Your Honor.

THE COURT: Okay. Then I will give that instruction as well. Now I remember. Ms. Coggins, if you have a cautionary instruction you wish for me to give regarding what I've called intrinsic parts of the crime, what you call other bad acts, please give me a proposed instruction at your earliest convenience, and I'll review it and in all likelihood just read it to the jury.

MS. COGGINS: Thank, Your Honor.

THE COURT: If you could secure the Government's agreement on the instruction, that would also be helpful.

MS. COGGINS: Yes, Your Honor.

THE COURT: Can we bring the jury in?

MR. MAIATICO: Yes, Your Honor.

MS. COGGINS: Yes, Your Honor.

THE COURT: All right. Ms. Wittje. Who is going to give the Government's opening statement?

MR. MAIATICO: I will be, Your Honor.

THE COURT: Okay.

(Jury in at 10:36 a.m.)

THE BAILIFF: Please stand for the jury.

THE COURT: Good morning, everybody. Please be seated. I apologize for keeping you waiting. At the beginning of the trial, there are all kinds of legal matters that have to be addressed. Why don't we swear the jury?

(The Jury Is Sworn)

THE COURT: Please be seated. Members of the jury, allow me formally to welcome you now as official sworn members of the jury in this case. Before we begin I have a few brief preliminary instructions for you, it won't take more than a few minutes.

The Defendant Juan Jarmon is charged with conspiring from 2012 to 2014 to distribute 280 grams or more of cocaine base or crack in and around the Philadelphia Housing Authorities Norman Blumberg apartment complex.

He's charged with one count of use of a communication facility in furtherance of a drug felony, six counts of distribution of cocaine based, five counts of distribution of cocaine base within a thousand feet of public housing, one count of distribution of cocaine base and aiding and abetting, one count of distribution of cocaine base within a thousand feet of public housing and aiding and abetting, five counts of possession of cocaine base with intent to distribute and five counts of

possession of cocaine base within a thousand feet of public -- within 100 feet of public housing with intent to distribute.

Some of you have been selected to serve as alternate jurors in this case, and it's the two of you at the very end. And if any of the first 12 jurors cannot continue to serve, they would be replaced by an alternate juror. So, the alternate juror should therefore pay close attention to the trial along with the other jurors because you never know when you might be called upon.

The Government has charged the Defendant in this case with violating federal law. The charges against the Defendant are contained in a document called an indictment. An indictment is simply a description of the Government's charges and is not evidence of anything.

The Defendant has pled not guilty. A Defendant who pleads not guilty is presumed innocent and may not be found guilty by you unless all 12 of you unanimously find at the end of the case that the Government has proven the Defendant guilty beyond a reasonable doubt.

The burden of proof rests on the Government and not on the Defense. It will be your duty as jurors and yours alone to determine what the true facts are from the evidence presented during the trial. You will then apply the facts as you and you alone find them to the law as I and I alone give it to you in my charge during the trial, now at the beginning of the trial, and

at the end of trial.

I'll tell you some general things about the procedure that will follow. First, the Government's attorney will make the Government's opening statement outlining their case. Immediately after that, the Defense attorney will make an opening statement outlining the defense.

Next, the Government will introduce its evidence and when the Government has finished the Defendant may present his evidence although the Defendant is under no obligation to present evidence.

Sometimes, after that, evidence in rebuttal is introduced. Evidence usually takes the form of witnesses testifying on the stand, and the stand is right here in front of you. And after a witness testifies, the witness may be cross-examined by opposing counsel.

Sometimes I may even ask questions of a witness. Nothing I do or say should be taken by you as indicating that I have any feelings about this case because I can assure you I do not. Even if I had an opinion, it would be totally unimportant because I will not decide this case, you will.

Remember that it is the answers to questions that provide evidence, not the questions themselves and you should not speculate that a fact may be true merely because a lawyer asks a question in a way that suggests a fact is true.

Evidence can also take the form of exhibits. At the

end of all the evidence, the Government and the Defendant may make their closing arguments. In these arguments they will tell you what they think the evidence shows. And while these arguments should be given due consideration by you, they are not evidence.

Only the evidence which has been admitted during the trial can be considered by you in determining what the facts are.

As you probably know, the admission of evidence in court is governed by rules of law. During the trial, the Government or the Defendant may deem it necessary to make an objection. And when they do, it becomes my duty to rule on those objections and to decide whether certain evidence can be admitted for your consideration.

You must not concern yourself with the objections or the reason I ruled on them the way I did, but you should listen to my ruling. You must not consider any testimony or exhibits to which I have sustained an objection or which I have ordered stricken from the record.

On the other hand, if I overrule an objection or deny a motion to strike, then you may consider the testimony or exhibit in question. If I tell you that evidence may be received only for a limited purpose, you must obey that instruction.

Do not concern yourselves if counsel and I meet at sidebar which will be over there where we did the follow-up questioning, and whisper or ask you to leave the room for we are

only discussing legal matters that are not for your consideration.

As I said earlier, nothing I do or say including asking questions or ruling on objections should be taken by you as indicating that I have any feelings about this case because I can assure you I do not.

Moreover, even if I had an opinion, it would be totally unimportant because I will not decide this case, you will.

You are the judges of the facts. That is, what actually happened or took place, and excuse my voice. In honor of this trial I'm beginning to get a cold. I'll try to speak up.

An important part of your job will consist of making judgments about the testimony of each witness who testified in this case. You should decide whether you believe what each witness had to say and how important that testimony was.

In making that decision, I suggest you ask yourselves a few questions. Did the witness impress you as being honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things the witness testified about? And did the witness appear to understand the questions and answer them directly or was the witness evasive or hesitant?

Did the witness' testimony differ from the testimony of

other witnesses, and if so, was the difference a major or minor one? What was the witness's demeanor on the witness stand?

These are a few of the common sense considerations that will help you determine the accuracy of what each witness said. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses testifying on one side than on the other. Do not reach a conclusion on a particular point just because there are more witnesses testifying for one side on that point.

Your job is to think about all the testimony of each witness you hear and decide how much you believe of what each witness had to say. Raise your hand if you can't hear or if you can't see something and let me know. We don't allow the jurors to ask questions or to take notes. That's the job of the lawyers. We will now hear the Government's opening statement.

MR. MAIATICO: Thank you, Your Honor.

OPENING STATEMENT BY THE GOVERNMENT

MR. MAIATICO: Good morning, ladies and gentlemen. This is a case about drugs, money and power. The Defendant, Juan Jarmon, otherwise known as Juan or Yizzo. He was a drug dealer, a powerful drug dealer who operated in the Norman Blumberg Housing Projects. He even worked together with others to make money selling crack cocaine.

At the Blumberg Housing Projects, here's an aerial view of them. They were located right here in Philadelphia and about

three years ago they were demolished. But before them, Blumberg was home to thousands of residents and their families.

As you can see from this photo, Blumberg encompassed several city blocks. There were two high rise buildings. One of them called the Hemberger building, we're going to talk about in one second.

The Hemberger building was 18 floors. There were also several low rise buildings. There was a senior living facility within the Blumberg complex, and there were playgrounds where kids play.

Now to the many law abiding people of this area, they looked at these buildings, and they saw a place to raise your kids, raise a family.

The Defendant, Juan Jarmon, he looked at these buildings, and he saw a way to make money off of them. Juan Jarmon took advantage of and terrorized the people in these buildings including the residents who live there, other drug dealers and even members of his own drug trafficking group. All in order to make money selling crack cocaine.

And boy, did he work hard to sell crack. You're going to hear that Juan Jarmon set up a group to sell crack cocaine in and around the Hemberger building. This is one of the high rise buildings we saw in that previous aerial view.

Juan Jarmon employed a network of drug sellers, drug dealers, lookouts, and stash houses. And Jarmon and this group

sold crack cocaine in and around the Hemberger building, in the 18th floor of the Hemberger building in shifts, 24/7, day after day, week after week.

Now I mentioned shift sellers. Well, the shift sellers, those are the people that would supply the crack cocaine by the Defendant, Juan Jarmon. They work for him.

And they sold crack cocaine to drug users and drug addicts who came into Blumberg and came up to the 18th floor of the Hemberger building.

I talked about lookouts. Lookouts were just that. Lookouts were people that stood outside of the Hemberger building, and they would look out for police presence. They were the ones that protected the building. They would let the shift sellers know when police were in the area, and they would sometimes direct drug users and the drug addicts up to the 18th four of Hemberger.

And then Juan Jarmon himself, he was the leader of this group. There he is sitting in his place of business, a hallway of a high rise. And he did whatever was necessary to keep his business going.

You're going to hear evidence that Juan Jarmon bought in bulk, crack cocaine. You're going to hear that he cooked cocaine into crack cocaine. You're going to hear these sold bulk crack cocaine to other drug dealers. You're going to hear a supplied his shift sellers with bundles of yaks of crack cocaine.

And you're going to hear that he helped the shift sellers sell the crack, small bags of crack, to drug users and drug addicts.

This is a cash business and the Defendant was all about the money. Juan Jarmon, he worked hard to sell crack cocaine and make money in the Blumberg Housing Projects. And he operated this drug trafficking business with an iron fist.

If you were a shift seller, if you were a lookout and you were late for your shift or you missed your shift, well he berated you and he fired you.

If you were a shift seller and your money wasn't right, you didn't give him the money that he believed was owed to him, well he might take your head and crack it against the table and bloody you up.

If you were a resident of one of these high rise buildings and you went to the police, told the police all about Juan Jarmon and his drug trafficking group, well he would approach you, and he'd flat out punch you in the face.

You're going to hear that evidence, ladies and gentlemen. In this case during the course of this trial, you'll hear from about eight witnesses. You'll hear from special agents from the Federal Bureau of Investigation. Special agents from the Drug Enforcement Administration, civilians, drug experts and people from inside Juan Jarmon's drug trafficking group.

They will all tell you what they know about the Defendant's crimes, and they will take you inside the world of

selling crack for money in the housing projects.

Now in this case Federal agents used a number of different investigative techniques to uncover Juan Jarmon's crimes. The agents are going to present evidence where you will have the opportunity to hear the Defendant's own voice on telephone calls that were intercepted and recorded by law enforcement. These are the calls that Juan Jarmon made. These are the conversations that he had when he thought no one was listening. But law enforcement was and you're going to have the opportunity to hear those calls.

In fact, you will hear call after call, about 55 calls in total that were recorded in which Juan Jarmon talks about his drug trafficking business.

You're going to hear a call from late 2012, for example, where Jarmon is talking to another drug dealer and he's talking about setting up shop on the 18th floor of the Hemberger building to sell crack in order to make money off the building.

That you're also going to hear telephone calls where Jarmon works hard sell crack cocaine to the building. And some of these conversations they're going to include drugs slang or slang words. And you're going to hear from people inside the conspiracy of the drug dealers as well as special agents with knowledge of this slang, and they're going to describe what some of these words mean.

You're going to hear about yaks or bundles. A bundle

is a large bag of crack cocaine that contains smaller bags of crack cocaine. Those smaller bags, those are the bags that are sold to the drug users and drug addicts in the buildings.

These yaks, these bundles, they were supplied to the shift sellers by Juan Jarmon.

You're going to hear different terms for money. Dough, bean, stack. You're going to hear, dub. That means $20. A bean, $100. A stack, $1,000. $1,000. A shift seller might make $1,000 selling crack cocaine in just one shift.

Grind it, trap it, you're going to hear that means to grind and to trap. It means to sell crack.

You're going to hear the terms PD and hard, PD and hard, that's crack cocaine. Hard, because crack cocaine are these small white chunky substance that's hard.

Smokers. Smokers are the people that are smoking the crack. So, when Juan Jarmon and other people his group refer to smokers, those are the drug addicts, those are the drug users that they're selling to.

Tax. You're going to hear Juan Jarmon's own voice talking about taxing his workers. He's taxing the workers because they're not following his rules. You're going to hear that word tax meaning he's taking money out of his worker's pockets because they're not following his rules.

Rat or to rat. That means to report crimes to the police. Number one rule of Juan Jarmon's drug trafficking group,

is don't talk about his drug trafficking group. Don't rat. Don't snitch.

The law. So, looking out for the law, that means looking out for police. And why are people looking out for the police? Why are people in Juan Jarmon's group looking out for the police? Because selling crack is illegal, they don't want to get arrested.

Now you're also going to hear some words that are not slang at all. You're going to hear Juan Jarmon on telephone calls saying he's there trying to "make money" for him and his workers. You'll hear him say that he's not going to pay his workers and lookouts for doing nothing. And you'll hear him say that if a female is going to rat on him, to go to the police and tell the police about his group's drug dealing, well, let me be clear, these are Juan Jarmon's own words that you're going to hear, if she rats, he will, "Get six people to beat her the fuck up. She's getting her ass whooped tonight."

But that's not all the evidence that you're going to hear. You'll see and hear other audio and video recordings of Juan Jarmon during undercover police stings in what we call controlled drug buys.

So, a controlled drug buy, all that means is that law enforcement is controlling or monitoring that drug buy. A person who poses as a drug dealer, law enforcement takes that person and puts an audio/video recording device somewhere on their body,

hides it.

That person is sent into the housing projects and you'll see evidence that there's controlled drug buys where crack cocaine is purchased from Juan Jarmon and it was caught on tape.

You're going to see photo, after photo, after photo of the Defendant Juan Jarmon during these undercover police stings, going in these controlled drug buys in when he sold a total of over 80 grams of crack cocaine just during these controlled drug buys.

So why are we here? Well, it's against federal law to sell crack. Crack is a controlled substance, it's banned by the DEA because there's potential for abuse and addiction. And Juan Jarmon has been charged with, as the Judge told you, conspiracy to distribute 280 grams or more of crack cocaine over a period from 2012 and 2014.

The conspiracy in this case is simply an agreement. It's an agreement to sell crack cocaine and to distribute crack cocaine in the Blumberg Housing Projects.

And you'll hear evidence about Juan Jarmon's conspiracy and how he worked together with others to make money selling crack.

Juan Jarmon, he was the leader of this group. And you're going to hear some other names. An individual by the nickname E-Black and an individual by the nickname, Boo. There's the names on either side of Juan Jarmon.

Those were other drug dealers that helped supply crack cocaine to Juan Jarmon's group and helped manage the group.

Below Juan Jarmon are the shift sellers and we talked about them. Juan Jarmon hired, fired and managed the shift sellers that he supplied with these large bundles of crack cocaine.

Below the shift sellers, the lookouts and we talked about those lookouts and what they do. Juan Jarmon hired, fired and managed those lookouts who looked out for police so that Juan Jarmon and people in his group didn't get arrested.

All of these people worked together to make money selling crack cocaine. And you'll hear evidence of this conspiracy.

Now the Defendant has also been charged with what we call substantive drug counts and the Court went over these, relating to specific dates when Juan Jarmon possessed or sold drugs and when he discussed drug trafficking on the telephone calls.

And finally, the Defendant has been charged with selling drugs inside what we call a drug free public housing zone which makes it a crime to sell drugs within 1000 feet of property designated as low income public housing, such as the Northern Blumberg Housing Projects.

Now you'll hear from the Judge that the Government must prove its case beyond reasonable doubt. And that doesn't mean

beyond any doubt. The reasonable doubt is a fair doubt that's guided by reason, by logic, by common sense.

The Government accepts, and we embrace that burden. And we're going to show you even additional evidence that further corroborates the fact that Juan Jarmon was working together with others to sell crack cocaine.

You'll hear from several people in and around the conspiracy and they'll tell you about this group from the inside. These are the people who spent weeks and months alongside Juan Jarmon helping him sell crack cocaine.

You'll hear from an individual named Rasheen Chandler. He was a shift seller that worked for Juan Jarmon. You're going to hear from an individual named, Dotty Good. She was a shift seller who worked for Juan Jarmon.

Those witnesses, they will tell you how they and Juan Jarmon sold bundle, after bundle, after bundle of crack cocaine, every day, 24/7 every week for months and months.

And these shift sellers, they'll tell you how Juan Jarmon exercised his control over them, over his drugs, and over this group.

Now these shift sellers, these witnesses, they're not saints themselves. Now you're going to hear that they helped Juan Jarmon commit these crimes and that they committed other crimes too.

But those are the people that Juan Jarmon chose to

surround himself with. He chose people that were willing to sell crack.

Juan Jarmon and his group, people in his group, they're not choir boys. They're crack dealers. And so other crack dealers are the eyewitnesses to the crimes.

So, ladies and gentlemen, over the next few days, you're going to hear all of this evidence that shows that Juan Jarmon worked together with others, he conspired and agreed with others to make money selling crack cocaine in the Blumberg Housing Projects.

You're going to hear those telephone calls, you're going to see those undercover police stings, you're going to see physical evidence, and you're going to listen to these witnesses. And once you do, we'll be asking you to use your logic, your common sense and to return the only verdict that's consistent with this evidence, and that's a verdict of guilty on all counts. I want to thank you for your time. Thank you for your service.

THE COURT: Thank you. Ms. Coggins.

OPENING STATEMENT BY THE DEFENSE

MS. COGGINS: My goodness. That was a long speech. You know what, that's all it was is a speech because nothing that Mr. Maiatico just said is evidence in this case. None of it.

Instead, what he just did was he just gave you a picture of what he wants you to find in this case. I'll give you an example. Say that you're going to go on vacation, right? And

you rent a house down at the Jersey Shore for a week.

You wake up the first morning, and you're all excited, right? You put on your bathing suit, you grab your beach towel, run to the door, open it, pouring rain, right? What happens.

So now you got to find something to do. So, you look around this house, and you look at the cabinets, and you open up drawers, and there on a shelf, you see a box. So, reach up and you take the box down. It's heavy. It's incredibly heavy, this box.

You look at it, it's old, right? There's dust on the top. So, you blow all your dust off and there underneath it is a picture, right? It's a Robert Kinkade waterfall, or a deer in the woods, or a clown in the circus, who knows? But you realize it's a puzzle because that picture there on top of that box is what the puzzle maker wants you to find when you take off the lid.

That's exactly what Mr. Maiatico just did. He painted a picture for you of what he wants you to find in that box. So, you take off that lid and spread the pieces all over the table. Two, three hours later, you can't do it. It's impossible. Why? Because there's pieces missing from that puzzle. The pieces that are there, they don't fit. And strangely enough there's pieces of other puzzles that have been shoved in this box. Other whole portions of puzzles have been stuck in the box.

That's what you're going to see in this case. Now I'm

going to ask you to do three things. The first thing I'm going to ask you to do is keep an open mind.

Now the Government in this case, the all-powerful Government, they have unlimited resources, unlimited money and they throw it all at my client, Juan Jarmon. But just because the Government says it's true, it doesn't mean it's true. Just because they have these unlimited resources to use to throw in front of you, it doesn't mean it's true.

Now I lost count the number of agents involved in this case. I think I stopped at around 15. But you're going to see that they have FBI, they have DEA, they have the Philadelphia Police Department, they have laboratories, they have helicopters, pole cameras. Secret squirrel little cameras that they can put in smoke detectors.

They have undercover workers for them, confidential sources. My favorite, cooperating witness. All of these resources at their fingertips. Just because they say and they present this evidence to you, doesn't mean it's true.

Now second what I want to ask you to do is pay attention. It's going to be very difficult. You're going to go to lunch, right? It's Philadelphia. Got to get your cheese steak, got to get your french fries. You come back here, you sit in your comfy chairs, it's nice and warm. But you come back and, you know, I'm actually just getting tired even thinking about that.

But you've heard the expression the devil is in the detail, right? That's never more true than in a criminal trial. The devil is the detail. Pay attention to the details.

You're going to hear phone calls ad nauseum. And these phone calls are almost impossible to understand, but the ever helpful Government, they're going to give you a transcript. And who is it made by? A Government agent.

Now that transcript is not evidence, and the Judge will tell you that. That transcript is what the Government wants you to hear on that tape, but that doesn't matter because it's what you hear on the tape that matters.

Now in addition to that you're going to see witnesses. Pay attention to these witnesses. And not just to what they say, pay attention to what they look like on the witness stand. Do they seem shifty, do they seem dishonest to you? And also, keep in mind what is the motivation for these cooperating co-defendants?

Imagine, what makes them sit up there and not just testify, ladies and gentlemen, there's a distinction, but to testify against my client.

Now think about it. You're going to hear that these people are facing life. 20 year mandatory minimums potentially. Pay attention to that because the fate, their fate rests in Mr. Maiatico's hands.

Listen to deals that were made in return for these

cooperating co-defendants not just to testify, to testify against my client. Also, they're criminals. Listen to what they've done in their past, to their priors. They're criminals. Pay attention to that and keep that in the back of your mind.

In addition to that, pay attention to how many times these people have been prepped by the agents in this case. How many times have they sat down and met with the agents to make sure they come in and testify the right way? And also, pay attention to how their statements change over the years. How the inconsistencies in those statements all come up to the very end, to when they testify in front of you here today.

Pay attention to the way that Mr. Maiatico asks his question of these witnesses. Does Mr. Maiatico say to them simply what happened on this date at this time, or does Mr. Maiatico drag them by the nose to give the answer that he wants?

Does Mr. Maiatico ask his questions with the answer already in it? Pay attention, also, ladies and gentlemen, there's a lot of stuff that you're going to hear.

Pay attention to the dates and the times and the names and nicknames and the roles of the different people and who they work for, when they worked for them and what they do for each person, who likes who, who robs who, who wants to kill who.

As you're going to see there's a lot of different things all going on all the same time.

Now the third thing I'm going to ask you to do is use

your common sense. You were asked to leave any preconceived notions that you may have had outside the door before you came in here. You were never asked to abandon your common sense.

Now at the close all the evidence and the testimony I'm going to come back to you in what's called a closing statement. And at that time based upon all the missing pieces and the pieces that don't fit and all of these multiple different puzzles that are all going on at the same time, I'm going to ask that you find my client not guilty of conspiracy to possession with intent to deliver. Thank you, very much.

THE COURT: Thank you. Mr. Maiatico.

MR. MAIATICO: Yes, Your Honor. At this time, we would like to read a stipulation into the record and begin the presentation of the Government's evidence.

THE COURT: Very well. Ladies and gentlemen, you're about to hear stimulations of facts that have been offered and received in evidence. A stipulation of fact constitutes an agreement between the parties through their lawyers that these facts may be accepted as undisputed.

These facts require no further proof and no contradictory evidence will be permitted. These facts constitute evidence that you will consider with all the other evidence in the case and you may accept or reject all or any part of such evidence.

Mr. Maiatico. Ms. Osirim, sorry.

MS. OSIRIM: That's all right, Your Honor. Good morning. It is stipulated by and between the United States by its attorneys William and McSwain, United States Attorney in and for the Eastern District of Pennsylvania, Jerome Maiatico and Yvonne Osirim, assistant United States Attorneys for the District, and the Defendant Juan Jarmon and his counsel that the following facts are true and correct and may be entered into the record of the trial of this case without further proof.

That is that the entirety of the 2300 block of Redner Way in Philadelphia, Pennsylvania and 2400 West Oxford Street in Philadelphia, Pennsylvania are within 1000 feet of the real property comprising the Norman Blumberg apartment complex. A housing facility owned by the Philadelphia Housing Authority located at 2311 West Jefferson Street in Philadelphia, Pennsylvania.

If a representative from the Philadelphia Housing Authority was called to testify, he or she would testify that Blumberg was a housing facility owned by Public Housing Authority and that the facility was operating throughout 2013 including on May 3rd of 2013, May 17th of 2013, June 11th of 2013, August 2nd of 2013, August 14th of 2013 and September 5th of 2013.

This stipulation shall be received as an exhibit at trial and is stipulated and agreed to by both parties.

THE COURT: Ms. Coggins, so stipulated?

MS. COGGINS: That is correct, Your Honor.

THE COURT: Very well.

MS. OSIRIM: Thank you.

THE COURT: Thank you, Ms. Osirim. Could the Government please call its first witness?

MR. MAIATICO: Your Honor, the Government calls Special Agent Sarah Cardone from the Federal Bureau of Investigation.

THE COURT: Very well.

THE CLERK: Would you please raise your right hand?

SARAH CARDONE, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Please state your name for the record.

THE WITNESS: My name is Sarah Cardone and my last name is spelled, CARDONE.

DIRECT EXAMINATION

BY MR. MAIATICO:

Q Good morning, Agent Cardone.

A Good morning.

Q Agent Cardone, how are you currently employed?

A I am employed as a special agent by the Federal Bureau of Investigation.

Q And in what capacity are employed with the FBI?

A As a special agent.

Q And that's in the City of Philadelphia?

A Yes.

Q How long have you been the FBI here in Philadelphia?

A In Philadelphia I've been here for approximately six years.

Q And prior to that where were you trained?
A I was trained at the FBI Academy in Quantico, Virginia.
Q And can you discuss what your duties are as a special agent with the Federal Bureau of Investigation?
A My duties as a special agent are to investigate violations of United States Code which could also be considered violations of federal law.
Q Okay. And to what unit are you currently assigned?
A I'm currently assigned to an organized crime unit.
Q Okay. Before that, to what unit were you assigned?
A Previously I was assigned to a narcotics squad.
Q Okay. And during the time of this investigation back in 2013, 2014, what squad were you assigned to?
A I was assigned to the narcotics squad.
Q And can you describe some of the types of cases that you investigated as a member of the narcotics squad?
A As a member of the narcotics squad we would investigate any crimes that would involve drug narcotics trafficking, possession and distribution.
Q And what types of drugs or controlled substances would you investigate?
A We investigated such controlled substances as crack cocaine, heroin, methamphetamines and prescription pills.
Q During your time with the FBI over these last six years, about how many investigations have you participated in through

your work?

A I've participated in at least 100 investigations.

Q And just specifically for drug trafficking investigations, about how many have you been involved in?

A I've been involved in approximately 50 different types of drug investigations.

Q And you mentioned that you did your training at FBI Quantico?

A Yes.

Q What type of training did you receive there?

A At the FBI Academy in Quantico, Virginia I received training, some legal training, I received firearms training, received interview training, defensive tactics training and intelligence training, other types of training related to using the various databases that the FBI has.

Q And did you receive any training that related to -- that was helpful in drug trafficking investigations?

A Yes.

Q And including such as?

A Such as interviewing witnesses, also handling sources, writing reports.

Q Okay. And during your tenure at the FBI, have you received ongoing training?

A Yes.

Q Can you describe what type of ongoing training you received?

A I received ongoing training in interviewing and handling confidential sources. I've received training in evidence collection and processing.
Q So turning now to this case, the reason we're here today. Are you one of the lead agents in the investigation of the Defendant, Juan Jarmon in drug trafficking in the Blumberg Housing complex?
A Yes.
Q And for how long have you been involved in that investigation?
A I have been involved in an investigation for almost six years. So, the entirety of the time that I have been assigned to the Philadelphia division.
Q Okay. And have you worked with other law enforcement agencies in investigating and prosecuting this case?
A Yes.
Q What other agencies were involved?
A The other agencies who were involved include the Drug Enforcement Administration, the Philadelphia Police Department and the Philadelphia Housing Authority Police Department.
Q Okay. And I just want to talk about some of the acronyms. We may hear some of these terms again. So Federal Bureau of Investigation, is that the FBI?
A Yes.
Q Drug Enforcement Administration, DEA?

A Yes.
Q Public Housing Authority, PHA?
A Yes.
Q Or Housing?
A Yes.
Q Okay. So, let's talk about the Norman Blumberg Public Housing Projects. Where was is located?
A It was located in North Philadelphia.
Q Okay. And about how many city blocks did it encompass?
A It was several. The boundaries of the Public Housing were on the east and west side where North 22nd Street and North 24th Street and north and south boundaries were Oxford Street and Jefferson Street.
Q Okay. Can you describe what the Norman Blumberg apartment complex looked like, the buildings within those boundaries?
A The Norman Blumberg apartment complex was comprised of two twin 18-story high towers, as I said, each contained 18 floors. There were additional smaller buildings that surround them. They were townhouse style buildings that would also be referred to as low rise buildings.
And there was a separate unit which was a separate tower which was not as tall as the two primary towers, and that tower was the senior building that housed individuals of a certain age.
Q And could anybody live there inside of the Blumberg complex?

A No.
Q Who specifically could live there?
A Specifically the housing was designed for low income individuals who did not make more than a certain threshold of income.
Q And who manage that process, who managed the Blumberg complex?
A The Philadelphia Housing Authority did.
Q And during that period of time in this case, 2012 to 2014, was Blumberg home to adults, children, families?
A Yes.
Q And about how many people lived there during that period?
A Over 1000 people lived there during that period.
Q Okay. Have you personally been to the Norman Blumberg Housing Projects?
A Yes.
Q And how many times have you been there approximately?
A I have been either to the facility or have driven past the facility at least 100 times.
Q And have you conducted surveillance of the buildings within Blumberg?
A Yes.
Q Have you viewed photographs and videos of that area?
A Yes.
Q And have you previously viewed, turning to some exhibits

which are in the book before you, have you previously viewed the photos that have been marked Government Exhibits 101 through 108?

(Government's Exhibit 101 to 109 marked for identification)

A Yes.

Q I'm sorry. 101 through 109.

A Yes.

Q And after viewing those, do they accurately depict the Blumberg buildings in the areas within Blumberg?

A Yes.

MR. MAIATICO: Your Honor, we would ask that those nine exhibits, Exhibits 101 through 109 be admitted and published to the jury.

THE COURT: Ms. Coggins?

MS. COGGINS: I have no objection, Your Honor.

THE COURT: All right. They'll be admitted and the jury may see them.

(Government's Exhibit 101 through 109 received)

BY MR. MAIATICO:

Q I'm showing you, Agent Cardone, what's been marked the first one, Government Exhibit 101.

MR. MAIATICO: And can you publish to the jury?

BY MR. MAIATICO:

Q Can you describe what this is?

A Yes. This is an aerial photograph of what was the Norman Blumberg apartment complex.

Q Okay. And you described that there were two high rise buildings?
A Yes.
Q What were the names of those high rise buildings?
A The two high rise buildings were -- one's address was 1515 Hemberger Way, and that was often referred to as the Hemberger building. The other was 1516 Judson Way, and that was often referred to as the Judson building.
Q Okay. And between the Hemberger building and the Judson building, was there a courtyard? What were the other things that were between those buildings?
A There was a courtyard that sat in between the buildings. There was a playground that was located in front of the Hemberger building. There was a playground that was located behind the Judson building in between the Judson building and the Senior building.
Q Okay. I'm going to show you what's been marked Government Exhibit 102. And can you describe what that is?
A This is a sign; Government's Exhibit 102 is a sign that was in the courtyard portion of the Norman Blumberg apartment complex.
Q And what does it read?
A It reads, "Norman Blumberg Apartments Philadelphia Housing Authority building beyond expectations." The bottom says, "Accredited management organization"

Q Okay. Turning to Government Exhibit 103. What building is this?
A This is a photograph depicting the Hemberger building.
Q Okay. And how many floors is the Hemberger building?
A 18.
Q And what is at the top floor?
A It's the 18th floor.
Q Okay. So, moving to Government's Exhibit 104. Is this a playground outside of the Hemberger building?
A Yes.
Q And what do we see in the background there? Is there a booth or an area that has a green roof?
A Yes. The structure with the green roof is a security booth that sat outside in front of the Hemberger building.
Q Okay. I'm going to move to Government Exhibit 105. And to the left of that photograph, is that the security booth that you're talking about?
A Yes.
Q Okay. And who sits inside that booth?
A At one point in time there was a contracted security company that sat inside the booth, and at another time there were police officers from the Philadelphia Housing Authority's Police Department.
Q And that transition from security to Public Housing Police, when did that occur approximately?

A It occurred sometime over the course of this investigation. I believe sometime in the fall of 2013.
Q Was that security booth, was that always staffed?
A I don't believe it was always staffed.
Q Sometimes there were police in there, sometimes not?
A Yes.
Q Okay. Turning to 106. And can you describe what we're looking at here?
A We're looking at a portion of the 18th floor of the Hemberger building as depicted by the number 18 on the wall.
Q Okay. And turning to 107. Can you describe what we're looking at here?
A In Exhibit 107, this is a photograph of the hallway, a portion of the hallway on the 18th floor of the Hemberger building.
Q Okay. And have you looked at these photos before?
A Yes.
Q When you zoomed in on this photo, is that apartment 1805, do you see on the left?
A Yes.
Q Okay. And during the course of your investigation, did you identify an individual who lived in Apartment 1805?
A Yes.
Q Who was that?
A The individual who resided an Apartment 1805 was Raheem

Chandler.
Q Did you also identify an individual that lived in the apartment at 1804?
A Yes.
Q Across the way? And who was the person that lived there?
A Norma Mercado lived in Apartment 1804 in the Hemberger building.
Q And I'm turning to Government Exhibit 108. What are we looking at here?
A Government's Exhibit 108 is a photograph that depicts one of the stairwells on the 18th floor in the Hemberger building.
Q Okay. We're going to head back outside of the Hemberger building outside the Blumberg complex, Government Exhibit 109. And can you describe what area we're looking at here?
A This is the intersection of 24th Street and Oxford Street or the 2400 block of Oxford Street.
Q Okay. And on the right side it appears to be something labeled, a Mini Market?
A Yes.
Q Is that correct? And on the left side of that photograph, what do we see?
A On the left hand side is a portion of the Norman Blumberg Apartments and this would be some of the low rise dwellings.
Q Now all these buildings we just looked at, Agent Cardone, are they still there?

A All of them are not still there.
Q Okay. And why not?
A The two towers, Hemberger and Judson were imploded in March of 2016 after all the residents had been evacuated.
Q Okay. And where did the residents and the families, where did they go?
A They went to various locations. They were either transferred to other public housing areas or into what's considered scattered sites which would be individual houses that were located within traditional residential areas of the city.
Q So I want to turn to how your investigations to Juan Jarmon and drug trafficking began. When did you initially --
THE COURT: Before you do that, the jury's been sitting for an hour. Why don't we take a short break?
MR. MAIATICO: Yes, Your Honor.
THE CLERK: All rise.
THE COURT: Go ahead. You can go.
(Jury out at 11:27 a.m.)
THE COURT: Okay. Please be seated. I misspoke in reading -- Please be seated. I misspoke in reading the charges. I said within a hundred feet of public housing, I meant a thousand. I don't think it's worth correcting. I'm going to send the indictment as redacted by the parties out with the jury, and I won't say a hundred feet again. Although in light of the stipulation I don't think it matters, unless counsel have some

reason for concern.

MS. COGGINS: No, Your Honor.

MR. MAIATICO: No, Your Honor.

THE COURT: Okay.

(Recess at 11:28 a.m., recommencing at 11:48 a.m.)

THE CLERK: Court's in session.

THE COURT: Please be seated. Can we bring the jury back in?

MR. MAIATICO: Yes, Your Honor.

MS. COGGINS: Yes, Your Honor.

THE COURT: Okay. Agent Cardone, you're still under oath.

THE CLERK: Please stand for the jury.

(Jury in at 11:50 a.m.)

THE COURT: Welcome back, please be seated. Mr. Maiatico.

MR. MAIATICO: Thank you, Your Honor.

BY MR. MAIATICO:

Q Picking up where we left off, Agent Cardone, when did you initially become involved in the investigation into Juan Jarmon and his drug trafficking?

A In April of 2013.

Q And were you one of the lead case agents?

A Yes.

Q And in this case, in this investigation, were the FBI and

the DEA asked to assist local law enforcement?
A Yes.
Q Now during the course of the investigation, did you and the other agents that were involved in this case, use different investigative techniques or tools?
A Yes.
Q And can you describe some of those investigative techniques or tools that you used?
A We used interviewing techniques which we use investigative techniques of speaking with cooperating witnesses. We listen to recorded phone calls, consensually recorded phone calls as well as there was a Title III wiretap to intercept. We also conducted surveillance and --
Q Were there also controlled drug buys --
A Yes.
Q -- that were done in this case, Agent Cardone?
A Yes.
Q Okay. Now you talked about a few of those techniques. I want to go through some of those. And you said Title III wire intercept. So, I'm going to ask you some questions about what that means. What is a Title III wiretap?
A A Title III wiretap is a court approved intercept of someone's phone. So essentially a court is approving law enforcement to listen to phone calls.
Q Okay. And you used this as an investigative tool during

this investigation?
A Yes.
Q And how so?
A They were used to obtain evidence of crimes that were occurring. Law enforcement was listening, specifically listening for the individuals to discuss crimes that they were committing.
Q Okay. And did you receive permission to listen to these calls?
A Yes.
Q And from whom did you receive permission?
A The Court.
Q How long is an order permitting a wiretap?
A The length of the order is for 30 days.
Q And when 30 days is up, what are your options in terms of continuing to listen to those calls?
A In order to continue to listen to the calls you would need to receive a renewal and approved from the court.
Q Okay. And is it a judge that permits the extension of the wiretap?
A Yes.
Q Now when a wiretap is up and running, do you inform the individuals that you're listening to that they're being recorded?
A No.
Q Okay. And why not?
A The court does not permit you to notify the individuals that

they are being listened to.
Q It's under seal at that time?
A Yes.
Q And once a wiretap is then approved, can you describe the process? What happens next once you have an approved wiretap?
A Once the wiretap is approved, the order from the court is sent by the agency who will be conducting the wiretap. In this particular case, the Drug Enforcement Administration was the one who will would say housed the wiretap. Either the FBI or the DEA could have done it.
So, they sent the order to the phone company and with the DEA technical agents and the phone company. The phone company essentially allows the DEA and/or law enforcement to listen to the particular phone calls from that particular number.
Q Okay. Does the phone company help identify each of the phone calls and phone numbers to be intercepted?
A Yes. The phone numbers of the incoming calls, the other party essentially. Their telephone numbers will be recorded as well and provided to law enforcement.
Q Okay. So, in addition to the actual calls, there's other data that's sent from the phone company; is that correct?
A Yes.
Q So you mentioned the audio, you mentioned the telephone numbers. What other data is part of the information that's sent?
A Both the time and date that the call was made either to or

from the particular target telephone.
Q Okay. And during the course of the wiretap, are you receiving information in real time?
A Yes.
Q Okay. And where do federal agents or how do you go about listening to these calls?
A Typically these calls are listened to in what is referred to as a wire room. As I said for this case, the DEA used the DEA's wire room for this case. So, both law enforcement officers from the DEA and the FBI would go to the wire room which has a series of stations. They have a computer monitor and a headset, speakers that you could use to listen to any incoming or outgoing calls to that particular telephone number that was being intercepted.
Q As you're listening to these intercepted calls in real time, about how many people are in the wire room?
A It depends on how active the wire is. At least one person needs to be what's considered live monitoring or listening to the call when it comes in, otherwise you cannot be monitoring the line.

So, if there's no law enforcement personnel present, the calls cannot be recorded or listened to. You can't just play it when no one is present in the room.
Q Okay. Can you describe then what happens when a live outgoing or incoming call comes in?

A When a call comes in or goes out from the target telephone number, a sound will come on the line, and then the phone call will begin. At that point in time any live calls that are being listened to are also being recorded. And the agent or the task force officer who is also a law enforcement officer, would listen to the calls and if there is evidence that a crime is being committed, then they will continue to listen to that call and that call will continue to be recording.

If that call is of a different nature and doesn't involve crimes being committed, then they will push, not monitor, and they will not be listening to the call, and it would not be being recorded.

If that call is of a privileged nature, if the individual is speaking to a doctor or an attorney, that call would not be monitored and not be recorded either.

Q Okay. And in this particular case, Agent Cardone, did a judge permit the interception of phone calls to and from a cellphone with a telephone number 215-327-4080?

A Yes.

Q And based on your investigation which included as you said your review of the wire calls, telephone calls, controlled drug buys in this case, did you identify the user of that telephone number?

A Yes.

Q Who was that?

A The user of that telephone number was Juan Jarmon.
Q Okay. Was the wiretap approved for the periods from August 30th, 2013 to November 13th, 2013?
A Yes.
Q Okay. And also, in this case did the judge permit an interception of phone calls to and from a cellphone with the telephone number 267-368-2972?
A Yes.
Q And again, based on your investigation which would include the controlled drug buys, your review of the wire calls, interviews in this case, were you able to identify the user of that phone number?
A Yes.
Q Who was that?
A The user of that phone number was Damon Edwards.
Q Did Damon Edwards have a nickname?
A Yes.
Q What was that?
A He went by Booboo or Boo.
Q Okay. And this particular wiretap on Boo or Damon Edwards' phone number, was that from the periods December 10th, 2013 to March 12th, 2014?
A Yes.
Q Before listening to any calls, I want to talk about some of the other investigative tools that you've used in this case. I

want to move onto, you mentioned the controlled drug buys. Controlled drug buys, what type of individual, who do you use to conduct these controlled drug buys?
A For this particular case we used cooperating witnesses or confidential sources were used in this case.
Q Okay. So confidential source, can you describe what a confidential source is to the jury?
A A confidential source is a source whose identity is not -- is known to law enforcement, but it's not known to the individual from whom we're purchasing narcotics from. So, they are not aware that this person is operating on behalf of the government.
Q And have you received training on handling confidential sources during the course of your time as an FBI agent?
A Yes.
Q Okay. And what type of training have you received on that?
A I received training in meeting with confidential sources, how to meet with them in order to ensure their safety and law enforcement safety.
Q Let me ask you about that, you mentioned for their safety. Are there safety concerns when dealing with confidential sources?
A Yes.
Q And how so?
A Sometimes the work or what's requested of confidential sources that law enforcement is asking them to do can be considered dangerous. They are purchasing drugs from individuals

who might be known to be violent.
Q Okay. And when using confidential sources in these drug trafficking investigations, do you use individuals who are drug dealers or drug users themselves?
A Yes.
Q And why do you do that?
A A confidential source, one of the criteria of being a confidential source is you have to have access to the person or to the information. So often these types of individuals would have access or be able to purchase narcotics from a particular individual that law enforcement is interested in purchasing drugs from.
Q Okay. So, do you use just anybody as a confidential source?
A No.
Q Do you put them through some sort of background check?
A Yes. A criminal history check is conducted on any potential confidential source.
Q Okay. And what makes someone other than access to a drug dealer or drugs, what makes them a good confidential source?
A They have to be willing to be a confidential source, and they have to be willing to provide truthful information to law enforcement.
Q You ever force someone to be a confidential source?
A No.
Q And what type of ongoing supervision do you provide when

you're dealing with confidential sources?

A When dealing with confidential services, the agent, law enforcement will periodically meet with the confidential source. They'll also periodically conduct criminal background checks on the confidential source. And the confidential source also receives various advisements from law enforcement such as that they are doing this willingly, they are not an employee of the United States Government.

They are not to inflict any harm against any individual unless it's in self-defense. They are not to take any action on their own outside of what the law enforcement officer is instructing them to do as a confidential source.

Q Is it fair to say it's a tightly controlled process?

A Yes.

Q Okay. Now are the sources ever paid?

A Yes.

Q And why would they be paid?

A The source is compensated for expenses associated with what law enforcement is asking them to do. So, for instance, if law enforcement's asking a confidential source to make a telephone call to a particular individual, they might be compensated for the portion of their telephone bill. Also, they could be compensated similarly to if you go to work, you get compensated for the work you do. They are compensated -- they can be compensated for their time spent working as a confidential

source.

Q Okay. And in this case did the FBI and the DEA use confidential sources?

A Yes.

Q Now you talked about the confidential sources being used for controlled drug buys, and I want to talk about the controlled drug buys. What is it? What is a controlled drug by or an undercover police sting?

A A controlled drug by is when the government has, or law enforcement has a sense of control of the particular buy. And what I mean by that is the confidential source is briefed on -- given a set of instructions on what law enforcement would like the confidential source should do.

They are searched for contraband, so they're searched for drugs or money before they would go to make a purchase of narcotics. They would be given a set of money by law enforcement along with the instructions. And then they would be provided with either an audio or an audio video recording device in order to capture the purchase of narcotics on audio and/or video.

Q Okay. Then after the purchase, what would happen?

A The confidential source would again meet with law enforcement, and they would provide any drugs or any remaining money to law enforcement, and they would also again be searched to make sure they didn't have any drugs or money on their person, and then they would be debriefed. So, they would talk to law

enforcement about what occurred during the purchase.
Q Okay. And Agent Cardone, have you received training in this area?
A Yes.
Q And have you personally been involved in controlled drug buys with confidential sources?
A Yes.
Q And are there any dangers involved in these controlled drug buys?
A Yes.
Q Can you describe those?
A As I previously mentioned, it could be dangerous for the source depending on from whom they're buying drugs. If this person is a violent individual, if they have to meet them in an area where there might be other violent individuals. It's also a concern for the source to make sure that their identity as a source isn't revealed to the particular individual from whom they're purchasing drugs.
Q You talked about the audio video recording equipment. Is that equipment that's hidden on the confidential sources' body?
A Yes.
Q And does that equipment always work?
A No.
Q Can you describe simulations where it doesn't work or why it wouldn't work?

A The audio video recording equipment is an electronic device. As you're probably familiar with, sometimes electronic devices fail. Sometimes the phone doesn't work. Sometimes, you know, an appliance in our home doesn't operate properly. To combat this, often times we would give the confidential source more than one recording device in case one of the devices failed.
Q Okay. And these audio video recording devices that we're talking about, are they big or they small?
A Typically small.
Q And why are they small? What's the reason that they're so small?
A They're small because they are intended to be concealed and for the target or the person from whom the confidential source is purchasing drugs, for them not to be able to tell that the confidential source is recording that interaction.
Q Okay. And these little cameras, do they always capture everything that's going on in and around these controlled drug buys?
A No.
Q Okay. And can you describe the audio video quality typically of these little cameras, these little recording devices that are hidden?
A The audio and video quality varies based on where the device is placed on the confidential source and how the confidential source is, I guess, which part of their body it's on and how that

particular part of their body is facing the target individual.
Also, any kind of background noise could be picked up. So, if the person is walking outside and it's windy outside, that could impact the resulting quality of the audio on the recording.
Q Okay. And in this case, did the FBI and DEA make controlled drug buys from Juan Jarmon and other in his group?
A Yes.
Q And moving on now you mentioned consensually recorded calls is another investigative tool that you've used in this investigation. So, do you have occasion to review a number of consensually recorded telephone calls?
A Yes.
Q And about how many of those consensually recorded telephone calls did you review?
A I reviewed over a thousand consensually recorded telephone calls.
Q Now are those calls when the parties have notice that the call may be recorded?
A Yes.
Q Now in drug trafficking investigations, have you learned how drug dealers communicate with one another?
A Yes.
Q Typically how do they communicate?
A They typically communicate by cellphone or in person.
Q Okay. Just like anybody else?

A Yes.
Q And when they use a telephone in your experience, how do they communicate?
A Oftentimes they communicate using slang or coded language in the event that someone such as law enforcement is listening to their conversations. They would like to seal the actual content of the conversation.
Q Okay. So, based on your training and experience in the dozens of drug trafficking investigations that you've done, are drug dealers paranoid about enforcement listening?
A They are concerned, yes.
Q Now based on your training and experience in these drug trafficking investigations, do drug dealers often use countersurveillance techniques?
A Yes.
Q And when I say countersurveillance techniques, what does that mean?
A A countersurveillance technique is a technique that someone would use to try to evade surveillance from law enforcement. For example, if I thought I was being followed by someone, maybe I'm going to drive around the block a couple of times to see if any particular car follows me around the block twice.
Q Okay. And why would drug dealers be performing countersurveillance or being concerned about this?
A They would be concerned if law enforcement might be

following them or monitoring their movement.
Q So next I want to show you, Agent Cardone, some of the photos of people that you identified in this investigation. Before coming here today, I'm referring to some of the Government exhibit numbers. Did you review photographs that were marked Government Exhibit 1 through 11?
(Government's Exhibit 1 to 11 marked for identification)
A Yes.
Q And based on your investigation and include your review of the wire calls, telephone calls, the controlled drug buys in this case, were you able to identify each of the people by their name and by their nickname on that list?
A Yes.
Q Okay.
MR. MAIATICO: Your Honor, at this point we ask that -- there's actually 12 exhibits. Exhibits numbered 1 through 12 including 2A, that they be admitted.
(Government's Exhibit 12 marked for identification)
THE COURT: Ms. Coggins?
MS. COGGINS: No objection, Your Honor.
THE COURT: Very well, they'll be admitted.
(Government's Exhibit 1 through 12 received)
MR. MAIATICO: All right.
BY MR. MAIATICO:
Q And Agent Cardone, I'm going to ask that Government Exhibit

Number one be published to the jury. So, Agent Cardone, is the photograph that's up there, Government Exhibit 1, do you recognize that individual?
A Yes.
Q And who is that?
A That is Juan Jarmon.
Q And were there any nicknames during the course of your investigation you determined that Juan Jarmon used?
A He used the nickname, Yizzo.
Q Okay. And was he also known as Waterboy Yizzo?
A Yes.
Q And do you see Juan Jarmon in court today?
A Yes.
Q And can you point him out please?
A Yes. He is the individual, he's the male individual sitting at Defense table wearing a white shirt and tie.
MR. MAIATICO: And for the record, Your Honor, Agent Cardone's identified the Defendant, Juan Jarmon.
THE COURT: Yes.
BY MR. MAIATICO:
Q Moving onto Government Exhibit Number 2. Do you recognize this individual?
A Yes.
Q And based on your investigation, who do you identify that as?

A This individual is Damon Edwards.
Q And what nickname did he go buy?
A He went by Booboo or Boo.
Q I'm going to ask that you take a look at Government Exhibit 2A. What is that a photograph of?
A That is a photograph of a tattoo located on Damon Edwards' arm.
Q And what does it say?
A It says, "Boo."
Q Government Exhibit Number 3, please. Who did you identify this photograph as?
A Edward Stinson.
Q Okay. And what nickname did Edward Stinson go by?
A E-Black.
Q Government Exhibit Number 4. Did you identify this individual during the course of your investigation?
A Yes.
Q And who is that?
A Rasheen Chandler.
Q And what was the nickname that Rasheen Chandler went by?
A Sheen.
Q Turning to Government Exhibit Number 5. Did you identify this individual during the course of your investigation?
A Yes.
Q And who is this?

A Dottie Good.
Q And what nicknames did she go by?
A Dot or Dreds.
Q Turn to Government Exhibit Number 6. Did you identify this individual?
A Yes.,
Q And who is that?
A Raheen Butler.
Q And what nicknames does Raheen Butler go by?
A Riddles or Ra-Ra.
Q Government Exhibit Number 7, do you recognize this individual?
A Yes.
Q And who did you identify that as?
A Michael Ferrell.
Q Did he go by Michael?
A He went by Mike.
Q Government Exhibit Number 8. Who'd you identify this person as?
A Taft Harris.
Q And what did he go by? What were his nicknames?
A Taf or Taz.
Q Government Exhibit Number 9. Did you identify this individual in the course of your investigation?
A Yes.

Q And who is this?
A Stephen Dawkins.
Q And what was his nickname?
A Diamond.
Q Government Exhibit Number 10, did you identify this individual?
A Yes.
Q And who is that?
A Derek Fernandez.
Q And what was his nickname?
A Rez.
Q And in the last photograph in the series, Government Exhibit Number 11, who'd you identify this person as?
A Anthony Staggers.
Q And what was his nickname?
A Ant.
Q Now I'm going to show you some additional photographs, Agent Cardone. Before I do I want to talk about how you attained these additional photographs. Did you obtain information from an Instagram account that you believe was associated with the Defendant, Juan Jarmon?
A Yes.
Q And how did you go about doing that?
A I wrote an affidavit establishing the probable cause or reason to believe that there would be evidence of particular

crimes contained on Juan Jarmon's Instagram account.

MS. COGGINS: I'm sorry, Your Honor, I'm having a difficult time hearing.

THE COURT: Perhaps you could move the mic a little closer or you could sit forward a little. Why don't you start your answer again?

MS. COGGINS: Thank, Your Honor.

BY MR. MAIATICO:

Q So Agent Cardone, I had asked how you obtained those records?

A Yes. And I was explaining that I had obtained them through a court order.

Q Okay. And these Instagram records, did Instagram provide those records to you?

A Yes.

Q The Instagram account that you got the records from, what was the account username that was being used?

A The account username was Yizzo_23. So Yizzo_23.

Q And based in your investigation, did you identify someone in this case that goes by that nickname, Yizzo?

A Yes.

Q And who was that?

A Juan Jarmon.

Q And I'm going to ask you on what street cuts through the center of the Blumberg Housing Projects?

A 23rd Street cuts through the middle of the Blumberg Housing Project.
Q Okay. So Yizzo_23, you got the Instagram records from that account.
A Yes.
Q Based on your investigation to include your review of the wire calls, the telephone calls a controlled drug buys in this case, were you able to identify certain photographs and the people in those photographs that came from Yizzo_23's Instagram account?
A Yes.
Q And before coming here today, did you review photographs that were marked Government Exhibits 501 to 504? And there's an exhibit list in front of you and book, if you could turn to those please.
(Government's Exhibit 501 to 504 marked for identification)
A Yes.
MR. MAIATICO: And, Your Honor, before admitting each of these photographs, the parties do have a stipulation.
THE COURT: Very well. The previous instruction I gave you about stipulations controls here. I'll repeat it again at the end of the case, but, if you don't remember, raise your hand, and I'll give it again. Okay. No one raised their hands. Go ahead.
MR. MAIATICO: And, Your Honor, I'll read that into the

record, and I'll be marking that Government Exhibit 505.

(Government's Exhibit 505 marked for identification)

THE COURT: Okay.

MR. MAIATICO: It's a stipulation regarding business records from a social media provider. It is hereby stipulated by between the United States in for the Eastern District of Pennsylvania and Jarome Maiatico and Yvonne Osirim, Assistant United States Attorney, Defendant Juan Jarmon and his attorney, that the following facts are true and correct and may be entered into the record of this trial of this case without further proof.

The government obtained records via Instagram for various accounts as part of its investigation in this case. These records include contact, personal identifying information, profile information, activity logs, photographs, videos, lists, messages and communications.

These records are true and correct copies and admissible at trial as business records. The information contained in these records was made out or near the time by and from information transmitted by someone with knowledge. The record was kept in the course of regularly conducted activity of the social media provided. The record was kept as a regular practice by the social media provider and records custodian from Instagram could testify to each of these conditions. Neither the sources nor the method or circumstances of preparation of these records indicate a lack of trustworthiness.

This stipulation and Government Exhibits 501 through 504 shall be received as exhibits at trial stipulated and agreed to and signed by all the parties.

THE COURT: So, stipulated?

MS. COGGINS: Yes, Your Honor.

THE COURT: Very well.

BY MR. MAIATICO:

Q So Agent Cardone --

MR. MAIATICO: Your Honor, I ask that Government Exhibits 501 through 504 be admitted and I would ask that they be published to the jury with that stipulation.

MS. COGGINS: No objection, Your Honor.

THE COURT: Very well. They will be admitted, and the jury may see them.

(Government's Exhibit 501 to 504 received)

BY MR. MAIATICO:

Q I'll start with Government Exhibit 501. I'd ask you Agent Cardon, is this a photograph from Yizzo_23's Instagram account from September 4th, 2013?

A Yes.

Q And who do you see in that photograph?

A Juan Jarmon is depicted in this photograph.

Q Okay. And where does he appear to be located?

A He appears to be located within the Norman Blumberg apartment complex.

Q And what makes you say that?
A It's consistent with what I've seen in the housing complex and what in the background appears to be behind the Norman Blumberg apartment complex.
Q Turning to Government Exhibit 502. Is this a photo from Yizzo_23's Instagram account September 9th, 2013?
A Yes.
Q And who is that in that photograph?
A Juan Jarmon is in this photograph.
Q Where does he appear to be located?
A He appears to be located in a hallway inside one of the towers in the Norman Blumberg apartment complex.
Q Turning to Government Exhibit 503. Is this a photo from Yizzo_23's Instagram account September 24th, 2013?
A Yes.
Q And can you identify the people in this photo?
A The individual in the left hand side of this photo is Damon Edwards, and the individual on the right hand side is Juan Jarmon.
Q And then turning to Government Exhibit 504. Is this a photo from Yizzo_23's Instagram account on October 1st, 2013?
A Yes.
Q And can you identify the people in this photo?
A The individual in the left of this photo is Raheen Butler, and the individual on the right is Juan Jarmon.

Q And the individual on the left, Raheen Butler, based on your investigation, what nickname did he go by?
A He went by Riddles or Ra-Ra.
Q Agent Cardone, after looking at all those photographs, will the jury hear some of these individual's names, some of those individuals voices on telephone calls obtained by law enforcement in this investigation?
A Yes.
Q Okay. I want to talk about some of those telephone calls. You mentioned the Title III calls, you mentioned the consensually recorded calls. Are all these calls recorded and saved by law enforcement?
A Yes.
Q Okay. And did the equipment used to record the calls, did it operate properly?
A Yes.
Q And were the recordings preserved?
A Yes.
Q And did you and other law enforcement officers help prepare transcripts of these recorded calls?
A Yes.
Q Did you review those?
A Yes.
Q And do the corresponding transcripts accurately represent the time, the date, and the conversations on those telephone

calls?
A Yes.
Q And did the transcripts properly identify the voices speaking?
A Yes.
Q Okay. Now I want to talk to you just briefly about how you identified the voices. How were you able to identify the different voices in this case?
A The voices identified in this case were identified by a variety of methods. Some of the phone calls, the parties would self-identify by their true name or a nickname. Others we received from maybe the phone number was provided during a controlled drug buy, the telephone number was provided to the source. In certain instances, the telephone user would be the listed user on the listed subscriber of the telephone. And other instances we might have received information from a cooperating witness.
Q Okay. And did you listen to Juan Jarmon's voice and other voices of people that called him on these wire intercept calls for several months?
A Yes.
Q Approximately how many calls do you believe that you listened to that included Juan Jarmon's voice?
A I would estimate hundreds of calls that included Juan Jarmon's voice.

Q And you mentioned that some of the speakers self-identified. Did Juan Jarmon identify himself in some of these calls?
A Yes.
Q Okay. I want to talk about another way that you're familiar with Juan Jarmon's voice. Did you interview Juan Jarmon during the course of the investigation in this case?
A Yes.
Q And was that interview conducted on February 21st, 2017?
A Yes.
Q During that interview, did you play one of the wire calls that was intercepted on his phone?
A Yes.
Q Did he appear to listen to that entire call?
A Yes.
Q And after listening to that call, what if anything did Juan Jarmon say?
A Juan Jarmon affirmed that that was his voice that he heard on the telephone call.
Q He recognized his voice on the call?
A Uh-huh.
Q And Agent Cardone, before coming here today, did you have the opportunity to review the audio recordings that are marked Government Exhibits 201 to 245A, as well as Government Exhibits 306G to 312A? I'll have you -- if you want to look at the Government exhibit list as well as the book in front of you.

(Government's Exhibit 201 to 245A marked for identification)

(Government's Exhibit 306G to 312A marked for identification)

A Yes.

Q Okay. And did you review not only the audio recordings, but the accompanying transcripts?

A Yes.

Q And are those 58 of the phone calls that law enforcement obtained during the course of this investigation?

A Yes.

MR. MAIATICO: Your Honor, at this time we would ask that Government Exhibits 201 to 245A and 306G to 312A be admitted and that we begin playing some of those calls to the jury.

THE COURT: Ms. Coggins?

MS. COGGINS: I'm sorry. It was 201 to 245A and then 301 to what?

MR. MAIATICO: 306G to 312A.

MS. COGGINS: Your Honor, may we approach very briefly?

(Sidebar begins at 12:26 p.m.)

THE COURT: Yes?

MS. COGGINS: I'd just request, Your Honor, an instruction with regard to the transcripts.

THE COURT: I was just about to give it.

MS. COGGINS: All right. Thank you.

(Sidebar ends at 12:26 p.m.)

THE COURT: Any objection?

MS. COGGINS: No, Your Honor.

(Government's Exhibit 201 to 245A received)

(Government's Exhibit 306G to 312A received)

THE COURT: Okay. Ladies and gentlemen, you're about to hear audio recordings that were received in evidence. You just heard them being received in evidence. And you will be given written transcripts of the recordings.

Keep in mind that the recordings are, excuse me. Keep in mind that the transcripts are not evidence. They are being given to you only as a guide to help you follow what is being said. The recordings themselves are the evidence.

If you notice any differences between what you hear in the recordings and what you read in the transcripts, you must rely on what you hear, not on what you read. And if you cannot hear or understand certain parts of the recordings, you must ignore the transcripts as far as those parts are concerned.

The transcripts name the speakers, but remember, you must decide who is actually speaking in the recording. The names on the transcripts are used simply for your convenience.

Mr. Maiatico.

BY MR. MAIATICO:

Q Agent Cardone, you said that you have reviewed these audio recordings and transcript before coming here today?

A Yes.

Q Just so we can let the jury know, are they going to listen to audio recordings of the calls, and will there be a rolling transcript that accompanies that call?
A Yes.
Q Okay. Before getting to the first call, I want to ask you about an individual that you previously identified by the name of E-Black or Edward Stinson. Was Edward Stinson away from the Blumberg Housing Projects during the time of this first call we're going to hear and for extended periods of time throughout 2012, 2013 and 2014?
A Yes.
Q Okay. Turning to Government Exhibit 201. In front of you, Agent Cardone, Government Exhibit 201A. Did law enforcement obtain a recorded call from October 3rd, 2012 at 8:48 p.m. that was relevant to this investigation?
A Yes.
Q And was this a consensually recorded call?
A Yes.
Q Who were the participants that you identified on this call?
A The participants were identified as Jamila Bellamy, Edward Stinson and Juan Jarmon.
Q Okay. And in the rolling transcript that we're going to see accompanying this audio of the telephone call, Jamila Bellamy, what is she represented as or what initials are used?
A JB.

Q And for Edward Stinson or E-Black, what are the initials that you're going to see on that transcript?
A ES.
Q And for Juan Jarmon or Yizzo, what are the initials you're going to see on that transcript?
A JJ.
Q Very briefly I want to just talk about some of the other abbreviations you might see on those transcripts when you were reviewing these and approving these transcripts, what does UI stand for?
A UI stands for unintelligible.
Q Sometimes you might see OV, what does that mean?
A OV means there was an overlapping voice, or two people were talking over each other.
Q Okay. And at times when either the language is unintelligible or there's an overlapping voice, does that happen frequently?
A Yes.
Q And for some of these 58 calls we're going to listen to, are we hearing the entire call or are we just hearing some of the relevant portions?
A We are only hearing some of the relevant portions of the call.
Q Okay. And in some calls we are going to hear the entire call; is that correct?

A Yes.
Q Okay. So, turning to then the October 3rd, 2012 call.
(Audio played at 12:30 p.m., ending at 12:35 p.m.)
BY MR. MAIATICO:
Q All right. Agent Cardone, I'm going to ask you to turn to the transcript that was prepared which is marked as Exhibit 201A.
MR. MAIATICO: If I could have that pulled up as well.
BY MR. MAIATICO:
Q I'm going to ask you some questions about this approximately five minute call. If you turn to the transcript one page 5 and the second line starts, "J.J., yeah." There's a sentence there it says, "But I said, I said if E-Black tell me to give you some PD, I'll give you some PD and you can just," did you identify the voice of the person that said that?
A Yes.
Q And who was that?
A That individual was Juan Jarmon.
Q Okay. And I'm going to talk to you a little bit about that term PD and also some other terms as well that you hear throughout this call and you're going to hear throughout some other calls.
Agent Cardone, during the course of this investigation, how many of these types of calls did you listen to, both consensually recorded calls or wiretap calls?
A Thousands.

Q Okay. And during these calls did you hear the term used, PD?
A Yes.
Q Okay. And did you conduct dozens of controlled buys in Blumberg --
A Yes.
Q -- that we talked about? And did you conduct witness interviews with people within Juan Jarmon's group?
A Yes.
Q And during the course of those interviews did you learn during the course of listening to those wire calls, did you learn the meaning of the word, PD?
A Yes.
Q So based on your exhaustive personal knowledge then of this investigation and the use of this term, I'm going to go over some other terms as well, what does PD mean in your opinion?
A PD is another term for crack cocaine.
Q Okay. And in your opinion I'm also going to ask you -- you're going to hear the term grinding. What does grinding mean?
A Grinding means to make money or specifically to make money selling crack cocaine.
Q Now in this particular call I believe that you heard the term bean. What does the term bean mean?
A Bean means a hundred dollars.
Q You talked about the term grinding. What about the term

trapping? In your opinion, what do you believe that term means based on your knowledge, personal knowledge of these terms?
A Tapping means to sell crack cocaine.
Q And the term yak, what do you understand that to mean? What's your opinion on that word?
A A yak is another term to reference a bundle of crack cocaine. And a bundle of crack cocaine would be a package, like a small baggie that might contain other tiny baggies that would be or other tiny packages that would contain a user amount of crack cocaine. So, when a customer would be coming to buy, the bundle would be multiple of those.
Q And finally the term stack. What do you understand the word stack to mean based on your opinion?
A A stack is a term used to reference a thousand dollars.
Q Okay.
THE COURT: Ladies and gentlemen, just so it's clear, you're free to accept the agent's opinion, and we'll have other opinion testimony before the trial is over. You're free as you are with all the evidence to accept all part or none of the evidence including the agent's opinion.
It's your determination in the end as to what these words mean, if anything that controls. The agent's opinion is another piece of evidence for you to consider in making your decision as to what those words actually mean.
BY MR. MAIATICO:

Q And moving on, on this particular transcript on page 5 about five lines down where ES begins, "Yizzo, the whole thing is." So, "Yizzo, the whole thing is, you can get this shit rolling. You can make all the money off the building right now like real shit like at late, you don't get nobody for the late night nothing, do you?"

Agent Cardone, did you identify the voice of the person who said that?

A Yes.

Q And who was that?

A That was Edward Stinson.

Q Otherwise known as E-Black?

A Yes.

Q Who was E-Black talking to?

A E-Black or Edward Stinson was talking to Juan Jarmon.

Q Okay. And on the next line what did Juan Jarmon respond to that?

A Juan Jarmon said, "He had three people back there already and that --"

Q If you could start with, "This shit poppin'." What else did Juan Jarmon say?

A Juan Jarmon said, "But if you want me to go right there and start something in there for you, so when you come home you can be all the more point man making that shit, something unintelligible, then let me know."

Q Okay. Moving on down that page about three quarters of the way down where JJ begins, "So what." He says, "So what? Where da go, on the 18th?" Do you recognize the voice of the individual who said that?

A Yes.

Q And can you tell us how many floors are on the inside of the Hemberger building?

A There are 18 floors on the inside of the Hemberger building.

Q And moving down to the last line on page 5 where Jarmon says, "Yeah, so, we so like, is the house up there we holler at somebody about or something?" What does -- who is he talking to when he asked that question?

A Juan Jarmon was talking to Edward Stinson.

Q And then moving onto page 6 at the top, what does Edward Stinson reply?

A Edward Stinson replies, "Yeah, Norma. Norma house. She only want a bean and shit like, and her rent fucked up right now too."

Q So in the course of your investigation, Agent Cardone, did you identify a woman named Norma who lived in one of the high rise buildings?

A Yes.

Q And we talked about her before. Who is that individual?

A Norma Mercado.

Q And where does she live?

A She lived in Apartment 1804 in the Hemberger building.
Q I'd like to move onto the next phone call, the next exhibit. We're going to jump ahead to Government Exhibit 243. Are you there on 243, Agent Cardone?
A Yes.
Q Okay. And did law enforcement intercept a call from August 31st, 2013 at approximately 4:36 p.m.?
A I believe that --
Q I'm sorry. 2:36 p.m. The military time threw me off.
A Yes.
Q And who are the participants of that call?
A The participants in this call were Juan Jarmon and Rasheen Chandler.
Q And approximately how long is this call that we're about to listen to?
A It is approximately 2 minutes in length.
MR. MAIATICO: Play Exhibit 243.
(Audio played at 12:43 p.m., ending at 12:45 p.m.)
BY MR. MAIATICO:
Q All right. Before we turn to the transcript, Agent Cardone, throughout this call was there an individual that was discussed, Riddles?
A Yes.
Q Okay. And I'd like to pull up Government Exhibit 504. And can you identify the people in that photograph?

A The people in this photograph on the left hand side are Raheen Butler who is also known as Riddles and Juan Jarmon on the -- Raheen Butler on the left hand side and Juan Jarmon on the right hand side.
Q Okay. Riddles and Yizzo?
A Correct.
Q Okay. Going back to the transcript then for that call 243A. On page two about halfway down starting RC, "He must have. He had to." So RC, "He must have. He had to do a nickel because he got the other 250 unless he passed it off to Mike. I'm about to ask Mike. Matter of fact, he had to. He had to pass it off to Mike."
Did you recognize the person who was saying that?
A Yes.
Q And whose voice was that?
A That is the voice of Rasheen Chandler.
Q And have you identified during the course of your investigation an individual named Mike?
A Yes.
Q And who is that?
A Michael Ferrell.
Q During this conversation, who is Rasheen Chandler speaking to, who's he talking to?
A Rasheen Chandler was speaking to Juan Jarmon.
Q Okay. And in response to what Rasheen said about passing it

off to Mike, what does Juan Jarmon respond?
A Juan Jarmon replies, "Yeah man. Last night, man, they fuck that money up last night, man."
Q Now moving down to the last -- page 2 of the last line. It goes on to page 3. Somebody says, "He had to find a lookout, then when I came up, you know, he was all proud and shit, man. All them motherfucking smokers out there. I don't know. I don't why Riddles tell me like I mean he want -- he wants the John, but he don't want to grind. I don't know."
Did you recognize the voice of the individual who made that statement?
A Yes.
Q And who was that?
A That was Juan Jarmon.
Q And based on your personal knowledge of these terms, what is your opinion as to what grind means?
A My opinion is that grind means to sell crack cocaine.
Q I'm moving onto Government Exhibit 202. Agent Cardone, did law enforcement intercept a call from August 31st, 2013 at 6:05 p.m.?
A Yes.
Q And this is a few hours after the previous call we just listened to?
A Yes.
Q And who are the participants on this call?

A Juan Jarmon and Rasheen Chandler.
Q Okay. And is this call approximately five minutes?
A Yes.

MR. MAIATICO: I'd ask that Government Exhibit 202 be played.

(Audio played at 12:49 p.m., ending at 12:54 p.m.)

THE COURT: Mr. Maiatico, before you have the agent review the transcript, perhaps this would be a good time to break for lunch.

MR. MAIATICO: Yes, Your Honor.

THE COURT: Okay. I get that often before I say anything. Music play. Ladies and gentlemen, keep an open mind and do not form any opinions or discuss this case or anything concerning it among yourselves or with others and do not permit them to discuss the case in your presence.

You'll be able to discuss the case after all the evidence has been presented, you've heard the final arguments of counsel, you've heard me give you my final instructions and you've retired the jury room for deliberations to reach a verdict.

Don't do any research or investigation on your own and did not read, listen to or view any news stories or internet information about the case, don't remove any exhibits from the courtroom, don't try to investigate the scenes that you're hearing about, the actual places. Don't text or Tweet or

Instagram or email or social network or write in any way about the case.

And if any of these things I mentioned should occur, please let Ms. Wittje know immediately. In addition, don't talk to the counsel or the parties or the witnesses or me on any subject other than to say hello. That's why we've given you your juror identification buttons.

As always, I thank you for your patience. I thank you for your attention. I'll see you back here so we can begin at 2:00.

THE BAILIFF: All rise.

(Jury out at 12:56 p.m.)

THE COURT: Please be seated. Anything anybody wants to put on the record?

MS. COGGINS: No, Your Honor.

MR. MAIATICO: Nothing from the Government, Your Honor.

THE COURT: How much longer just for an estimate do you think you'll have with this witness? If the first trial is any indication, it's probably be another hour or two at least.

MR. MAIATICO: I think at least another hour or two. We have approximately 53 more phone calls about two minutes each.

THE COURT: All right. Well, you may or may not get to cross-examine today, Ms. Coggins, and I think you can let your other witnesses go for the day. And my thanks to counsel to our Marshals.

MR. MAIATICO: Thank you, Judge.

(Recess at 12:57 p.m., recommencing at 2:10 p.m.)

THE COURT: One of the jurors told Ms. Wittje that she's having trouble understanding what's on the tapes, and I think that that's -- I've instructed them what to do. I don't think there's really anything we can do with that. I did want to make you aware of it.

Okay. Let's bring the jury in.

MS. COGGINS: Your Honor, I'm sorry. There's just one matter if we could discuss that before the jury comes in.

THE COURT: Yes.

MS. COGGINS: Mr. Maiatico is going to bring up -- where is it now, 205B, one of his exhibits in the case and it was actually thrown in the middle of this, I didn't see it. But it's something that I would object to on the basis of relevance.

THE COURT: Let me see if I can -- 205?

MS. COGGINS: 205B.

THE COURT: 205B. A New York Times article?

MS. COGGINS: Yes, Your Honor.

MR. MAIATICO: And, Your Honor, if I may, I can proffer the testimony of Agent Cardone. So, there's a transcript where the Defendant mentions about not using phones anymore because of, "The shit in the papers." I propose to ask Agent Cardone in and around that time was there a headline or was there information in the papers that related to the use of phones by drug dealers.

It was contemporaneously recorded, that fact, in the summary of that particular call when she put that together or law enforcement put it together in the wire room.

I propose to ask that question, this is just supporting --

THE COURT: You're going to show them this article?

MR. MAIATICO: Well, what I can do, Your Honor, is it's a self-authenticating newspaper article, but I could just reference the headline and not admit the Government exhibit.

The front page news article in the New York Times that was picked up nationally and Agent Cardone is aware of the fact that --

THE COURT: Ms. Coggins, would you object to if the jury doesn't see this? That Mr. Maiatico simply says to the agent, was there in fact a prominent newspaper story at the time upon this subject?

MS. COGGINS: Your Honor, first of all, the phone call is the day after. And what it says in the phone call is, "Did you see that in the paper this morning?"

So, the newspaper article that they're attempting to put in was from the day before, it wasn't from that morning. And to my knowledge, my client is not a subscriber of the New York Times.

THE COURT: No, but it could have easily been picked, although you haven't done the research, and if he just says

around that time was there an article about -- I honestly don't think it matters one way or the other, so I'm just going to keep it out. You can certainly play the tape, but you're not going to show the article or make any reference to it.

MR. MAIATICO: Not ask the question?

THE COURT: No. Don't ask the question.

MS. COGGINS: Thank, Your Honor.

MR. MAIATICO: Understood, Your Honor.

THE COURT: Bring the jury in. Agent, you're still under oath.

THE WITNESS: Yes, sir.

THE BAILIFF: Please stand for the jury.

(Jury in at 2:14 p.m.)

THE COURT: Welcome back, please be seated. Mr. Maiatico.

BY MR. MAIATICO:

Q Agent Cardone, where we left off before the lunch break was with Government Exhibit 202. We had just listened to an audio recording.

I'm going to ask you to turn to Government Exhibit 202A which is the transcript of that recording. And Agent Cardone, on page 2 about a third of the way down there's a statement made by RC that begins with, "Cuz, I didn't know." It says, "Cuz, I didn't know what you want me to do. You, shit. You -- I depend on you, so I'm like what's up?" Who made that statement?

A Rasheen Chandler made that statement.
Q And who was he talking to when he said that?
A He was speaking to Juan Jarmon.
Q Turning to page 3 about a quarter of the way down there's a statement by JJ that begins, "That shit fucked us up." So, "That shit fucked us up because if I knew that, I wouldn't even did the shit I did. I went out. I would be up there. I don't give a fuck. Fuck about going out. I want to make money, dawg." Did you recognize the person on that call who made that statement?
A Yes.
Q And whose voice was that?
A Juan Jarmon's voice.
Q And finally, turning to page 4 just over halfway down. It begins, JJ, "That shit's wrong, man." And again, the words on the call, "That shit's wrong, man, because it's like what the fuck, I didn't have to. I didn't have to cut it, unintelligible. I could have gave the B-word something and made her still grind."
Did you recognize the person who made that statement on the audio call?
A Yes.
Q And who was that?
A That was Juan Jarmon.
Q Agent Cardon, turning to the next Government Exhibit, that's the audio call 203. Now did law enforcement intercept a call on September 1st, 2013 at approximately 7:56 p.m.?

A Yes.
Q And was this a call that was relevant to the investigation?
A Yes.
Q And who are the participants of that call?
A The participants were Juan Jarmon and Rasheen Chandler.
Q Okay. And approximately how long was this call?
A It is approximately 37 seconds long.

MR. MAIATICO: I would ask that Government Exhibit 203 the audio call be played.

(Audio played at 2:18 p.m., ending at 2:18 p.m.)

BY MR. MAIATICO:

Q Agent Cardone, there's a reference there to an individual named Ant. I'd like to pull up Government Exhibit Number 11. And do you recognize the person in that photograph?
A Yes.
Q And did you previously identify as Anthony Staggers?
A Yes.
Q And what's that person's nickname?
A His nickname is Ant.
Q I'm going to turn to Government Exhibit 204 of the audio call. Did law enforcement intercept a call on September 2nd, 2013 at approximately 3:58 p.m.?
A Yes.
Q And what was the approximate duration of that call?
A The approximate length was 4 minutes and 20 seconds.

Q And did you identify the voices on that call, the participants?
A Yes.
Q And who are they?
A Juan Jarmon and Rasheen Chandler.
MR. MAIATICO: I would ask that Government Exhibit 204 be played.
(Audio played at 2:19 p.m., ending at 2:24 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, turning to Government Exhibit 204A in the transcript on page 2, about halfway down where Juan Jarmon, JJ, starts, "This is my." Statement, "This is my, fucking, this is my little -- this is like my cousin dawg, I don't put like just like I wouldn't want you to grind with no lookout dawg, like."
Agent Cardone, did you recognize the voice of the individual who made that statement?
A Yes.
Q And based on your personal knowledge of this investigation, what do you believe the word grind means?
A I believe the word grind means to sell crack cocaine.
Q Moving on a couple lines down where Juan Jarmon starts, "Like, I don't want nobody." "Like, I don't want nobody to not on our clock, dawg, like not on our time. Like, that's our unintelligible, like it's different. We different from other motherfuckers, man. We need somebody to be out there all the

time."

Who's making that statement in that audio recording, Agent Cardone?

A Juan Jarmon is making that statement.

Q And who is he talking to?

A He is talking to Rasheen Chandler.

Q And moving onto page 4 at the bottom. The last line starts with, JJ, "Yeah." "Yeah, I said you're going to have to wait, just give me a couple. I said I'm going to give you another chance, but you gotta wait. Well, how the fuck that shit come back 230, 227, I'm confused."

Who's making that statement, Agent Cardone?

A Juan Jarmon is making that statement.

Q And is he speaking to the unidentified male?

A Yes.

Q Moving onto the next call, Government Exhibit 205. Agent Cardone, on September 3rd, 2013 at approximately 6:52 p.m. did law enforcement intercept an audio call that was relevant to this investigation?

A Yes.

Q And who were the participants of that call?

A Juan Jarmon and Raheen Butler.

Q And again, what was Raheen Butler's nickname?

A Riddles or Ra-Ra.

Q And what's the duration of this call?

A It is approximately 1 minute and 28 seconds.

MR. MAIATICO: Okay. If you could play Government Exhibit 205, please.

(Audio played at 3:26 p.m., ending at 3:28 p.m.)

BY MR. MAIATICO:

Q All right. Moving onto audio call 206. Agent Cardone, did law enforcement intercept a call on September 6th, 2013 at approximately 2:11 p.m.?

A Yes, but it was at approximately 1:11 p.m.

Q I'm sorry. The military time got me again. At approximately 1:11 p.m. What was the duration of that call?

A It was approximately 48 seconds.

Q And who were the participants of that call?

A The participants were Juan Jarmon and Mike Ferrell.

Q And you had previously identified a photo, Government Exhibit Number 7, if we can pull that up. And who is that?

A That is Mike Ferrell.

MR. MAIATICO: If you could begin to play Government Exhibit 206, please?

(Audio played at 2:29 p.m., ending at 2:30 p.m.)

BY MR. MAIATICO:

Q And moving onto 206A, the transcript of that audio call on page 2. Juan Jarmon says, "When he came up this morning, was they in the booth?" Go to that call, who was Juan Jarmon talking to, Agent Cardone?

A He was talking to Mike Ferrell.
Q And what did Mike Ferrell respond when asked, were they in the booth?
A He responded, "Who? The cops?"
Q Does Juan Jarmon respond to that?
A Yes. He says, "Yeah."
Q And then Mike Ferrell responds what?
A "Yeah, they was in there."
Q Now we talked before about a security booth. Is there a security booth at the floor of the Hemberger building?
A There is a security booth outside of the Hemberger building.
Q Okay. Is that right in front of the front of the building?
A Yes.
Q And who is it that sits inside of those booths?
A It was either the Housing Authority Police or a contracted security company.
Q Moving onto Government Exhibit 207. And did law enforcement intercept a call that was relevant to this investigation on September 7th, 2013 at 11:26 a.m.?
A Yes.
Q And who were the participants that you identify in this call?
A The participants were identified as Juan Jarmon and Dwayne Fountain.
Q And approximately how long is this audio call?

A It is approximately 2 minutes and 29 seconds.

MR. MAIATICO: If we could play 207, please.

(Audio played at 2:31 p.m., ending at 2:34 p.m.)

BY MR. MAIATICO:

Q Agent Cardone, in the course of your investigation, did you identify that phone number that was just referenced?

A Yes.

Q And whose phone number was that?

A That was a phone number used by Damon Edwards.

Q Is that Damon Edwards otherwise known as Boo?

A Yes.

Q And earlier on in that call if you can go to the transcripts on page 207A on page 2, just over halfway down where Juan Jarmon begins, "They took the security guard out." "So, they took the security guard out, you know what I mean, and put housing people in that John. Some stupid shit." Who is it that made that statement?

A Juan Jarmon made that statement.

Q And in late summer 2013 or somewhere around 2013 were there in fact changes in the staffing in the security booth?

A Yes.

Q And as you talked about before, what were those changes?

A They changed from having a contracted security firm conduct the security in the security booth to the Philadelphia Housing Authority Police Department conduct the security.

Q And that statement that they put housing people in that John, who was Juan Jarmon speaking to in that call?
A He was speaking to Dwayne Fountain.
Q And Dwayne Fountain responds, "Oh shit, I know that probably slows shit up." How does Juan Jarmon respond to that?
A Juan Jarmon says, "But nah, you know, I don't really want unintelligible, then that shit costs me more. That's all it is."
Q Moving onto Government Exhibit 208. On September 7, 2013 at approximately 5:35 p.m., did law enforcement intercept a call in the relevance of its investigation?
A Yes.
Q And who were the participants that were on that call?
A Juan Jarmon and Rasheen Chandler.
Q And approximately how long is this call?
A It is approximately 32 seconds long.
MR. MAIATICO: If you could play Government Exhibit 208.
(Audio played at 2:36 p.m., ending at 2:37 p.m.)
BY MR. MAIATICO:
Q Turning to Government Exhibit 208A, the transcript of that audio call. And right at the top where Juan Jarmon begins, "Look out," on page 2. There's a statement, "Look out, the porch real fast so I can show you my old head, he coming to get five for a dub. Told him, yeah. My old head." Who is that that's making that statement?

A Juan Jarmon.
Q And who is Juan Jarmon speaking to?
A Juan Jarmon was speaking to Rasheen Chandler.
Q And that phrase five for a dub. Based on your personal knowledge of the language that's used by this group, what do you believe dub means?
A In my opinion dub means $20.
Q So five for $20?
A Yes.
Q So moving onto Government Exhibit 209. Was there a telephone call that was intercepted by law enforcement on September 7th, 2013 at approximately 7:15 p.m.?
A Yes.
Q And who were the participants of that call?
A Juan Jarmon and Rasheen Chandler.
Q Is this a relatively short call?
A Yes.
Q How long?
A Approximately 18 seconds.
MR. MAIATICO: If you could please 209, please.
(Audio played at 2:38 p.m., ending at 2:38 p.m.)
BY MR. MAIATICO:
Q Moving onto Government Exhibit 210. Was there an audio call that was intercepted on September 8th, 2013 at approximately 4:32 p.m.?

A Yes.
Q And who were the participants of that call?
A Juan Jarmon and Rasheen Chandler.
Q And approximately how long is this call?
A 3 minutes and 44 seconds.
MR. MAIATICO: If you could play 210.
(Audio played at 2:39 p.m., ending at 2:42 p.m.)
BY MR. MAIATICO:
Q Turn to the transcript, Government Exhibit 210A, Agent Cardone. On page 2, three quarters of the way down, Juan Jarmon beginning, "Yeah, man." He mentions, "Yeah, man. Probably when you walked in Sharita house." During the course of this investigation, Agent Cardone, did you identify an individual named Sharita in the Hemberger building?
A Yes.
Q And who was that?
A That was Sharita Bailey.
Q And what floor did Sharita Bailey live?
A She lived on the 18th floor.
Q Turning to page 3 and just over halfway down where JJ, Juan Jarmon begins, "Yeah, he came straight back." "Yeah, he came straight back out here bitching, man. I'm sitting right here. I'm looking at towards the shit, you know, Ant right here and shit. All right, man, hold up. When he tell me, yo, he just got burnt. I'm like, man, fuck it. I'm about to go up there. I'm

thinking it's Meer Meer (phonetic) or somebody. I'm about -- I'm just going to beat the shit out of them."
Who is it that made that statement, Agent Cardone?
A Juan Jarmon.
Q And who was he speaking to?
A He was speaking to Rasheen Chandler.
Q And how did Rasheen Chandler respond?
A Rasheen Chandler said, "Right. Right. I got you like that, bro."
Q And then what did Juan Jarmon say in response to that?
A Juan Jarmon said, "That shit like, that shit like, you know what I mean, like motherfucker coming up, can't make money, coming on the floor then, that's disrespectful man. Right there on the elevator, shit like that and he doing it on the floor. Like come on, dawg. Shit drawn. Because he like, man, he like -- I'm the one who come to you. If you -- I fuck with you from back in the day, this, that and the third. That's just drawn."
Q And moving onto page 4, the third line Juan Jarmon begins, "I just seen Ant." So, "I just seen Ant. I'm about to call him ask him why he didn't call you." Who made that statement?
A Juan Jarmon.
Q And Ant, did you identify an individual who went by the name Ant during the course of this investigation?
A Yes.
Q Who was that?

A Anthony Staggers.
Q And two lines down referring to Ant, Juan Jarmon says, "Yeah man, well he got to start -- his check gotta start getting fucked up if he going to keep playing, man. I ain't trying to hear that shit."
Did you recognize the voice of the individual who said that?
A Yes.
Q And who was that?
A Juan Jarmon.
Q And then finally at the end of page 4, Juan Jarmon says, "I'm going to call this N-word, man. Yo, they both in the other booth. Our booth clear."
Now we talked about there being a security booth outside in the Hemberger building. Is there another security booth in Blumberg?
A Yes.
Q And where's that located?
A The other security booth was located in front of the Judson building.
Q And is that across the courtyard from the Hemberger building?
A Yes.
Q And is that often staffed by the security or police as well?
A Yes.
Q Turning to Government Exhibit 211 and the audio call. Was

there a telephone call that law enforcement intercepted on September 9th, 2013 at approximately 9:56 p.m.?

A Yes.

Q And who were the participants in this call?

A The participants were Juan Jarmon and Rasheen Chandler.

Q And approximately how long was this intercepted call?

A The call was approximately 1 minute and 52 seconds in length.

MR. MAIATICO: If we can play Government Exhibit 211, please.

(Audio played at 2:46 p.m., ending at 2:48 p.m.)

BY MR. MAIATICO:

Q Agent Cardone, turning to the transcript on Government Exhibit 211A for this call on page 2, the second line that begins, "Yeah, uh, this B-word going to tell the motherfuckers we sell drugs on the floor." Did you identify the voice of the person who said that?

A Yes.

Q And who was that?

A Juan Jarmon.

Q A few lines down and there's a statement, "I'm going to bring her up there. I'm going to make her beat Norma the fuck up." Who was it that made that statement?

A Juan Jarmon.

Q And again, have you identified an individual named Norma

during the course of this investigation?
A Yes.
Q And what was her full name?
A Her name is Norma Mercado.
Q And where did she live?
A She lived on the 18th floor in Apartment 1804 in the Hemberger building.
Q Moving down a few more lines where Juan Jarmon starts, "Oh, that's what -- Jay said that." And there's a statement, "And she was like, yeah, I'm rattin', I'm rattin', I'm rattin' and some goofy shit." Who is it that made that statement?
A Juan Jarmon.
Q Who was he speaking to at the time?
A He was speaking to Rasheen Chandler.
Q And how did Rasheen Chandler respond?
A He responded, "Hmm, the old one I seen, I seen because when I looked up at the porch, I see you came from the booth. When I seen her coming from the booth, I'm like, I was just looked at her and shit."
Q When I seen her coming from the booth. What type of booth is outside Hemberger?
A The security booth.
Q And who sits inside of them?
A Either contracted security group or the Philadelphia Housing Authority Police.

Q And finally on page 3 if we could highlight the rest of that section. There's a statement there, "I'm going to get six people to beat her the fuck up tonight. She getting her ass whooped tonight. I ain't playing." Did you recognize the voice of the person who made that statement?
A Yes.
Q And who was that?
A Juan Jarmon.
Q And after that there's a statement, "This is on the 18th floor." Who said that?
A Juan Jarmon.
Q Moving onto Government Exhibit 212. Did law enforcement intercept a call on September 10th, 2013 at approximately 12:44?
A Yes.
Q A.M.?
A Yes.
Q Who were the participants of that call?
A The participants were Juan Jarmon and Damon Edwards.
Q And approximately how long is this call?
A It is approximately 46 seconds.
MR. MAIATICO: If we could play Government Exhibit 212, please.
(Audio played at 2:51 p.m., ending at 2:52 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, did you again, identify the individuals that

were participants on that call?
A Yes.
Q And who were they?
A They were Juan Jarmon and Damon Edwards.
Q And if I could show you Government Exhibit 503. Is this a photograph that was posted to Yizzo_23, the Instagram account on September 24th, 2013?
A Yes.
Q Just about two weeks after that call?
A Yes.
Q And who are the individuals that are in that photograph?
A The individual on the left is Damon Edwards, and the individual on the right is Juan Jarmon.
Q The same participants of that call?
A Yes.
Q Moving onto Government Exhibit 213. Was there an audio recording that was intercepted by law enforcement on September 12th, 2013 at approximately 1:09?
A Yes.
Q A.M.?
A Yes.
Q And who were the participants in that call that you identified?
A They were Juan Jarmon and a Crystal Calonne (phonetic) --
Q And --

A -- and another individual only identified as Auntie.
Q All right. And was this approximately a 14 minute call?
A Yes.
Q And has this been redacted so that just about one minute of a pertinent part of that call?
A I believe so, yes.
MR. MAIATICO: If we could play Government Exhibit 213, please.
(Audio played at 2:54 p.m., ending at 2:55 p.m.)
BY MR. MAIATICO:
Q And turn to the transcript for 213, 213A. On page two of the transcript right at the beginning of the pertinent portion of this call, who is it that says, "That's my name, Waterboy Yizzo?"
A Juan Jarmon.
Q That's Juan Jarmon's voice that says that?
A Yes.
Q And about three quarters of the way down the page there's a statement beginning JJ, "18th floor in this building." "18th floor in this building. I said 18th floor in this building right here. We got something up there poppin' on the 18th floor in this building."
Whose voice is that that you hear in that call?
A Juan Jarmon.
Q And who was he talking to?
A He was talking to a person identified as auntie in the

background.
Q Moving onto Government Exhibit 214. Was there an audio call that was intercepted by law enforcement on September 12th, 2013 at approximately 5:52 p.m.?
A Yes.
Q And who were the participants in that call?
A The participants were Mike Ferrell and Juan Jarmon.
Q And is this call approximately 34 seconds long?
A Yes.
MR. MAIATICO: If you could play Government Exhibit 214.
(Audio played at 2:57 p.m., ending at 2:57 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, I'm showing you Government Exhibit Number 7, it's a photograph. Who is that?
A Mike Ferrell.
Q Is that the voice that you identified in that call that we just heard?
A Yes.
Q And if I can show you Government Exhibit 504. And again, who are the individuals that you identify in that photograph?
A On the left hand side is Raheen Butler, also known as Riddles or Ra-Ra and on the right hand side is Juan Jarmon.
Q Okay. And in that call Mike Ferrell you identified said, "I finished Ra Ra's joint off." Is this a photograph of Ra-Ra and

Juan?
A Yes.
Q Returning to Government Exhibit 215. On September 12th, 2013 approximately 6:34 p.m. did law enforcement incept a phone call that was relevant to this investigation?
A Yes.
Q And who are the participants that you were able to identify in this call?
A The participants were Juan Jarmon, and there was an unidentified female.
Q And approximately how long originally was this call?
A 13 minutes.
Q And has it been redacted to just play a short portion of it?
A Yes.
MR. MAIATICO: If you could play Government Exhibit 215.
(Audio played at 2:59 p.m., ending at 2:59 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, turning to Government Exhibit 215A the transcript of this call and on page 2 about halfway down beginning, JJ, "He's scared as shit." There's a statement, "You know I punched Norma." Who was it that made that statement?
A Juan Jarmon.
Q And you previously identified someone named Norma?
A Yes.

Q And what was her full name?
A Norma Mercado.
Q And where did she live?
A On the 18th floor in the Hemberger building.
Q And was this call that we just heard, how many days was this call after the one where Juan Jarmon says he's going to get Norma, "Beat the fuck up?"
A It wasn't long. I don't remember the exact date of the last -- the call that reference that.
Q Did we listen to a call on September 9th, 2013 that referenced Norma being beat the fuck up?
A Yes.
Q Okay. And was this call on September 12th, three days later?
A Yes.
Q Moving onto Government Exhibit 216. Did law enforcement intercept a call on September 13th, 2013 at approximately 8:49 a.m.?
A I believe it was at 12:08 a.m.?
Q 12:08 a.m.
A Yes.
Q Who were the participants in this call?
A Juan Jarmon and Rasheen Chandler.
Q And approximately how long is this call?
A 2 minutes and 11 seconds.

MR. MAIATICO: Can we play Government Exhibit 216, please?

(Audio played at 3:01 p.m., ending at 3:03 p.m.)

BY MR. MAIATICO:

Q Turn to Government Exhibit 216A, the transcript for this phone call. If you could look at page 2 about halfway down where Juan Jarmon begins, "Tell him. Tell him." "Tell him. Tell him. Just me like, man, Riddles, I be tired. As a matter of fact, I'm going to tell him when he comes up too. I'm going to tell him again though, man. But I'm just saying, he got to be here on time, dawg. This shits wrong."

Agent Cardone, who is it that makes that statement?

A Juan Jarmon.

Q And who is he talking to?

A Rasheen Chandler.

Q And how does Juan Jarmon respond to Rasheen Chandler after that?

A He says, "Then the look, then the lookout right here, he talking about he about to come right back. He about to do something, like come on man, I got to look out and everything dawg. Like, come on man, I'm going to tell him myself, man."

Q Moving onto page 3 discussing halfway down where Juan Jarmon begins, "Yeah, but damn. Come on dawg, you ain't got that certain you ain't got a lookout and not stay no extra time dawg because they not gettin' paid for it dawg. This shit fucked me

up. Damn. Boo Boo out here with me, but when Boo come on and Boo come back, we going to come up there. We going to talk to him together, like me and Boo man, fuck that and you're right there too." Who made that statement?
A Juan Jarmon.
Q And you identified an individual named Boo in this investigation we talked about before?
A Yes.
Q And who is that?
A Damon Edwards.
Q And if we could pull up a photograph of Government Exhibit 503. Is that Boo and Juan Jarmon?
A Yes.
Q Turning to Government Exhibit 217, an audio call from September 13th, 2013 at approximately 8:56 p.m. Did law enforcement intercept a call at that time?
A Yes.
Q And who are the participants on that call that you identified?
A They're Juan Jarmon and Taft Harris.
Q And approximately how long is the phone call?
A Approximately a minute.
MR. MAIATICO: If we could play that audio, 217 please.
(Audio played at 3:06 p.m., ending at 3:07 p.m.)
BY MR. MAIATICO:

Q Turning to Government Exhibit 217A, the transcript for that phone call. If you can look at page 2 and the third line down, there's a statement, "Once I've been trying to look for you man so you can do this late night, man."

Agent Cardone, do you identify the individual that made that statement?

A Yes.

Q And whose voice was that?

A Juan Jarmon's voice.

Q And who was he speaking to?

A He was speaking to Taft Harris.

Q And further down about halfway down the page where Juan Jarmon starts, "Yeah." "Yeah, I see you. Yeah, I see you call me earlier, I see though like, nine, nine and ten is, I going to need you to start price selling that shit by Sunday or something." Who is it that made that statement, Agent Cardone?

A Juan Jarmon.

Q And who is he speaking to?

A Taft Harris.

Q And if we could look at Government Exhibit 8. Is that a photograph of Taft Harris, Agent Cardone?

A Yes.

Q Turning to the audio call on Government Exhibit 218. On September 16th, 2013 at approximately 8:59 p.m., Agent Cardone, did law enforcement intercept a phone call?

A Yes.
Q And who were the participants of that phone call?
A Juan Jarmon and Rasheen Chandler.
Q And approximately how long is the duration of that call?
A 4 minutes and 44 seconds.

MR. MAIATICO: If you could play Government Exhibit 218 please.

(Audio played at 3:09 p.m., ending at 3:13 p.m.)

BY MR. MAIATICO:

Q All right. Agent Cardone, if you could turn to Government Exhibit 218A, the transcript for that phone call. I'd like to identify certain portions, I'd then ask you to identify the voices that you heard. Page 3 of the transcript about just over three quarters of the way down where Juan Jarmon starts, "No, he can get replaced." The statement, "No. He can get replaced. Other motherfuckers need couple dollars." Did you identify the voice of the person who made that statement?
A Yes.
Q And who was that?
A Juan Jarmon.
Q And turning the page 4 a couple lines down. JJ, "It ain't like," on the second line. JJ. "It ain't like we going to find somebody. What. All of N-words, keep trying to lookout every day." Could you identify the individual who made that statement?
A Yes.

Q And whose voice was that?
A Juan Jarmon's voice.
Q Turning to page five and just over halfway down. Juan Jarmon says, JJ, "Riddles shift, man. Riddles shift, man." Agent Cardone, did you identify the voice that made that statement?
A Yes.
Q And who was that?
A Juan Jarmon.
Q And have you identified the individual named Riddles --
A Yes.
Q -- through the course of this investigation? And who was that? What is his name?
A Raheen Butler.
Q Okay. Turning to page 6 at the top of page 6, the first line. Do you identify the voice in the first line?
A Yes.
Q And what did Juan Jarmon say?
A Juan Jarmon said, "About to be sad. Don't be able to give Sharita (phonetic) nothing because I'm about to take his dumb ass off the force."
Q And who is Juan Jarmon speaking to?
A Rasheen Chandler.
Q And a couple lines down it starts, JJ, "I should have. I should have taxed his ass another $40 for that nut shake he could

have caused me man." Who is it that made that statement?
A Juan Jarmon.
Q And then a couple of lines down, about five lines down from there, JJ, "I ain't even tax him. Ima tell him that too like, you know, I didn't tax you. I only taxed you for them hours late." Did you identify the individual who made that statement?
A Yes.
Q And who was that?
A Juan Jarmon.
Q Turn to Government Exhibit 219.
THE COURT: Mr. Maiatico, the jury's been sitting for a little over an hour. Why don't we give the jury its afternoon break?
MR. MAIATICO: Yes.
THE BAILIFF: All rise.
(Jury out at 3:17 p.m.)
THE COURT: Please be seated everyone. Mr. Maiatico, you may want to adjust the screen on my left a little so that it's back a little further and without blocking the jury's view of the agent. I'm not sure the jurors at the end can see that screen.
MR. MAIATICO: Yes, Your Honor. I will do that. Thank you.
(Recess at 3:18 p.m., recommencing at 3:34 p.m.)
THE CLERK: Court's in session.

THE COURT: Please be seated, everyone. Good afternoon. Can we bring the jury in? Agent Cardone, you're still under oath.

THE WITNESS: Yes, sir.

THE COURT: You have approximately 40 more of these riveting phone calls? Okay.

THE BAILIFF: Please stand for the jury.

(Jury in at 3:36 p.m.)

THE COURT: Welcome back, please be seated. Mr. Maiatico.

MR. MAIATICO: Thank you, Your Honor.

BY MR. MAIATICO:

Q Agent Cardone, we're going to move onto Government Exhibit 219. Did law enforcement intercept a call on September 18th, 2013 at approximately 8:16 p.m.?

A Yes.

Q And who did you identify as the participants of that phone call?

A The participants were Juan Jarmon and a female who was only identified as Ms. Pat.

Q And approximately how long was that phone call?

A 53 seconds.

MR. MAIATICO: If we could play Government Exhibit 219, please.

(Audio played at 3:37 p.m., ending at 3:38 p.m.)

BY MR. MAIATICO:
Q All right. Turn to Government Exhibit 219A, the transcript of that phone call. And just about five or six lines down from unidentified female, Ms. Pat says, "And, uhm." "And, uhm, the number is six. Now Juan, tell me please, is a real little and nasty? Because if they is, I don't want them."
Agent Cardon, who was Ms. Pat talking to during that call?
A She is talking to Juan Jarmon.
Q And what did Juan Jarmon respond to Ms. Pat when she said that?
A He said, "Uh-uh, uh-uh, Ms. Pat."
Q Okay. She says, "Are you going to see me?" What does he respond?
A Juan Jarmon responds, "Yeah, yeah, I'm right here. Just come on up. Call me when you get there."
Q All right. Turning to Government Exhibit 220, an audio call from September 19th, 2013 at approximately 7:18 p.m. Did law enforcement intercept a call then?
A Yes.
Q And who did you identify as the participants of this phone call?
A Rasheen Chandler and Juan Jarmon.
Q And what was the duration of the call?
A Approximately 40 seconds.

MR. MAIATICO: If we could please Government Exhibit 22, please.

(Audio played at 3:39 p.m., ending at 3:40 p.m.)

BY MR. MAIATICO:

Q And turning to Government Exhibit 228 of the transcript of that phone call. About three quarters of the way down, somebody says, "Oh, I got." "Oh, I got a bean left." Agent Cardone, did you identify the voice that said that?

A Yes.

Q And who was that?

A Rasheen Chandler.

Q And who was he talking to? Who was he giving that information to?

A Juan Jarmon.

Q And based on your exhaustive personal knowledge of the language used in this case, what's your opinion on what a bean means?

A My opinion as a bean means a hundred dollars.

Q Moving onto Government Exhibit 22. Agent Cardone, did law enforcement intercept a phone call September 19th, 2013?

A Yes.

Q And what time was that phone call?

A At approximately 9:12 p.m.

Q And who did you identify as the participants on that phone call?

A Excuse me. I mean 11:12 p.m.
Q All right. And who did you identify as the participants on that call?
A Rasheen Chandler and Juan Jarmon.
Q And what was the duration of that call?
A Approximately 27 seconds.
MR. MAIATICO: Okay. If we could play Government Exhibit 221, please.
(Audio played at 3:42 p.m., ending at 3:42 p.m.)
BY MR. MAIATICO:
Q Moving onto Government Exhibit 222. Did law enforcement intercept a call on September 20th, 2013 at approximately 7:02 p.m.? I'm sorry, approximately 5:02 p.m.?
A Yes.
Q And who did you identify as the participants of that call?
A Juan Jarmon and Rasheen Chandler.
Q And what was the approximate duration of that phone call?
A Approximately 2 minutes and 30 seconds.
MR. MAIATICO: If we could play Government Exhibit 222, please.
(Audio played at 3:43 p.m., ending at 3:45 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, if you could turn to Government Exhibit 222A, please. And on page 2 about a quarter of the way down where RC says, "I was in the doorway." "I was in the doorway talkin' to

Jamie real quick. I want to see Kima (phonetic) going to be my lookout."

Now who was it that said that?

A Rasheen Chandler.

Q And who is he speaking to?

A Juan Jarmon.

Q Did you identify an individual named Kima, we've heard that name a few times, during the course of your investigation?

A Yes.

Q Who do you believe that to me?

A I believe Kima is Shakima Sweet (phonetic).

Q And was she a resident in the Hemberger building?

A Yes.

Q And turning to page 3 of the transcript, at the top, the second line, RC says, "350, she came right a little bit right after Mike left." Who is a Rasheen Chandler updating there? Who's he speaking to?

A Juan Jarmon.

Q And then about halfway down the page Juan Jarmon says, "What's it looking like?" "What's it looking like? What's Mike look like today?" Who's asking that question?

A Juan Jarmon.

Q And who's he speaking to?

A Rasheen Chandler.

Q And what does Rasheen Chandler respond?

A Rasheen Chandler says, "Uh, he did 250."
Q Okay. Now moving onto Government Exhibit 223. Is there an audio call on September 21st, 2013?
A Yes.
Q That was intercepted by law enforcement. And what time is that call?
A It was intercepted at approximately 11:56 p.m.
Q And who'd you identify as the voices and the participants on that call?
A Juan Jarmon and Rasheen Chandler.
Q And approximately how long is that phone call?
A 47 seconds.
MR. MAIATICO: If we can play Government Exhibit 223, please.
(Audio played at 3:48 p.m., ending at 3:48 p.m.)
BY MR. MAIATICO:
Q If we could turn to the transcript, 223A, please, on page 2. Just about halfway down starting, "All right, well, damn." JJ. "All right, well." "All right, well, damn. All right. Well, let us know. Let us know when you get to the last one."
Agent Cardone, who is it that made that statement?
A Juan Jarmon made that statement.
Q And who is he talking to?
A Rasheen Chandler.
Q And how did Rasheen Chandler respond?

A He responded, "When I get low." And what did JJ respond to that?
A Juan Jarmon said, "Yeah, call Boo. Don't call me, man. Call Boo."
Q And did you identify the individual named Boo in this phone call?
A Yes.
Q And during the course of your investigation, who did you identify as Boo?
A Boo was identified as Damon Edwards.
Q Turn to Government Exhibit 224. Is there an audio call, an interception on September 22nd, 2013 at approximately 12:28 a.m.?
A Yes.
Q And did you identify the participants and the voices on that call?
A Yes.
Q Who was on that phone call?
A Juan Jarmon and Rasheen Chandler.
Q and approximately how long was the duration of this call?
A 2 minutes and 57 seconds.
MR. MAIATICO: If we could play Government Exhibit 224, please.
(Audio played at 3:50 p.m., ending at 3:53 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, turning to the transcript for this call,

224A. If we could just turn to page 4 and the top line. They're talking about a bean. "All right, yeah. All right. It's only a bean, but just try to calculate where you think that bean went and just let me know."

Who made that statement, Agent Cardone?

A Juan Jarmon.

Q And who was he speaking to?

A Rasheen Chandler.

Q And based on your knowledge and the language that's used by this group in this investigation, what do you understand a bean to mean?

A I understand a bean to mean a hundred dollars.

Q Moving onto Government Exhibit 244. Was there an audio call, telephone call that was intercepted on September 24th, 2013 at approximately 7:38 p.m.?

A Yes.

Q And who did you identify as the participants of this phone call?

A Juan Jarmon and Rasheen Chandler.

Q And approximately how long was the duration of this phone call?

A 49 seconds.

MR. MAIATICO: If we could play Government Exhibit 224, please.

MS. OSIRIM: I'm sorry, could you repeat the number?

MR. MAIATICO: 244.

MS. OSIRIM: Okay.

(Audio played at 3:54 p.m., ending at 3:54 p.m.)

BY MR. MAIATICO:

Q All right. Moving onto Government Exhibit 225. Now Agent Cardone, did law enforcement intercept a phone call on September 26th, 2013?

A Yes.

Q And approximately what time did they intercept that phone call?

A 9:48 p.m.

Q And who did you identify as the participants of that phone call?

A Juan Jarmon and Rasheen Chandler.

Q And what was the duration?

A Approximately 48 seconds.

MR. MAIATICO: If we could play Government Exhibit 225.

(Audio played at 3:55 p.m., ending at 3:56 p.m.)

BY MR. MAIATICO:

Q Turning to the transcript for this audio call on Government Exhibit 225A. And the fourth line down there's a statement that begins, "Yeah. Yeah, but." "Yeah, but the B-word didn't even deserve that, dawg. The B-word shut the shit down at 5:00. Man, everybody out here saying that we ran out at 5:00."

Agent Cardone, who is it that made that statement, do you

identify the voice?
A Yes. The statement was made by Juan Jarmon.
Q And who was he speaking to?
A Rasheen Chandler.
Q And a few lines down Rasheen Chandler mentions an individual by the nickname Diamond. He mentions, Diamond. I'm going to show you what's previously been admitted and marked, Government Exhibit 9. Do you recognize that individual?
A Yes.
Q And who is that?
A That individual is Stephen Dawkins, also known as Diamond.
Q Okay. And going back to the transcripts on page 2, when Chandler asks at the bottom, "Mmm, did Diamond get back out there yet?" What does Juan Jarmon respond?
A Juan Jarmon responds, "I'm out here with Reds. I'm sitting out front on the side with Reds and shit."
Q And during the course of your investigation did you identify an individual with the nickname, Reds?
A Yes.
Q I'm going to show you Government Exhibit 10 which has already been admitted. What's that individual's nickname?
A Reds.
Q And what's his name?
A Derek Fernandez.
Q Then moving onto Government Exhibit 226. Was there an audio

call that was intercepted by law enforcement on September 27th, 2013 at approximately 4:50 p.m.?
A Yes.
Q And who did you identify as the participants on that call?
A Juan Jarmon and Rasheen Chandler.
Q And what was the approximate duration of that phone call?
A 52 seconds.
MR. MAIATICO: If we could play Government Exhibit 226.
(Audio played at 3:59 p.m., ending at 4:00 p.m.)
BY MR. MAIATICO:
Q All right. If we could turn to the transcript for that audio call on 226, Government Exhibit 226A. Just about halfway down on page 2 where Chandler begins, "Yeah, I don't -- yeah, I don't." "Yeah, I don't -- what's up with Diamond? Damn, I need him. It's poppin', he drawn."
Agent Cardone, did you identify the voice that made that statement?
A Yes.
Q And who was that?
A That was Rasheen Chandler.
Q And who is he speaking to?
A Juan Jarmon.
Q And what did Juan Jarmon respond?
A Juan Jarmon responded, "He ain't, he ain't come out there? He said he called you and checked in."

Q All right. Turning to the audio call Government Exhibit 227. Did law enforcement intercept a telephone call on September 27th, 2013 at approximately 5:23 p.m.?
A Yes.
Q And did you identify the voices on that phone call?
A Yes.
Q And who were they?
A Juan Jarmon and Rasheen Chandler.
Q And what was the approximate duration of this phone call?
A 1 minute and 13 seconds.

MR. MAIATICO: If we could play Government Exhibit 227, please.

(Audio played at 4:01 p.m., ending at 4:02 p.m.)

BY MR. MAIATICO:
Q Now if we could turn to the transcript for this audio call, Government Exhibit 227A. And on page 2 of that transcript of the call we just heard, about half way down that starts JJ, "I just had this conversation." JJ, "I just had this conversation with like, you know what I mean, with everybody about this shit, ma'am. Like ain't nobody going to trap without no lookouts. So that mean I don't -- I'm not making no money."

Agent Cardone, did you identify the voice that made that statement?
A Yes.
Q Whose voice was it?

A Juan Jarmon.
Q And based on your knowledge of the language used in this investigation by this group, what do you understand the word trap to mean?
A I understand the word trap to mean sell crack cocaine.
Q Okay. And who is Juan Jarmon speaking to when he made that statement?
A Rasheen Chandler.
Q How did Rasheen Chandler respond?
A Rasheen Chandler said, "Thank you and you can only press your luck but so long."
Q And when Juan Jarmon responded, "But see, I got a start man on this tight time, like and all this shit. This shit going to have to stop. I'm going to have to grind myself because I'm not keep paying people for free, dawg."
Did you identify who made that statement?
A Yes.
Q Who was that?
A Juan Jarmon.
Q And who was he speaking to?
A Rasheen Chandler.
Q And how did Rasheen respond?
A Rasheen said, "Shit, maybe you. Luckily, might do a better job than, you know what I mean, you always have a consistent lookout, but it's hard, bro."

Q And moving onto the next phone call. Government Exhibit 228. On September 28th, 2013, did law enforcement intercept a phone call at approximately 12:16 a.m.?
A Yes.
Q And who were the participants in that phone call?
A Juan Jarmon and Rasheen Chandler.
Q And what was the duration of that call?
A Approximately 52 seconds.
MR. MAIATICO: And if we could play 228, please.
(Audio played at 4:05 p.m., ending at 4:05 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, turning to Government Exhibit 228A of the transcript of that phone call. If we could look at page 2 about halfway down where RC starts, "Yeah, um, I'm glad." RC says, "Yeah, um, I'm glad Reds staying out there, so I know the building protected."
Agent Cardone, did you identify the voice that made that statement?
A Yes.
Q And who is he speaking to?
A Rasheen Chandler was speaking to Juan Jarmon.
Q And how did Juan Jarmon respond?
A Juan Jarmon said, "Yeah, I know. Reds out here."
Q And moving onto Government Exhibit 229. On October 1st, 2013 at approximately 11:06 p.m., did law enforcement intercept a

telephone call?
A Yes.
Q And who were the participants on that phone call?
A They were Juan Jarmon and Rasheen Chandler.
Q And what was the approximate duration of that call?
A 27 seconds.
MR. MAIATICO: Okay. If we could play 229, please.
(Audio played at 4:07 p.m., ending at 4:07 p.m.)
BY MR. MAIATICO:
Q All right. If we could turn to the transcript for that audio call, 229A. And on page 2 about the third line there's a statement, "Yeah, housing'. I guess they sittin' in there. Me and Boo sittin' out here, Diamond's still right here, I'm sending people over there now."
Who made that statement?
A Juan Jarmon.
Q And does PHA, do they have a police department branch?
A Yes.
Q And their own police force?
A Yes.
Q And based on your knowledge of this investigation, how are they often referred to as?
A They're often referred to as housing.
Q Or housing police?
A Or housing police, yes.

Q So moving onto Government Exhibit 230. Agent Cardone, was there a telephone call that was intercepted on October 2nd, 2013 at approximately 8:46 p.m.?
A Yes.
Q And did you identify the participants in that phone call?
A Yes.
Q Who were they?
A They were Juan Jarmon and a male only identified as Reef (phonetic).
Q Okay. And what's the approximate duration of that call?
A 3 minutes and 16 seconds.
MR. MAIATICO: If we could play 230, please.
(Audio played at 4:09 p.m., ending at 4:11 p.m.)
MR. MAIATICO: Can we stop that phone call right there?
BY MR. MAIATICO:
Q Agent Cardone, I 'm going to show you the transcript marked Government Exhibit 230A. If I could point you to page 2 at the bottom, the last four lines, starting with JJ, "I ain't doing shit." "I ain't doing shit. I'm about to get in the lab and shit, man."
Did you identify the voice that made that statement?
A Yes.
Q And then two lines down, "Yeah, I'm about to get in the lab, though. Yeah." Did you identify the person that made that statement?

A Yes.
Q And who was it that made both of those statements?
A Juan Jarmon.
Q Moving onto Government Exhibit 231. Did law enforcement intercept a telephone call that was relative to this investigation October 5th, 2013?
A Yes.
Q And was that at approximately 1:42 a.m.?
A Yes.
Q And did you identify the individuals on that phone call?
A Yes.
Q Who were they?
A Juan Jarmon, an unidentified female and Taft Harris.
Q And approximately how long was this phone call?
A 34 seconds.
MR. MAIATICO: If we can play Government Exhibit 231, please.
(Audio played at 4:12 p.m., ending at 4:13 p.m.)
BY MR. MAIATICO:
Q Agent Cardone, there's an individual there that's identified as Taz. Did you identify that person by name?
A Yes.
Q Who was that?
A That individual is Taft Harris.
Q And if I could show you Government Exhibit 8. Who is that

individual in that photograph?
A That is Taft Harris.
Q Moving onto Government Exhibit 232. Did law enforcement intercept a phone call on October 15th, 2013 at approximately 11:47 p.m.?
A Yes.
Q And did you identify the individuals that were intercepted on that call?
A Yes.
Q What were their names?
A Juan Jarmon and Taft Harris.
Q Was the duration of this call approximately 3 minutes?
A Yes.
MR. MAIATICO: If we could play Government Exhibit 232.
(Audio played at 4:14 p.m., ending at 4:17 p.m.)
BY MR. MAIATICO:
Q Turning to the transcript of this telephone call, 232A. If you could look at page 2 at the bottom and about three quarters of the way down starting with JJ, "Listen." JJ, "Listen, this is how you gotta do this shit to make sure them N-words are out there. I'm going to tell you how you do it. Tell them N-words you ain't given them shit until the shifts over, man."
Agent Cardone, did you identify who made that statement?
A Yes.
Q And who was that?

A Juan Jarmon.
Q And who was he speaking to?
A Taft Harris.
Q And turning to page 3 of the transcript, just over halfway down starting JJ, "Yeah, but they going to turn that shit back on." "Yeah, but they going to turn that shit back on. That will be good. I'm trying to get this shit to pick up for you all so you can make more money, man. That's all. Once this shit pick back up, that shit would have you doin' what you was doin' on the first like nine to a stack a day and that shit going to pick up. Man, your checks going to pick up heavy as long as you don't miss no days. Your checks still look a little all right."
Agent Cardone, did you identify the person that said that?
A Yes.
Q Who was that?
A Juan Jarmon.
Q And who was he speaking to?
A Taft Harris.
Q And how did Taft Harris respond?
A Taft Harris said, "Right. I ain't missin' no more days, bottom line."
Q Moving onto a telephone call, Government Exhibit 233. Did law enforcement intercept a phone call on October 18th, 2013 at approximately 12:16 a.m.?
A Yes.

Q And did you identify the participants on that call?
A Yes.
Q And who were they?
A Juan Jarmon and Taft Harris.
Q And what was the approximate duration of this call?
A 1 minute and 22 seconds.
MR. MAIATICO: If we could play 233, please.
(Audio played at 4:19 p.m., ending at 4:20 p.m.)
BY MR. MAIATICO:
Q All right. Turning to Government Exhibit 233A, the transcript of that audio call. If we could start just about over halfway down it starts, JJ, "Just came to meet now, talkin' about it." Agent Cardone, this statement, "Just came to me now, talkin about it, yeah. Uh, yeah. Reds told us it went up. It's talkin' about -- Reds talkin' about $25. No, give that N-word a dub and but I'm about to tell you, why the fuck? That's why I was trying to catch you and told you. You them N-words keep trying to say you keep given up 190 and 200 and shit like that. Ima come up there and talk to you, you heard me?"
Who was it that said that, Agent Cardone?
A Juan Jarmon.
Q And who is he talking to?
A Taft Harris.
Q And what did Taft Harris say in response to that?
A Taft Harris said, "Yeah, I hear you."

Q And what did Juan Jarmon then direct him to do?
A Juan Jarmon said, "This, this look -- this what you do. Like every time before you leave just, you know what I mean, in front of him. Just count it in front of him, all right?"
Q Moving to Government Exhibit 234. Did law enforcement intercept a telephone call relevant to this investigation on October 23rd, 2013?
A Yes.
Q Is that at approximately 12:09 a.m.?
A Yes.
Q And who did you identify as the individuals on that phone call?
A Juan Jarmon, Rasheen Chandler and an individual only identified as Jay.
Q And what was the approximate duration of this call?
A 2 minutes and 28 seconds.
MR. MAIATICO: If you could play Government Exhibit 234, please.
(Audio played at 4:23 p.m., ending at 4:25 p.m.)
BY MR. MAIATICO:
Q And turning to the transcript for this telephone call, Government Exhibit 234A, on page 2. Just over halfway down starting with JJ, "Man, you can't pay." "Man, you can't pay that N-word if he ain't doin' nothing. 250 ain't nothin', man. What the fuck. And then the lookout like we only got what, one

somethin' out that shit?"

Agent Cardone, did you identify the individual who said that?

A Yes.

Q And whose voice was that?

A Juan Jarmon's voice.

Q And who was he speaking to?

A Rasheen Chandler.

Q Moving onto page 3 of the transcript just about a quarter of the way down starting JJ, "You gotta stay up." "You gotta stay up all night, Jay. Ain't no more fallin' asleep or none of that, dawg."

Did you identify who said that, Agent Cardone?

A Yes.

Q Who was that?

A Juan Jarmon.

Q And who was he speaking to?

A He was speaking to Jay.

Q Okay. How did Jay respond to that?

A Jay said, "I fall asleep at like 7:00 and that's when it was over."

Q And then after that, what did Juan Jarmon direct Jay to do?

A Juan Jarmon directed Jay to stay up and said that there was more money to be made.

Q Moving onto Government Exhibit 235.

THE COURT: Mr. Maiatico, it's just about 4:30. So we'll break for today. Ladies and gentlemen, you know to keep an open mind and not to discuss the case among yourselves or with others and not to let them discuss the case in your presence.

You know not to Tweet or text or email or write or Instagram or Facebook or social network or anything like that. You know not to do any investigation on your own as to anything involved with this case. You're not to read any news stories, I don't know if there are any. You're not to read any news stories, watch TV, listen to the radio or go on the internet for information about this case.

If any of these things, if anyone tries to talk to you about the case or anything like this occurs, you should advise Ms. Wittje immediately.

As always, I thank you for your patience, I thank you for your attention. I'll see you tomorrow morning so we can begin at 9:30.

THE BAILIFF: All rise.

(Jury out at 4:28 p.m.)

THE COURT: Okay. Please be seated, everybody. Mr. Maiatico, how many more of these intercepts are you going to have?

MR. MAIATICO: It's about 10 more calls with Agent Cardone for her testimony here.

THE COURT: And is that the end of her direct

testimony?

MR. MAIATICO: There are a few other matters that we'll be addressing with her, but that shouldn't take more than another five minutes. And then we also would be reserving the right to recall Agent Cardone for some controlled buys that she'll be introducing.

THE COURT: Okay. Then I guess you could be prepared to cross-examine tomorrow morning.

MS. COGGINS: Yes, Your Honor.

THE COURT: And you should have another witness ready for tomorrow morning. Is there anything anybody would like to put on the record?

MS. COGGINS: No, Your Honor.

MR. MAIATICO: No, Your Honor.

THE COURT: All right. My thanks to all counsel and to our marshals.

MR. MAIATICO: Thank you.

THE BAILIFF: All rise.

(Proceedings adjourned at 4:29 p.m.)

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: March 21, 2019

Jessica B. Cahill

Jessica B. Cahill, CER/CET-708